**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ASSOCIATION OF AMERICAN UNIVERSITIES,
1200 New York Ave NW, Suite 500
Washington, DC 20005

*Plaintiff,*

v.

U.S. DEPARTMENT OF EDUCATION,
400 Maryland Avenue, SW
Washington, DC 20202

LINDA McMAHON, in her official capacity as Secretary of Education,
400 Maryland Avenue, SW
Washington, DC 20202

U.S. DEPARTMENT OF STATE,
2201 C Street NW
Washington, DC 20520

*and*

MARCO RUBIO, in his official capacity as Secretary of State,
2201 C Street NW
Washington, DC 20520

*Defendants.*

Case No. 26-cv-3438

**COMPLAINT**

## INTRODUCTION

1. Tomorrow, October 2, 2026, the U.S. Department of Education ("Department of Education" or "ED") will publish, on a public website, the identities of all foreign donors to American universities—information it has collected over the past six years pursuant to express, repeated, written assurances across Administrations that it would never make them public. The

consequences will be immediate and irreversible. Some of those donors live or have family in countries where their support for American universities will invite persecution and even prosecution. Some donors made their gifts in reliance on that confidentiality. That is why today—and at every prior period—hostile foreign governments can only identify such donors through financial surveillance and painstaking investigation into these individuals' private philanthropic activity. But tomorrow, October 2, 2026, Defendants will do that work for them. This action thus seeks to vacate and enjoin ED's flagrantly unlawful decision to publish the identifying information of covered donors it previously collected (the "Publication Decision") and to enjoin agency action that will allow for such publication going forward. And because ED announced its decision to release this information just one week before the disclosure would happen, and confirmed last night that it will not extend the October 2 publication date any further, Plaintiff is simultaneously seeking a TRO, preliminary injunction, and stay to freeze the status quo before this irrevocable publication happens—when all the attendant harms would be permanently incurred—and prevent such unlawful disclosure in the future.

2. For nearly four decades, American universities have reported gifts received from foreign donors and contracts with foreign sources under Section 117 of the Higher Education Act. Under the specific, express statutory scheme Congress adopted to govern these reports, Congress obligated universities to report only the amount and country of origin for qualifying foreign gifts and contracts. Section 117, by its plain language, only requires universities that are themselves owned or controlled by foreign sources to report the identities of those sources to the government. Congress declined to require the disclosure of the identities of any other foreign donor or foreign contract counterparty—collectively, "covered donors."

3. In 2020, the Department of Education began requesting that universities also report the names and addresses of their covered donors. This Information Collection Request ("ICR") was in addition to the statutory mandate that universities report the amounts of gifts or contracts and their countries of origin, which universities had done for decades. At the time, ED, under the leadership of then-Secretary Betsy DeVos, expressly and repeatedly promised that the government would not publicly disclose covered donors' names. ED could hardly have been clearer: ED noted that while it must make some information public (*i.e.*, the aggregate amounts of foreign donations received), "[t]he Department does not consider the name and address it seeks under this information collection to be part of the disclosure report that must be made public under Section 117(e)" because "it is not information that Congress intended to be part of the public disclosure report." U.S. Dep't of Educ., *Foreign Gifts and Contract Disclosures: Summary of Public Comments with Responses* 4 (Feb. 10, 2020) ("2020 Comment Response") (attached as Ex. 15). When ED renewed its information collection request in 2023, it again "assure[d] submitting institutions" that it "will withhold the foreign source party's name and address (excepting country) from the public disclosure report." U.S. Dep't of Educ., *Foreign Gifts and Contract Disclosures: Summary of Public Comments with Responses* 2 (June 20, 2023) ("2023 Comment Response") (attached as Ex. 11).

4. In response to the Department of Education's request and in reliance on its express and repeated promises of confidentiality, universities and donors have, since 2020, submitted the requested details about their covered donors to the government. Although ED's request for covered donor names exceeded its statutory authority, universities have nonetheless elected to provide this information in the spirit of transparency and partnership. ED's repeated public promises that this information would be treated confidentially have been critical to the universities' own decisions

to cooperate with these requests. And universities have, in turn, promised their donors that their identities would not be made public. Indeed, many gifts over the last six years have been made in reliance on that promise of confidentiality.

5. On July 6, 2026, in a stunning reversal, the Department of Education announced—with mere days' notice—that it had made a decision to publish the names of American universities' covered donors on a public website, for all the world to see, without any regard for the damage to universities or danger to donors. The Publication Decision is not just about future donations—it is about donations that were already made over the past six years, during which time the government committed publicly and repeatedly *not* to publish donor names that it asked universities to provide. ED first told universities that it would break those promises in a three-paragraph "reminder" posted to a Federal Student Aid webpage, in which it disclosed that the government had made the final decision to "publish[] its next public report of foreign source reporting, including the names of all foreign sources from prior reporting cycles," and that it would begin doing so nine days later—on July 15, 2026. U.S. Dep't of Educ., Fed. Student Aid, Off. of Gen. Counsel, Elec. Announcement GENERAL-26-45, *Reminder: Reporting Deadline for Section 117 of the Higher Education Act of 1965* (July 6, 2026) ("July 6 Announcement") (attached as Ex. 4).

6. This seismic shift came with no warning. ED's "reminder" said that its Publication Decision was "[c]onsistent with previous public statements." *Id.* But the only previous statement ED had made about this July 15 publication was from just ten days earlier—buried on page 4 of a response to comments, and tucked away on the website of the Office of Management and Budget ("OMB") for changes to Information Collection Requests. *See* U.S. Dep't of Educ., *Foreign Gifts and Contract Disclosures: Summary of Public Comments with Responses* 4 (June 26, 2026) ("2026 Comment Response") (attached as Ex. 6). In other words, although ED had made its Publication

Decision by no later than June 26, 2026, it nevertheless waited until *nine days* before the proposed publication date to directly inform the regulated community about this sea change—a sea change that broke from consistent ED practice and that reflected an unambiguous repudiation of ED's own repeated written assurances—all while characterizing its missive as a mere "reminder."

7. On July 14, 2026, the eve of its announced publication date, ED announced that it would instead implement its final decision in two stages. First, on July 15, it would make a partial publication: rather than publishing the names of all covered donors, ED said it would publish only the names of 92 foreign entities that also appeared on other lists the U.S. government maintains. ED followed through, terming this now-public subset of foreign source identities the "Section 117 Entity of Concern Data." *Section 117 Foreign Gift and Contract Public Transparency Dashboard*, U.S. Dep't of Educ., https://www.foreignfundinghighered.gov/downloads (last visited Sept. 30, 2026) (attached as Ex. 1) ("Section 117 Dashboard"); Section 117 Entity of Concern Data (Feb. 23, 2026) (attached as Ex. 2). At the same time, ED announced that it would delay its publication of the identities of all other covered donors that universities had submitted since 2020—meaning that none of the remaining covered donors are an "entity of concern." U.S. Dep't of Educ., Fed. Student Aid, Off. of Gen. Counsel, Elec. Announcement GENERAL-26-45 (updated July 14, 2026) ("July 14 Update") (attached as Ex. 3). ED committed to not publish that information until July 29, 2026. It then deferred enforcement of the remainder of the Publication Decision repeatedly.

8. Then, on September 25, the Department of Education announced that it would be implementing the rest of its Publication Decision just one week later—on October 2, 2026. The Association of American Universities ("AAU") contacted the government seeking to delay the publication of the identities of remaining covered donors—all of whom donated under a regime

in which ED promised confidentiality repeatedly in writing, and none of whom fall within the Section 117 Entity of Concern Data—by just one week to allow orderly resolution of its claims challenging the unlawful disclosure. But last night, at 8:49 p.m., the Department of Justice replied that there would be no further extension of the publication date. *See* Email from U.S. Dep't of Just. to Counsel for AAU (Sept. 30, 2026) ("Sept. 30, 2026 Email") (attached as Ex. 17).

9. Defendants' decision to publish the identities of covered donors is unlawful many times over. At the outset, ED's decision to publish a blanket list of covered donor names exceeds its statutory authority. Section 117 requires institutions to file "disclosure report[s]" identifying the "aggregate dollar amount" of foreign gifts and contracts "attributable to a particular country," 20 U.S.C. § 1011f(a), (b)(1), and makes only those "disclosure reports" "public records open to inspection," *id.* § 1011f(e). Congress required the identity of a foreign source in just one specific circumstance: when the foreign source owns or controls the institution itself. *Id.* § 1011f(b)(3). Where Congress specifies the precise information to be published and excludes donor identities except in one narrow circumstance, an agency may not publish other donor information that it wishes Congress had swept in too. Indeed, ED itself has previously acknowledged that the statute does not require identities of other covered donors, admitting these covered donor names are "not information that Congress intended to be part of the public disclosure report." 2020 Comment Response, Ex. 15. ED was right then and is flouting the governing statutory restrictions now.

10. The Publication Decision is unlawful for myriad other reasons beyond the lack of statutory authorization. The Publication Decision also violates the U.S. Constitution: compelled submission and publication of donor identities burdens the First Amendment rights of universities and their supporters. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606–07 (2021). As a result, such disclosure must be narrowly tailored to a substantial governmental interest. *See id.* at

608. Yet ED has imposed a blanket decision to publish all the covered donor names it has received from all the universities, making no effort to tailor its public disclosure whatsoever. This is a First Amendment violation in its own right, and at the very least provides another reason not to construe the law to permit ED's blunderbuss release of sensitive donor information.

11. And there is much more. For one, the Publication Decision violates not only the governing statutes and the Constitution, but ED's own binding documents. Just as an agency may not violate its rules, an agency may not violate its own Information Collection Request when that ICR governed the relevant body of information. For another, an agency cannot act in an arbitrary and capricious manner, yet the unexplained reversal of six years of written promises—without acknowledging those commitments, weighing the reliance they induced, or addressing the safety of the donors now put at risk—is paradigmatically arbitrary and capricious under the Administrative Procedure Act ("APA"). Still more, the Publication Decision violates the Trade Secrets Act, 18 U.S.C. § 1905, the Freedom of Information Act ("FOIA"), and ED's own FOIA regulation, 34 C.F.R. § 5.11.

12. Publication of covered donor names would inflict immediate and irreversible harm, as courts have repeatedly recognized. Confidentiality, once lost, cannot be restored. Donors from around the world, identified by the federal government's own public online dashboard, would face exposure to retaliation and political persecution in their home countries. In some countries the danger is codified. Russia, for example, has made it a crime to finance American universities that it has blacklisted—including at least six AAU members or their programs. That will work harms to donors, and make it less likely that they will contribute to AAU's members or trust institutions' confidentiality commitments in the future. And those harms could never be undone—once the rest of the Publication Decision is implemented, donors' names would be exposed forever. Even if the

government is subsequently ordered to remove names, individuals—and foreign governments—will have downloaded, retained, and could republish them without recourse.

13. Nor does the Court need to take the universities' word on these harms alone: Until its recent about-face, ED itself acknowledged the risks of disclosing donor names, consistent with its many promises of confidentiality. In 2020, commenters warned ED that "disclosure of a donor's identity in certain instances could put the donor in danger of being harmed by violence." 2020 Comment Response, Ex. 15, at 4. ED did not deny the harms that would come from publication; it said instead that it was "confident that the Department would continue to focus on the safety of donors in religiously persecuted countries and the strong privacy implicated in their personally identifiable information." *Id.* Yet the Publication Decision reflects no similar consideration of the possibility that donors may be harmed—let alone a "focus" on that issue.

14. Consistent with the gravity of those risks, eighteen higher-education associations again this June warned that publication of the covered donors' identities "could have tragic, and even deadly, consequences for some foreign donors"—including for, among others, "a political dissident of a repressive government living abroad" whose family lies within that government's reach; "prominent foreign individuals advancing Westernizing (pro-democracy) causes"; donors "at risk of physical harm or kidnapping in countries where organized crime preys upon individuals for financial compensation"; and "donors to an institution with a religious mission who may be targeted for their support." Ltr. from Ted Mitchell, President, Am. Council on Educ., et al., to Carolyn Rose, U.S. Dep't of Educ., Comment on Docket No. ED-2026-SCC-1354, at 3 (June 15, 2026) ("ACE Letter") (attached as Ex. 8). That fell on deaf ears. Although ED recognized that it previously promised to "consider the safety of foreign donors and contractors in countries where religious persecution is known to occur and the privacy concerns implicated in their personally

identifiable information," 2026 Comment Response, Ex. 6, at 4, ED now declares that it is "making a change to the publication parameters"—without any true regard for those concerns. *Id.*

15. AAU thus brings this action on behalf of its members in part to enjoin Defendants' October 2 publication of the remaining covered donor identities—all of which were collected based on the Department of Education's many assurances of confidentiality—and to obtain swift temporary and preliminary relief before that disclosure becomes impossible to undo.

16. Further, to prevent all this harm from occurring again in the future, AAU brings this action to challenge the Department of Education's related, forward-looking decision to collect this information about covered donors without the promises of confidentiality it made in 2020. That final agency decision, the 2026 ICR, revises the ICR the Department of Education adopted in 2023, which continued the collection then-Secretary DeVos first established in 2020. The 2026 ICR seeks the same categories of donor information going forward, but instead of promising confidentiality, it now represents: "the Department intends to publish the contents of reports made by institutions to the fullest extent required by 20 U.S.C. § 1011f(e), including publication of details about specific counterparties, such as the counterparty's name." U.S. Dep't of Educ., *Supporting Statement for Paperwork Reduction Act Submission: Foreign Gifts and Contracts Disclosures* 5 (June 26, 2026) ("June 2026 Supporting Statement") (attached as Ex. 7). But collection of this information, let alone without any promise of confidentiality, is contrary to Section 117, the First Amendment, a series of other statutes, and the APA's prohibition on arbitrary and capricious decisionmaking. So AAU seeks both (i) immediate temporary relief to prevent Defendants from implementing the Publication Decision this week and thereby causing myriad immediate irreparable harms to its members and their donors, and also (ii) final relief from the

2026 ICR before the next statutory reporting date of January 31, 2027 to prevent this crisis from ever recurring.

## JURISDICTION AND VENUE

17. This action arises under the APA, 5 U.S.C. §§ 701–706; Section 117 of the Higher Education Act of 1965, 20 U.S.C. § 1011f; the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*; the Freedom of Information Act, 5 U.S.C. § 552; the Trade Secrets Act, 18 U.S.C. § 1905; and the First Amendment to the U.S. Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

18. This Court has authority to grant the relief requested under 5 U.S.C. §§ 705–706 and its inherent equitable powers.

19. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are two agencies of the United States and two officers of the United States acting in their official capacities and residing in this District; because a substantial part of the events giving rise to the claims occurred in this District, where the challenged decision was made and from which the planned publication will be carried out; and because Plaintiff resides in this District, where it maintains its principal place of business.

## PARTIES

20. Plaintiff Association of American Universities is a nonprofit association of 71 leading research universities in the United States and Canada, 69 of which are based in the United States. AAU is headquartered in Washington, D.C. Its members are public and private research universities dedicated to education, research, and innovation. AAU's mission includes advancing policies that sustain its members' ability to conduct research and education of the highest quality and advocating on their behalf regarding federal regulation of higher education.

21. AAU brings this action on behalf of its member institutions. AAU's members have standing to sue in their own right. They are "institution[s]" subject to Section 117's reporting requirements, 20 U.S.C. § 1011f(h)(4). All U.S.-based AAU members are currently reflected on Defendants' Section 117 Dashboard, www.foreignfundinghighered.gov, meaning its members have reported qualifying foreign gifts and contracts pursuant to Section 117. Since 2020, those members have reported the identities of their covered donors to ED in reliance on its express written assurances that the donor identities would not be made public. Many have designated reported transactions as confidential business information and exempt from disclosure using the mechanism ED previously provided for institutions to mark reported material as covered by FOIA Exemption 4. All of AAU's U.S.-based members are among the institutions whose donors' names Defendants will publish on October 2, 2026. Neither the claims asserted nor the relief requested requires the participation of individual members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

22. AAU's members may also assert the First Amendment rights of their donors. An organization facing compelled disclosure of its supporters' identities may invoke its donors' associational rights, including in a facial challenge. *See First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 187–90 (2026); *Ams. for Prosperity*, 594 U.S. at 615; *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459–63 (1958). Many of AAU's members' donors hold First Amendment rights of their own; indeed, Section 117 defines "foreign source" to include any "individual who is not a citizen or a national of the United States," 20 U.S.C. § 1011f(h)(2)(C), encompassing lawful permanent residents and other foreign nationals residing in the United States. AAU's members also assert their own associational and expressive rights; the First Amendment protects an institution's ability to associate with its supporters and to solicit their support. *See Ams.*

*for Prosperity*, 594 U.S. at 605–06, 618; *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798–801, 801 n.13 (1988). Members' donors face obvious obstacles to asserting their own rights: the injury they fear is public identification, and litigating in their own names would cause the very exposure they seek to avoid.

23. The Department of Education's announced publication threatens AAU's members and their donors with immediate harm. Specific AAU member institutions have covered donors who gave in reliance on the fact that their identities would not be made public and who would no longer be willing to give if their identities are disclosed. After all, donors from particular countries fear retribution and other harm against themselves, their families, and their property if their names are released. AAU's members expect that they could lose significant donor funding, with direct consequences for ongoing research programs, upon publication. Because that publication cannot be reversed, the harm from publication would be immediate and irrevocable.

24. Defendant U.S. Department of Education is an executive department of the U.S. government. ED administers Section 117's reporting regime through its office of Federal Student Aid ("FSA") and its Office of the General Counsel.

25. Defendant Linda McMahon is the Secretary of Education. She is sued in her official capacity.

26. Defendant U.S. Department of State is an executive department of the U.S. government. The State Department helps administer Section 117's reporting regime through an interagency agreement with ED. *See* Interagency Agreement Between U.S. Dep't of Educ. & U.S. Dep't of State at 4 (Feb. 20, 2026) (attached as Ex. 16). That agreement includes, among its stated purposes, the collection and publication of information covered by Section 117. *Id.*

27. Defendant Marco Rubio is the Secretary of State. He is sued in his official capacity.

## FACTUAL BACKGROUND

### A. Section 117's Reporting Scheme and Decades of Historical Practice

28. Section 117 of the Higher Education Act of 1965 requires institutions of higher education to file periodic disclosure reports about foreign funding. Congress specified exactly what those reports must contain, and it calibrated the disclosures to the nature of the foreign source:

> Whenever any institution is owned or controlled by a foreign source or receives a gift from or enters into a contract with a foreign source, the value of which is $250,000 or more, considered alone or in combination with all other gifts from or contracts with that foreign source within a calendar year, the institution shall file a disclosure report with the Secretary on January 31 or July 31, whichever is sooner.

20 U.S.C. § 1011f(a).

29. The statute is clear that these reports need not include names of foreign sources except where Congress clearly specified. For gifts from or contracts with "a foreign source other than a foreign government," the report must state "the aggregate dollar amount of such gifts and contracts attributable to a particular country." *Id.* § 1011f(b)(1). Congress further defined the country of attribution only as "the country of citizenship, or if unknown, the principal residence for a foreign source who is a natural person, and the country of incorporation, or if unknown, the principal place of business, for a foreign source which is a legal entity." *Id.* For any gifts from or contracts with a foreign government, Congress specified that the report must state "the aggregate amount of such gifts and contracts received from each foreign government." *Id.* § 1011f(b)(2). In other words, Congress required dollar amounts aggregated by country or by government—but not the identity of the particular foreign source.

30. There is a single statutory exception to this rule: where the institution "is owned or controlled by a foreign source." *Id.* § 1011f(b)(3). In that case, Congress required the institution's report to disclose "the identity of the foreign source, the date on which the foreign source assumed

ownership or control, and any changes in program or structure resulting from the change in ownership or control." *Id.* This exception also appears in the provision governing "restricted or conditional" gifts and contracts: For such gifts and contracts, Congress generally required amounts, dates, a description of the conditions or restrictions, and country-level attribution, *id.* § 1011f(c)(1), and only in the case of these "restricted or conditional" gifts from or contracts with foreign governments has Congress required that the disclosure include "the name of the foreign government," *id.* § 1011f(c)(2).

31. Congress included a public inspection command that makes clear that only the information in required reports, whose content Congress fixed in subsections (b) and (c), is to be made public: "All *disclosure reports required by this section* shall be public records open to inspection and copying during business hours." *Id.* § 1011f(e) (emphasis added). In other words, the information is deemed a public record, open to the public, only if the statute directly requires reporting that particular information.

32. The language of Section 117(e) mirrors FOIA's reading room provision, 5 U.S.C. § 552(a)(2), under which agencies must "make available for public inspection" specified categories of records without awaiting any request.

33. But Section 117(e) defines what must be made public; agencies possess no roving authority to enlarge the specific categories Congress enumerated, and FOIA's regular enumerated exemptions still continue to apply. And neither statute grants the Secretary of Education authority to publish information beyond the reporting required by the statutes.

34. Congress also specified the method of enforcement for noncompliance—civil judicial actions. "Whenever it appears that an institution has failed to comply" with Section 117, "a civil action may be brought by the Attorney General, at the request of the Secretary," to "compel

compliance," 20 U.S.C. § 1011f(f)(1), which could result in the institution paying "the full costs to the United States of obtaining compliance, including all associated costs of investigation and enforcement," *id.* § 1011f(f)(2). By contrast, nothing in the statute authorizes an agency to demand and publish information beyond what is directly required by Section 117.

**B. 2020 Collection: For Enforcement But Not For Public Disclosure**

35. For more than three decades after Section 117's reporting requirements were first enacted, institutions reported foreign funding to the Department of Education at the aggregate, country-attributed level the statute prescribes.[1] Anyone could learn from ED's published records that one university, for example, received gifts of $1,067,000 and $320,000 attributed to "Ireland" and $288,247 attributed to "England" in 2016. *See* U.S. Dep't Educ., *Section 117 Foreign Gift and Contract Public Transparency Dashboard*, https://www.foreignfundinghighered.gov/downloads (link for "Section 117 Data—September 23, 2020") (last visited Sept. 30, 2026) ("Section 117 Dashboard: 9/23/20 Data"). When ED had reason to question the accuracy or completeness of a particular institution's reports, it could and did seek underlying information about foreign gifts and contracts from that institution directly, through targeted investigative records requests.

36. In 2019, the Department of Education—under the leadership of then-Secretary DeVos—proposed a new Information Collection Request to obtain more granular information from every reporting institution about every reportable foreign source of a gift or a contract. *See* Agency Information Collection Activities; Comment Request; Foreign Gifts and Contracts Disclosures, 84 Fed. Reg. 46,943 (Sept. 6, 2019) (Docket No. ED-2019-ICCD-0114) (60-day notice); Agency Information Collection Activities; Comment Request; Foreign Gifts and Contracts

[1] Section 117 in its current form dates to 1998, but Congress first enacted the reporting requirements in 1986 at 20 U.S.C. § 1145d. *See* Higher Education Amendments of 1986, Pub. L. No. 99-498, tit. XII, § 1206(a), 100 Stat. 1268, 1577.

Disclosures, 84 Fed. Reg. 68,911 (Dec. 17, 2019) (Docket No. ED-2019-ICCD-0154) (requesting emergency OMB review); Agency Information Collection Activities; Submission to the OMB for Review and Approval; Comment Request; Foreign Gifts and Contracts Disclosures, 85 Fed. Reg. 7,540 (Feb. 10, 2020) (Docket No. ED-2019-ICCD-0114) (30-day notice). OMB approved the new ICR in June 2020, under OMB Control No. 1801-0006.

37. The 2020 collection required, for the first time, that institutions report the names and addresses of individual foreign sources. Commenters objected that compelled identification of donors exceeded the Department of Education's explicit statutory authority and would endanger individuals. ED's answer was categorical: it needed the names for enforcement, not for the public record. ED thus made clear that it would *not* publicly disclose the additional information it was requesting, stating unambiguously, "The Department does not consider the name and address it seeks under this information collection to be part of the disclosure report that must be made public under Section 117(e)"; rather, "[t]he Department needs the name and address to support its enforcement activities and provide a basis for verifying institutions are disclosing information to the public as Congress directed, and it is not information that Congress intended to be part of the public disclosure report." 2020 Comment Response, Ex. 15, at 4.

38. The Department of Education repeated this promise in numerous other statements around this time:

a. ED's assurances began with the collection itself. In its 2020 Supporting Statement, in the section of the Paperwork Reduction Act submission in which an agency is required to describe "any assurance of confidentiality provided to respondents," ED stated, without qualification: "The Department will not make the names and addresses provided through this information collection request part of the publicly available disclosure report. Additionally, the

Department is required to withhold confidential business and financial information requested under the Freedom of Information Act pursuant to 5 U.S.C. 552(b)(4) and 34 CFR 5.11. We will strictly adhere to this prohibition." U.S. Dep't of Educ., *Supporting Statement for Paperwork Reduction Act Submission: Foreign Gifts and Contracts Disclosures* 5 (Apr. 13, 2020) ("2020 Supporting Statement") (attached as Ex. 14).

b. In its 2020 Comment Response issued after the sixty-day comment period for the 2020 collection, ED promised that it "will strictly adhere to this prohibition with regard to the names and addresses collected pursuant to Section 117," and that "Title 34 CFR §5.11(e), requires the Department to communicate with an institution as part of the FOIA process and we would follow those procedures in response to a FOIA request for non-public information submitted under Section 117." 2020 Comment Response, Ex. 15, at 3.

c. In the same comment response, ED stated publicly that it was "confident" that future Department officials would likewise prioritize the confidentiality of donors' identities. A commenter warned that a future administration might "take a different view of the confidential nature of the disclosure," and that disclosure "could put the donor in danger of being harmed by violence." *Id.* at 4. Tellingly, ED did not retort that Section 117 mandated, or even authorized, such disclosure. Instead, the Department of Education responded that it was "confident that the Department would continue to focus on the safety of donors in religiously persecuted countries and the strong privacy implicated in their personally identifiable information." *Id.*

39. ED's consistent practice matched its promises. Even after ED began collecting donor identities in June 2020, its public records disclosed only amounts and countries: they show, for example, that one university received a $1,000,000 gift attributed to "Hong Kong" on June 26, 2020, but not from whom. *See* Section 117 Dashboard: 9/23/20 Data.

40. Although many of AAU's members heard from their donors that they had concerns about identities being reported to the federal government, the universities complied on the basis of ED's assurances of confidentiality—assurances many, in turn, reported to their donors.

**C. The 2023 Collection: Express Written Assurances of Confidentiality**

41. In June 2023, the Department of Education renewed its 2020 ICR and transferred administration of Section 117 collection and compliance from its Office of General Counsel to its FSA section under a new control number, OMB Control No. 1845-0172, "with a few minimal changes." 91 Fed. Reg. at 39,089. ED again repeatedly and unambiguously assured institutions that donor names would remain confidential. ED's assurances came after AAU and other higher-education associations pressed their confidentiality concerns during the renewal, questioning the reporting of "names and addresses of anonymous gifts." Ltr. from Ted Mitchell, President, Am. Council on Educ., et al., to Manager of the Strategic Collections and Clearance Governance and Strategy Division, Federal Student Aid, U.S. Dep't of Educ., Comment on Docket No. ED-2022-SCC-0159, at 3 (Feb. 27, 2023) ("2023 Associations Comment") (attached as Ex. 13).

42. ED's 2023 Supporting Statement, in which the agency was instructed to "[d]escribe any assurance of confidentiality provided to respondents and the basis for the assurance in statute, regulation, or agency policy," responded: "The Department will not make the names and addresses provided through this information collection request part of the publicly available disclosure report, except as required by law. Additionally, the Department is required to withhold confidential business and financial information requested under the Freedom of Information Act pursuant to 5 U.S.C. § 552(b)(4) and 34 C.F.R. § 5.11. We will strictly adhere to this requirement." U.S. Dep't of Educ., Supporting Statement for Paperwork Reduction Act Submission: Foreign Gifts and

Contracts Disclosures 5 (Apr. 26, 2023) ("2023 Supporting Statement") (attached as Ex. 12). Again, ED did not suggest that Section 117 required disclosure of donor names and addresses.

43. Responding to public comments that even these protections were insufficient, the Department of Education went further: "As previously stated, the Department will not make the name and address part of the publicly available disclosure report. The Department assures submitting institutions that other than with respect to restricted gifts from and contracts with a foreign government, the Department will withhold the foreign source party's name and address (excepting country) from the public disclosure report to the extent permitted by law." 2023 Comment Response, Ex. 11, at 2. ED did not identify any source of law requiring disclosure.

44. The Department of Education also paired its 2023 assurances with an additional layer of potential protection: a mechanism for designating information protected by Exemption 4 of FOIA. "In the reporting portal, an institution will have the option to indicate whether it considers the name and address of a foreign source to be confidential and exempt from public disclosure pursuant to FOIA. ED is required to withhold confidential business and financial information requested under the Freedom of Information Act pursuant to 5 U.S.C. § 552(b)(4) and 34 C.F.R. § 5.11." *Id.* at 2. Indeed, that regulation, 34 C.F.R. § 5.11, provides submitters of confidential commercial information a specific process for designation of material as covered by Exemption 4, notice of a potential disclosure, an opportunity to object, agency consideration of the objection, and a reasoned written explanation before disclosure. ED pledged to adhere to those procedures before disclosing designated information. Although "[a]n institution's designation of information as exempt is not binding on the Department," ED noted that its regulations mandate that "whenever the Department has reason to believe that it may be required to disclose information designated as confidential business information, the Department will follow the procedures outlined in its

regulations for notifying the submitting institution and providing an opportunity to object to the disclosure. *See* 34 C.F.R. § 5.11." 2023 Comment Response, Ex. 11, at 2.

45. ED also defended collection of donor names against First Amendment objections by emphasizing the names would be seen by the government alone. When a commenter warned that "the risk of public disclosure of this information could potentially chill associational rights protected by the First Amendment," ED responded that it had "not observed any evidence that the disclosure of foreign donor names *to the Department* has resulted in actual or widespread burden on donors' or institutions' associational rights." *Id.* (emphasis added). ED's own justification for the collection of this information thus rested on the distinction between confidential disclosure to the government, on the one hand, and disclosure to the public, on the other.

46. Again, institutions relied on these assurances. From July 2023 through December 2025, universities filed thousands of Section 117 disclosure reports identifying covered donors by name through ED's portal. The Department of Education has acknowledged the scale of that compliance, observing that the most recent reporting period was "the second highest reporting period in history." 2026 Comment Response, Ex. 6, at 2. During this time, many institutions identified the qualifying transactions as exempt under the FOIA. *Id.* at 4. AAU's members are among the institutions that reported the identities of covered donors in reliance on ED's assurances and designated transactions as exempt under FOIA Exemption 4.

47. Donors relied on these promises too. AAU's members have informed AAU that for many covered donors, confidentiality was important to their gift giving. Without an assurance of confidentiality from public disclosure, some donors would not have given. So AAU's members communicated ED's assurances to donors, and donors continued to give in reliance on them.

**D. The 2025 Executive Order and the 2026 Proposed ICR Revision**

48. On April 23, 2025, the President issued Executive Order 14282, *Transparency Regarding Foreign Influence at American Universities*. Exec. Order No. 14282, 90 Fed. Reg. 17,541 (Apr. 23, 2025). The Order announced a policy "to end the secrecy surrounding foreign funds in American educational institutions," and directed the Secretary of Education to "take all appropriate actions to enforce the requirements of [S]ection [117]" including "to require complete and timely disclosure by higher education institutions of foreign funding." *Id.* §§ 1–2.

49. In January 2026, the Department of Education launched a new reporting portal, located at www.foreignfundinghighered.gov, together with a public-facing "Section 117 Foreign Gift and Contract Public Transparency Dashboard." In connection with the new portal, and without prior notice to institutions or any publicized rationale or opportunity for comment, ED removed from the reporting form the FOIA-designation checkbox. Commenters would later object, in the Department of Education's own summary, that "the elimination of the FOIA checkbox represents a significant change implemented in January without prior notification to institutions." 2026 Comment Response, Ex. 6, at 4; *see also* ACE Letter, Ex. 8, at 3 (objecting that "the department appeared to make this major change to the reporting portal in January, removing the ability to indicate that donors' names should remain private for privacy or proprietary concerns, without any public notice or indeed a notice to reporting institutions").

50. On April 15, 2026, just under a year after the President signed Executive Order 14282, ED published a 60-day notice proposing revisions to the 1845-0172 collection. Agency Information Collection Activities; Comment Request; Foreign Gifts and Contracts Disclosures, 91 Fed. Reg. 20,156 (Apr. 15, 2026) (Docket No. ED-2026-SCC-1354). The notice characterized the

proposal as "seeking renewal for substantially the same information collection, utilizing a new, more user-friendly portal located at https://www.foreignfundinghighered.gov." *Id.* at 20,157.

51. Despite this characterization, the April proposal to collect information under a new 2026 ICR differed from the existing ICR in three key ways. First, the 2026 ICR proposal indicated that while the Department of Education would continue to collect the identifying information of covered donors as it had since 2020, it would now choose to publish all that information pursuant to Section 117(e). U.S. Dep't of Educ., *Supporting Statement for Paperwork Reduction Act Submission, Foreign Gifts and Contracts Disclosures*, Docket No. ED-2026-SCC-1354, at Item 10 (Apr. 14, 2026) ("April 2026 Supporting Statement") (attached as Ex. 10). Second, ED proposed to eliminate the checkbox on the Section 117 disclosure form allowing institutions to designate information as exempt from mandatory public disclosure under FOIA, formalizing the change it had already made to its portal in January without notice. U.S. Dep't of Educ., Foreign Gifts and Contracts Disclosure Form (Tracked Changes), Docket No. ED-2026-SCC-1354, Document No. ED-2026-SCC-1354-0003, attach. 3, at 2, 4–6 (Apr. 14, 2026), https://downloads.regulations.gov/ED-2026-SCC-1354-0003/attachment_3.pdf. Third, ED proposed to require a new certification that would accompany each completed Section 117 disclosure form, pursuant to which the individual submitting the form would certify "to my institution's compliance" with Section 117. *Id.* at 8, 10.

52. Commenters, including AAU and other higher-education associations, objected that publication of donor names would repudiate ED's written assurances, exceed its authority under Section 117, endanger donors in countries where identification with an American university invites retaliation, chill lawful donations, and risk stripping institutions of the FOIA protections on which they had relied. *See* Ltr. from Kate Hudson, Deputy Vice President & Counsel for Gov't

Rels. & Pub. Pol'y, & Meredith Asbury, Assoc. Vice President for Gov't Rels. & Pub. Pol'y, Ass'n of Am. Univs., to Carolyn Rose, U.S. Dep't of Educ., Comment on Docket No. ED-2026-SCC-1354 (June 10, 2026) ("AAU 2026 Comment") (attached as Ex. 9); ACE Letter, Ex. 8.

53. AAU's comment warned that the 2026 ICR proposal "creates a real possibility that the Department could publish not only upcoming disclosures but historical data as well, effectively 'flipping a switch' to expose years of donor information with no notice, no opportunity for affected individuals to object, and no rulemaking process," and urged that "[a]t a minimum, the Department must make clear that any new disclosure policy would apply only prospectively." AAU 2026 Comment, Ex. 9, at 5. In other words, although the 2026 ICR proposal did not yet confirm whether its changes would apply to information already collected, AAU emphasized the special heightened concerns that would follow if publication was applied to prior university submissions of names.

54. The sixty-day comment period closed on June 15, 2026. On June 26, the Department of Education posted its responses to comments it had received, along with a revised supporting statement on OMB's website, making a single revision to the certification requirement. *See* 2026 Comment Response, Ex. 6; June 2026 Supporting Statement, Ex. 7. Three days later, on June 29, the Department of Education published its 30-day notice in the Federal Register. 91 Fed. Reg. at 39,088. As published, the notice invited comments "on or before June 29, 2026," the day the notice itself was published. *Id.* ED did not correct that error until July 6, 2026, when it released a correction resetting the comment deadline to July 29, or thirty days after the 2026 Comment Response was issued. *See* Foreign Gifts and Contracts Disclosures; Correction, 91 Fed. Reg. 40,991 (July 6, 2026) (Docket No. ED-2026-SCC-1354). For the first week of the 30-day comment period, the operative notice thus informed the public that the period had already closed.

**E. The Publication Decision: To Publish Previously Collected Donor Names**

55. On June 26, the Department of Education posted on an OMB website a Summary of Public Comments with Responses (the 2026 Comment Response), a technical document that responded to objections to the Department of Education's proposal that it publish the identities of covered donors it will collect going forward. In the 2026 Comment Response, ED revealed for the first time that it had made a final decision to publish the identities of covered donors it previously collected (the Publication Decision). ED acknowledged the commenters' safety objections and rejected them, baldly asserting that "the statutory inspection requirement outweighs countervailing confidentiality interests or FOIA-based objections." 2026 Comment Response, Ex. 6, at 4. It also dismissed commenters' concerns for the safety of donors in "countries of concern" on the ground that institutions had themselves decided to accept funding from donors in or from those countries, and suggested such reports "indicat[e] that institutional concerns about the safety and human rights of natural person donors in those countries is apparently not a compelling concern to institutions." *Id.* It announced: "Based on this balance and the additional community comments, the Department is making a change to the publication parameters. *The publication of counterparty names will occur on July 15, 2026*." *Id.* (emphasis added). Put differently, in response to comments on a 2026 proposal for a prospective ICR revision, ED decided to reverse its longstanding promise not to publish the information it had already collected for six years. The 2026 Comment Response at no time acknowledged the 2020 and 2023 assurances, addressed the reliance interests implicated by those assurances, or explained why information submitted under a promise of confidentiality may now be published retroactively. Nor did it explain how Section 117's text compels publication.

56. In the same document, ED stated that the scope of publication was a matter of its own discretion. Explaining that it would publish names but not addresses, ED stated that "[i]n

deference to the community's concerns about risk to individuals, the Department agrees as a policy matter that it will only publish the name of foreign sources of qualifying gifts and contracts and not the addresses (or similar personally identifiable information, "PII"), although the Department has the legal right to continue to collect and to disclose identities and addresses of all reported foreign sources." *Id.* ED thus treats the scope of its publication as "a policy matter" when withholding some PII (i.e., addresses), while asserting elsewhere that publication of other PII (*i.e.*, names) is compelled by statute. *Id.*

57. On July 6, 2026, the same day the comment-period correction was posted, FSA issued an Electronic Announcement from the Office of the General Counsel, styled a "Reminder," through its website. July 6 Announcement, Ex. 4. The announcement states: "The next date by which [institutions of higher education or] IHEs must submit Section 117 disclosure reports is Friday, July 31, 2026. Any failure to comply or provide accurate submissions could result in an enforcement action." *Id.* It goes on to clarify the publication to follow: "Consistent with previous public statements and Section 117's transparency requirements, the Department will be publishing its next public report of foreign source reporting, *including the names of all foreign sources from prior reporting cycles*, on July 15, 2026." *Id.* (emphasis added).

58. No previous public statement of the Department of Education announced that it would publish the names of covered donors already collected on July 15, 2026. In fact, the Department of Education's previous public statements consistently repeated that donor names were collected to support enforcement, that it "will not make the name[s] and address[es] part of the publicly available disclosure report," that it "assures submitting institutions" that names will be withheld, and that it "will follow the procedures outlined in its regulations" before disclosing designated information. *E.g.*, 2023 Comment Response, Ex. 11, at 2. Only the April proposal to

revise the ICR reflected, for the first time, a change in the government's position—but by its own terms, it indicated that any publication would follow completion of the pending ICR revision. *See* April 2026 Supporting Statement, Ex. 10 at Items 1 & 10.

59. Indeed, as recently as January 7, 2026, ED's own website "assured submitting institutions" that while "[t]he Department requires the name and address of foreign sources to assess an institution's compliance with Section 117," "the Department does not consider the name and address of a foreign source to be part of the disclosure report that must be made public." U.S. Dep't of Educ., *Section 117 Foreign Gift & Contract Reporting: FAQs (question PD-Q2)*, Fed. Student Aid, https://web.archive.org/web/20260107132906/https://fsapartners.ed.gov/knowledge-center/topics/section-117-foreign-gift-and-contract-reporting/resources/frequently-asked-questions (archived Jan. 7, 2026; as last modified Jan. 2, 2026). ED "provided this assurance in response to several concerns . . . including concerns that disclosure of a foreign source's identity in certain instances could put the foreign source in danger of being harmed by violence or subject the foreign source to political pressure and persecution by their home countries." *Id.*

60. The July 15, 2026 date had appeared publicly only once, in the Comment Response Document posted on OMB's website on June 26. Institutions thus received days' notice that the identities of their covered donors, collected over six years without any statutory authority to do so and under ED's express and repeated assurances of confidentiality, would be posted on a website accessible by anyone.

61. On July 14, 2026, the Department of Education updated its July 6 Announcement to defer, in part, its implementation of its Publication Decision. The updated announcement states "[t]he Department has agreed to delay by two weeks—until July 29, 2026—its planned publication of the names of all 'foreign sources from prior reporting cycles,'" and that on July 15, 2026, ED

"will instead publish only the names of the 92 foreign entities that appear on the list entitled 'Funding of Universities from Foreign Entities on US Government Lists'" on its "Section 117 Foreign Gift and Contract Public Transparency Dashboard," and "will tie specific transactions by these 92 foreign entities to specific universities." July 14 Update, Ex. 3.

62. On July 15, 2026, ED carried out the partial publication of foreign source identities. *See* Section 117 Entity of Concern Data, Ex. 2. The Section 117 Entity of Concern Data published on July 15 matched reported foreign sources with other U.S.-government-maintained lists. *Id.* But those lists serve different purposes and are governed by different statutes. Some reflect that federal agency's determination that dealings with a specific entity raise national-security or foreign-policy concerns, such as the Department of Commerce's Entity List and "Military End-User" List, the Department of the Treasury's Office of Foreign Assets Control sanctions list, and compilations of Chinese military-affiliated companies prepared under the National Defense Authorization Acts. Others reflect no adverse determination about the listed entity. For example, an entity appears on the Department of Justice's roster of registrants under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 et seq., by complying with that statute's disclosure requirements, and on the Department of Commerce's Unverified List when end-use checks could not be completed, not upon any finding of wrongdoing. *Id.* The Department of Education published the data on a public dashboard at foreignfundinghighered.gov, with a disclaimer that "Some of these funds were received by institutions of higher education before the foreign entity appeared on a U.S. Government List. Our data does not distinguish between those funds received before and after the foreign entity appeared on a U.S. Government List." Section 117 Dashboard, Ex. 1.

63. Even ED's curated July 15 publication, focused on foreign "entities of concern," is misleading in multiple respects—and threatens the entities and institutions it names.

a. For example, it includes the National Wildlife Federation ("NWF"), an American conservation nonprofit headquartered in Virginia, which appears solely by reason of a FARA registration that the Justice Department required over NWF's objection and that NWF has publicly contested. Section 117 Entity of Concern Data, Ex. 2; *see* Ltr. from Benjamin P. Kota, Gen. Counsel, Nat'l Wildlife Fed'n, to Jennifer Kennedy Gellie, Chief, FARA Unit, Nat'l Sec. Div., U.S. Dep't of Just., Comment on Docket No. DOJ-LA-2021-0006, at 1–2 (Feb. 10, 2022), https://www.regulations.gov/comment/DOJ-LA-2021-0006-0010.

b. Consistent with the Department of Education's decision to include foreign sources who have ever been on any federal government list for any reason, the Section 117 Entity of Concern Data also includes an Israeli public university—which was added to a government list in 1997 and removed in December 2020—in connection with a reported contract with an American university that did not begin until May 2023. *Compare* Section 117 Entity of Concern Data, Ex. 2 (listing Ben-Gurion University of the Negev as the source of a foreign contract valued at $990,000 beginning in May 2023), *with Addition of Entities to the Entity List, Revision of Entry on the Entity List, and Removal of Entities From the Entity List*, 85 Fed. Reg. 83,416, 83,419 (Dec. 22, 2020) (removing "Ben Gurion University," which "was added to the Entity List on February 3, 1997"). ED's disclaimer does not address this: it speaks to funds received before an entity appeared on a list, not to entities that the government has since determined should be removed. And ED's own announcement describes the file posted on July 15, in the present tense, as comprising entities that "appear" on U.S. Government lists. July 14 Update, Ex. 3.

c. The Section 117 Entity of Concern Data identifies gifts and contracts between a Swiss agricultural foundation and American universities spanning 2009 to 2019 because the Department of Education matched that Swiss foundation to the "Non-SDN Communist

Chinese Military Companies List." Section 117 Entity of Concern Data, Ex. 2. That list did not exist until the end of 2020, when it was created to implement an Executive Order restricting United States investment in the securities of designated "Communist Chinese military companies." *See* Exec. Order No. 13959, 85 Fed. Reg. 73,185 (Nov. 12, 2020). Every transaction reported by the universities concluded before the list existed, and nothing in the July 15 file explains the basis for matching a Swiss agricultural charity to a list about Chinese military financing.

64. ED has made clear that it now intends to imminently publish the identities of all remaining covered donors reported by universities pursuant to the 2020 and 2023 ICRs. Indeed, ED now says on its website that—"[c]onsistent with the public inspection requirements of Section 117"—it will "publish the contents of disclosure reports made by institutions as required by 20 U.S.C. § 1011f(e), including publication of material details about counterparties, such as counterparties' identities as reported to the Department by institutions." U.S. Dep't of Educ., *Section 117 Foreign Gift and Contract Reporting: Frequently Asked Questions (question PD-Q2)*, Fed. Student Aid, https://fsapartners.ed.gov/knowledge-center/topics/section-117-foreign-gift-and-contract-reporting/resources/frequently-asked-questions (last modified June 18, 2026).

65. While ED delayed the publication of donor names that were previously submitted, it has announced it will delay no further. The Department of Education declared on September 25 that it would implement the rest of its Publication Decision on October 2, 2026. *See* Section 117 Dashboard, Ex. 1. AAU contacted the government seeking a delay of the publication of all remaining covered donors—all of whom donated under a regime in which the Department of Education had promised confidentiality repeatedly and in writing, and none of whom fall within the Section 117 Entity of Concern Data—by one week to allow orderly resolution of its claims challenging the unlawful disclosure. But as of last night at 8:49 p.m., the federal government

confirmed in writing that it will not extend the date by even that short period. *See* Sept. 30, 2026 Email, Ex. 17.

66. For the publication of all remaining covered donor identities, now imminently set for October 2, the Department of Education has announced no disclaimer, no process for reviewing the accuracy of what it publishes, no process by which an affected donor or institution may be heard before publication, and no ability to provide the public with additional information on ED's Section 117 website about the nature or context of a gift or contract with any particular covered donor. And by ED's own admission, every covered donor whose name it will publish on October 2 is a source it has matched to no U.S. Government list at all. *See* July 14 Update, Ex. 3. In other words, the government has no reason to think remaining covered donors are cause for concern—and has offered no reason that revealing their identities would be in the national interest.

67. There is no urgency to the government's new schedule. The names the Department of Education intends to publish on October 2 were collected between two months and six years ago, and, except for 92 entities published on July 15, 2026, ED has held this information without publication for this entire period, consistent with its express confidentiality assurances. No statute, regulation, or court order required publication on July 15, and none requires publication of these names on October 2—let alone any other date. But ED is insisting on effectuating its Publication Decision—first buried in a Comment Response Document posted June 26, disclosed to regulated entities on July 6, 2026, and reiterated as recently as September 25, 2026—in just one day.

**F. The Related 2026 ICR**

68. ED's contemporaneous June 2026 Supporting Statement also walked back its earlier promises of confidentiality for information it collects going forward. In the same section of the Paperwork Reduction Act submission in which ED had promised in both 2020 and 2023 that

it would "strictly adhere" to nondisclosure, *see* 2020 Supporting Statement, Ex. 14, at 5; 2023 Supporting Statement, Ex. 12, at 5, the Department of Education stated in 2026 that it "intends to publish the contents of reports made by institutions to the fullest extent required by 20 U.S.C. § 1011f(e), including publication of details about specific counterparties, such as the counterparty's name." June 2026 Supporting Statement, Ex. 7.

69. Said another way, the Publication Decision is ED's announced decision to publish the identities of covered donors it collected from 2020 through January 2026 under the prior information collection requests and its express written assurances of confidentiality. The 2026 ICR is the Department of Education's decision to revise the Section 117 ICR going forward to collect donor names and addresses *without* promising confidentiality. Although that decision was not yet final at the time the government first advised institutions of its Publication Decision on July 6, 2026, it has since taken action to finalize the 2026 ICR, which will apply going forward.

70. On August 6, 2026, the OMB issued its Notice of Action, approving the 2026 ICR without change. *See* Off. of Info. & Regul. Affs., Off. of Mgmt. & Budget, Notice of Action, OMB No. 1845-0172, ICR Reference No. 202604-1845-006 (Aug. 6, 2026) ("Notice of Action") (attached as Ex. 5). Now that the OMB has approved the collection, the 2026 ICR is in effect. *See* 44 U.S.C. § 3507(a); 5 C.F.R. §§ 1320.5(a)(2)–(3), 1320.10(b). The 2026 ICR will apply to the disclosure reports due on January 31, 2027—the close of the next statutory reporting cycle. *See* 20 U.S.C. § 1011f(a).

**G. The Harm Publication Will Inflict**

71. Publication on October 2 would be irreversible. Once ED posts donor names to its website and public dashboard, confidentiality is destroyed permanently, and no later judgment of

this Court could restore it. The names will be copied, indexed, republished, and available to foreign governments, foreign nationals, and the media immediately upon posting.

72. Covered donors include natural persons who reside in, or have family, property, or business interests in, countries whose governments monitor, harass, and persecute nationals associated with American institutions, independent scholarship, or disfavored causes. Donors from those countries fear retribution against themselves and their families the moment their names are released. Others face criminal reprisal. As commenters warned the Department of Education, some donors are "at risk of physical harm or kidnapping in countries where organized crime preys upon individuals for financial compensation." ACE Letter, Ex. 8, at 3; *see also* AAU 2026 Comment, Ex. 9, at 5 (warning of "reputational harm, harassment, or adverse consequences in their home countries"). ED itself recognized these dangers many times in the past when it demanded the disclosure of these names but promised to keep them confidential and has acknowledged the substantial risk to the safety of donors in countries where persecution is known to occur. *See* 2023 Comment Response, Ex. 11, at 2.

73. These dangers are impending and concrete. For instance, under Russian law, Russian citizens who fund or support institutions designated "undesirable" by the Russian government are exposed to fines or up to six years' imprisonment.[2] Russia has designated at least nineteen Western universities and university programs as "undesirable," including six AAU members or their constituent institutions,[3] and Russian authorities assert the power to prosecute

[2] *See* Uy B. Pham & Alexa M. Schmitt, *Russia Designates Three Harvard Institutions As 'Undesirable'*, Harv. Crimson (July 12, 2026), https://www.thecrimson.com/article/2026/7/12/russia-undesirable-harvard-institutions.

[3] *See id.*; Abbey Fenbert, *Russia labels Stanford University 'undesirable' in escalating crackdown on Western schools*, Kyiv Independent (Apr. 11, 2026), https://kyivindependent.com/russia-labels-stanford-university-undesirable-in-escalating-crackdown-on-western-schools/; *Russia Designates Tufts University 'Undesirable' Organization*, Moscow Times (Mar. 31, 2026),

people for conduct that occurred outside Russia.[4] Nor are these risks hypothetical. Public reporting indicates that the Russian government has systematically hunted for political donors, including by mining financial data to identify, prosecute, and imprison individuals who have given money to organizations it has blacklisted—and it has harassed family members in Russia when the donors themselves are beyond its reach.[5]

74. Russia is not unique. Belarus has convicted at least 159 people for donations to organizations it designates "extremist," including for donations made before those designations were imposed, and China's laws governing residents of Hong Kong criminalize the provision of financial assistance to entities deemed threats to national security and apply both to residents and foreign citizens alike, including for conduct occurring abroad.[6]

75. What these foreign authorities have had to reconstruct from fragments of publicly available information and resource-intensive investigations, the Department of Education is about to hand them in a single, official document. On October 2, ED will publish, on a federal

---

https://www.themoscowtimes.com/2026/03/31/russia-designates-tufts-university-undesirable-organization-a92385.

[4] Pham & Schmitt, *supra* note 2.

[5] *Russia Sees Sharp Rise in Prosecutions Over Donations to Navalny Foundation*, RFE/RL (Dec. 22, 2025), https://www.rferl.org/a/russia-prosecutions-navalny-anti-corruption-foundation-donations/33630223.html; *see also* Olga Romashova, *Every Tip You Make. DonationAlerts, the Popular Platform for Streamer Donations, Shared Payment Data with Russian Security Services*, Mediazona (Mar. 25, 2026), https://en.zona.media/article/2026/03/25/donationalerts; Pham & Schmitt, *supra* note 2.

[6] *See At Least 159 People Convicted for Making Donations in Belarus*, Viasna (June 19, 2026), https://spring96.org/en/news/120532; *77 People Were Convicted for Donations. How Are They Persecuted in Belarus for Solidarity, and How To Avoid Persecution for It*, Viasna (May 31, 2024), https://spring96.org/en/news/114028; Changhao Wei, Taige Hu & Haoran Zhang, *Legislation Summary: Hong Kong National Security Law*, NPC Observer (June 30, 2020), https://npcobserver.com/2020/06/30/legislation-summary-hong-kong-national-security-law; U.S.-China Econ. & Sec. Rev. Comm'n, *China 201: Hong Kong's National Security Law and Article 23 Ordinance* (Mar. 2026), https://www.uscc.gov/sites/default/files/2026-03/China_201_Hong_Kong_National_Security_Law_and_Article_23_Ordinance.pdf; Pham & Schmitt, *supra* note 2.

government website, the names of covered donors whose gifts American universities reported in confidence, organized by recipient institution, including institutions that Russia, for one, has formally declared "undesirable." ED's own account of this decision confirms the stakes: it has acknowledged that recent disclosure reports "reveal extensive and substantial foreign funding from countries of concern," a statutory category that expressly includes, for instance, the Russian Federation. 2026 Comment Response, Ex. 6, at 4; 42 U.S.C. § 19221(a)(1). Any Russian national appearing on that list will have been publicly identified, by the United States government, as a financial supporter of an institution whose activities Russia has criminalized. Worse, no Russian national or source on the October 2 list will have appeared on any U.S. government list of entities of concern—meaning that the U.S. government is poised to expose such donors to grave danger even though the U.S. government itself does not deem them a risk for any reason.

76. The Department of Education has never seriously engaged with this danger. When commenters urged an accommodation for donors facing "potential risks of reprisal or persecution," ED responded that it "cannot determine the credibility of risk to donors," that the decision to donate to American institutions is "wholly voluntary," and that donors and institutions "may freely consider any risk" for themselves before giving. 2026 Comment Response, Ex. 6, at 3. But the donors whose names ED will publish on October 2 made their gifts years ago, in reliance on ED's promise of confidentiality; they could not "freely consider any risk," *id.*, of giving related to the future public disclosure of their names by the U.S. government. Nowhere has the Department of Education considered that foreign adversaries have, in some instances, criminalized the financing of the very institutions whose covered donor lists it is about to publish.

77. Compelled disclosure of donor identities also burdens donors' rights of expressive association. Donors support universities' teaching, research, and missions; publicly identifying

them with those institutions and causes against their wishes will deter contributions and chill association. Members have informed AAU that many donors gave on the express condition that their identities not be made public and would not have given otherwise. Any publication will irreparably harm those rights.

78. Compelled disclosure also burdens AAU's members' own associational rights, including their rights to associate with foreign nationals who support their missions. Once any covered donor's name may appear on a federal public disclosure, an institution's decision to associate with alumni and other supporters outside the U.S. will likely be affected, particularly because some donors have specifically expressed concerns about such disclosure. AAU members must now weigh whether soliciting and accepting an otherwise-beneficial gift will subject the donor to unwanted public exposure and its attendant risks, forcing institutions to forgo lawful, valuable associations not because anything about them is improper but because the Department of Education has made it impossible to honor a donor's wish for privacy—raising the unnecessary risk of a chilling effect, in violation of the First Amendment. *See Ams. for Prosperity*, 594 U.S. at 618. This harm to AAU members' own associational interests is in addition to, and compounded by, the institutional injury to donor relationships.

79. Further, AAU's members made representations to donors in reliance on the Department of Education's assurances—representations ED's October 2 publication would vitiate overnight. Their relationships with covered donors, including alumni and longstanding supporters, were built on those representations. Members expect to lose critical funding for research if covered donor names are published. And foreign gifts help to sustain the breadth of university activity such as scholarships and fellowships, endowed professorships, capital campaigns and building projects,

libraries and collections, and academic programs across disciplines. These functions could all be significantly impacted if publication occurs in violation of the law and ED's prior assurances.

## CLAIMS FOR RELIEF

### Count I
### Violation of the APA—Agency Action in Excess of Statutory Authority
### 5 U.S.C. § 706(2)(C)

80. Plaintiff realleges and incorporates the foregoing paragraphs.

81. The Department of Education, in adopting the Publication Decision and the 2026 ICR, has acted beyond its statutory authority twice over. The APA directs courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). "An agency . . . literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up). Section 117 carefully provides limited authority to collect and publish certain information. But it does not cover the information here.

82. The Publication Decision, where the Department of Education decided to publish the identities of all covered donors collected under the 2020 and 2023 information collections, is a final agency decision subject to APA review. First stated in the 2026 Comment Response posted on OMB's website on June 26, the Publication Decision marks the consummation of the agency decisionmaking process to make an about-face and to publish donor names. Indeed, ED could hardly have been clearer when disclosing its decision to regulated parties in unequivocal terms: "[T]he Department is making a change to the publication parameters. The publication of counterparty names will occur on July 15, 2026." 2026 Comment Response, Ex. 6, at 4. ED has stood by that final decision, partially implementing it as to some entities on July 15, 2026, and on September 25, 2026, confirming it will implement the Publication Decision in full on October 2,

2026—encompassing all covered donors that are not on any other U.S. Government list. It made clear it will delay implementation no further. *See* Sept. 30, 2026 Email, Ex. 17. And this is a decision from which significant "legal consequences flow" and by which rights are "determined": it withdraws the operative assurance of nondisclosure under which institutions submitted six years of covered donor identities, deems the names required public reporting under Section 117(e), identifies the names affected, and deprives universities of any opportunity for them to assert specific interests in confidentiality for particular donors or countries or otherwise challenge the decision. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). That decision is final.

83. The Department of Education did not withdraw, reopen, or qualify its decision. On July 15, 2026, ED began carrying out that decision, publishing the names of 92 listed foreign entities tied to specific institutions. But it did not reflect a modification of its final decision, as ED has maintained at all times that it will be implementing the full Publication Decision. Indeed, the Department of Education has announced that publication of the remaining names is delayed "until October 2, 2026," Section 117 Dashboard, Ex. 1; it has not announced or otherwise indicated that the decision is under reconsideration, or that there are any other avenues for reconsideration. A postponement of the date on which an announced final action will be completed does not render the underlying decision nonfinal—or else a final agency decision, due to be effectuated within a day's time, could be allowed to take effect and work Article III harms without available court challenge.

84. The 2026 ICR is also a final agency decision. When it submitted its latest proposal, the Department of Education confirmed its intent "to publish the contents of reports made by institutions to the fullest extent required by 20 U.S.C. § 1011f(e), including publication of details about specific counterparties, such as the counterparty's name." June 2026 Supporting Statement,

Ex. 7. It received final OMB approval—the last step in approval of an ICR—on August 6, 2026. Notice of Action, Ex. 5. The 2026 ICR is now effective, and so it binds affected parties, who must next submit the information demanded by January 31, 2027. *See* 20 U.S.C. § 1011f(a).

85. Both the Publication Decision and the 2026 ICR exceed ED's statutory authority under Section 117. In enacting Section 117, Congress itself fixed the content of reports that ED may collect and publish. Congress authorized ED to collect aggregate dollar amounts attributed by country or foreign government, 20 U.S.C. § 1011f(b)(1)–(2), with a specific foreign source's identity required only where the source "own[s] or control[s]" the institution, *id.* § 1011f(b)(3), and a source's name otherwise required only for foreign governments in connection with restricted or conditional gifts, *id.* § 1011f(c)(2). Congress further directed only that the "disclosure reports required by this section," *id.* § 1011f(e)—the above reports, mostly aggregate information—would be made public. The identities of individual covered donors are not part of the statutorily mandated disclosure report and are therefore not authorized to be made public records by § 1011f(e). Said another way, the Department of Education has neither the authority to collect, nor to publish, the names of individual foreign sources under the plain text and structure of Section 117.

86. Section 117's enforcement provision does not authorize publication of the identities of covered donors either. Section 1011f(f)(1) instead authorizes the Department of Justice to bring a civil action, at the Secretary of Education's request, to "compel compliance" with the disclosure requirements that Section 117 actually imposes through its substantive requirements, detailed in the paragraph just above. It does not authorize ED to collect the identities of every foreign source from every reporting institution, in advance of and untethered to any enforcement proceeding. And it does not authorize mass public disclosure of identities, an act with no conceivable connection to a civil action by the government to compel any particular institution's compliance.

87. ED's unprecedented new reading of § 1011f(e) is entitled to no deference. Courts exercise "independent judgment in deciding whether an agency has acted within its statutory authority," *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024), and an agency's consistent, longstanding interpretation of the statute it administers is instructive in determining the statute's meaning, *see id.* at 394. ED's own settled interpretation, adopted in 2020 and reaffirmed in 2023, was that covered donor identities are "not information that Congress intended to be part of the public disclosure report." 2020 Comment Response, Ex. 15, at 4. The Department of Education was right then. Its contrary reading, first asserted in April 2026, cannot be squared with the plain text Congress enacted and should therefore be accorded no weight.

88. At a minimum, § 1011f(e) must be construed to avoid the serious constitutional questions that ED's reading would raise. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Reading § 1011f(e) to compel blanket publication of donor identities would raise the grave First Amendment problems alleged in Count II.

89. Because Congress only authorized the Department of Education to collect some information that does not include these donor identities, and because that information collected as an enforcement aid is not part of the "disclosure report[]" Congress defined, its publication is not authorized, much less required, by 20 U.S.C. § 1011f(e). That is dispositive: the Department of Education's Publication Decision, which will result in imminently publishing information it collected under the 2020 and 2023 ICRs, therefore exceeds its statutory authority and is unlawful.

And the 2026 ICR, which will collect this information without any promise of confidentiality going forward, exceeds its statutory authority and is unlawful for the same reason.

**Count II**
**Violation of the APA—Contrary to Constitutional Right: First Amendment**
**5 U.S.C. § 706(2)(B); U.S. Const. amend. I**

90. Plaintiff realleges and incorporates the foregoing paragraphs.

91. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). The Department of Education, in adopting the Publication Decision and the 2026 ICR, has issued final agency decisions that are contrary to the First Amendment.

92. Compelled disclosure of the identities of an organization's supporters burdens the freedom of association enshrined by the First Amendment, *see NAACP*, 357 U.S. at 462; *Ams. for Prosperity*, 594 U.S. at 618, and is subject to exacting scrutiny, requiring narrow tailoring to serve a sufficiently important governmental interest, *see Ams. for Prosperity*, 594 U.S. at 606–08; *First Choice*, 608 U.S. at 188–90. Even the demand for donor identities, standing alone, burdens that right of association: "heightened First Amendment scrutiny" applies "even when those demands contemplate disclosure only to government officials." *First Choice*, 608 U.S. at 187. In other words, collection by the government chills association and requires heightened scrutiny, and then publication broadly requires additional heightened scrutiny and justification to boot.

93. The collection and publication of donor identities in this case must meet that test, as collection and publication of covered donor identities burdens universities' own associational and expressive rights. *See* 608 U.S. at 190 (government "demand for private donor information injures *the group's* First Amendment associational rights" (emphasis added)). When an institution solicits or accepts a gift from a donor, that is the kind of associational act the First Amendment

protects. Where such association may result in the covered donor's name appearing on a public government list, however, the predictable consequence is self-censorship: some donors will likely forgo associations with AAU members, which limits AAU members' ability to associate with their donors, precisely the concern identified in *Americans for Prosperity* and *First Choice*. That danger is especially stark here, where the dragnet disclosure requirement the Department of Education announced for the first time in 2026 indiscriminately and retroactively sweeps up *all* institutions' covered donors since 2020.

94. Moreover, charitable fundraising is itself protected speech. *Ams. for Prosperity*, 594 U.S. at 618; *Riley*, 487 U.S. at 799–800; *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632–33 (1980). Public identification of donors, particularly where the recipients of those funds have promised confidentiality, burdens AAU's members' ability to solicit support and donors' willingness to respond. *See also First Choice*, 608 U.S. at 190 & n.2.

95. Donors' associational rights are likewise impacted by the collection and publication regime. Though foreign nationals are entitled to weaker constitutional protections than American citizens, foreign nationals with "substantial connections" may claim greater constitutional protections. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). This generally includes green-card holders, those residing or owning property in the United States, or current or former students of American institutions. *See, e.g.*, *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 996–97 (9th Cir. 2012); *Ranjan v. U.S. Dep't of Homeland Sec.*, 747 F. Supp. 3d 192, 199 (D.D.C. 2024). And the Supreme Court has long held that the freedom protected by the First Amendment "is accorded aliens residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). Because many members' covered donors have a "substantial connection" to the United States or reside here, their own First Amendment rights will be directly burdened by this disclosure. And, as noted,

the compelled disclosure also has the effect, here, of burdening the institutions' own associations with its covered donors. *Cf. Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972).

96. The burden on association here is not conjectural. As alleged above, Russia has criminalized the financing of designated American universities, including six AAU members or their constituent institutions, and it prosecutes donors identified through means far more laborious than a public federal website. For donors with ties to such countries, the Department of Education's publication would compel the precise donor-institution linkage that triggers criminal exposure. A disclosure regime whose foreseeable consequence is the criminal prosecution of the associating parties imposes the gravest possible burden on associational rights.

97. The Department of Education's Publication Decision and the 2026 ICR come nowhere close to meeting the demanding burden that the First Amendment imposes. Both lead to the indiscriminate publication of the identity of *every* covered donor to every reporting institution over the last six years, without regard to any indication of noncompliance, foreign-government influence, or any other individualized justification. As the Court recognized in *Americans for Prosperity*, this blunderbuss collection and disclosure regime has an obvious tailoring problem, because the government could seek individualized information when it has individualized justifications instead. *See* 594 U.S. at 613 (emphasizing "alternative means of obtaining [donor] information" covered by such a blanket request "such as a subpoena or audit letter").

98. Moreover, ED's July 15 publication offers another alternative: having published the only foreign sources that it deems a cause for concern, it can identify no interest served by publishing everyone else. On July 15, 2026, the Department of Education published the names of the foreign entities it had identified as appearing on other U.S. Government lists, tied to the institutions that reported transactions with them. Whatever governmental interest exists in public

transparency about institutional dealings with entities the government itself has designated on security-related lists, that interest has now been served. The publication scheduled for October 2 reaches only covered donors the Department of Education has not identified as appearing on any U.S. Government list: as to every one of those donors and counterparties, the government has articulated no individualized security concern of any kind, and it has never explained what interest is advanced by publicly identifying them. A disclosure regime that indiscriminately publishes the names of supporters whom the government itself does not deem a concern is the antithesis of narrow tailoring. *See Ams. for Prosperity*, 594 U.S. at 612–15.

99. The Publication Decision, to be implemented in full on October 2, 2026, also fails narrow tailoring for another reason: it is not tied to any interest ED asserted. The premise of the Publication Decision is that ED already has this information, and has had it for the last six years. Publication of information that ED already has in its own possession adds nothing to ED's ability to verify or compel university compliance with Section 117. The only parties who gain anything from publication are third parties with no role in enforcing Section 117, such as other foreign nationals and foreign governments—including those that have criminalized the very associations ED would expose. Nor is the October 2, 2026 publication of all remaining names narrowly tailored to serve any other goal identified by Executive Order 14282. Confidential collection would better serve the goals of "protect[ing] the marketplace of ideas from propaganda sponsored by foreign governments, and safeguard[ing] America's students and research from foreign exploitation," and to the extent the government is interested in "end[ing] the secrecy surrounding foreign funds in American educational institutions," it has yet to explain why the balance struck by Congress in the transparency statute it enacted was insufficient to achieve that goal. Exec. Order No. 14282 § 1.

100. Because the blanket collection and publication of all covered donor identities falls far short of satisfying the exacting scrutiny the Court has required, it violates the First Amendment.

**Count III**
**Violation of the APA—Not in Accordance with Law**
**Departure from the Department of Education's FOIA Regulation**
**5 U.S.C. § 706(2)(A), (D); 34 C.F.R. § 5.11**

101. Plaintiff realleges and incorporates the foregoing paragraphs.

102. The APA directs courts to "hold unlawful and set aside agency action" that is not "in accordance with law," 5 U.S.C. § 706(2)(A), or that fails to observe "procedure required by law," *id.* § 706(2)(D). ED, in adopting the Publication Decision and the 2026 ICR, has acted contrary to law and to required procedure by violating its own FOIA regulation.

103. ED's FOIA regulation, 34 C.F.R. § 5.11, is binding on the Department of Education and establishes the governing procedures protecting all submitters of confidential commercial information to ED. Its protections include notice of any contemplated disclosure, an opportunity to object, consideration of the objection, and a reasoned written statement before that disclosure. An agency must follow its own regulations and its own announced procedures.

104. ED previously invited institutions to designate covered donor names and addresses as confidential and exempt under Exemption 4; institutions did so for more than one in five reported transactions; and ED committed itself to its regulation's procedures at both the collection's inception and its renewal. In 2020, it stated that "Title 34 CFR §5.11(e), requires the Department to communicate with an institution as part of the FOIA process and we would follow those procedures." 2020 Comment Response, Ex. 15, at 3. In 2023, it stated that "whenever the Department has reason to believe that it may be required to disclose information designated as confidential business information, the Department will follow the procedures outlined in its

regulations for notifying the submitting institution and providing an opportunity to object to the disclosure." 2023 Comment Response, Ex. 11, at 2.

105. The full implementation of the Publication Decision on October 2, 2026, as well as further publications in 2027 pursuant to the 2026 ICR, would—as the July 15 publication did—disclose what institutions have designated confidential business information without notice to any submitter, without any opportunity to object, and without any reasoned pre-disclosure explanation, in violation of the plain language of § 5.11 and the Department of Education's binding commitment to follow it. Simultaneously, the Department of Education asserts that its designation and submitter-protection framework remain in effect. An agency may not maintain a disclosure policy irreconcilable with its own submitter-protection regulations, and its unexplained refusal to follow procedures it pledged itself to is arbitrary, capricious, and not in accordance with law. *See Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 934–35 (D.C. Cir. 2008).

**Count IV**
**Violation of the APA—Arbitrary and Capricious**
**5 U.S.C. § 706(2)(A)**

106. Plaintiff realleges and incorporates the foregoing paragraphs.

107. The APA directs courts to "hold unlawful and set aside" final agency actions that are "arbitrary" and "capricious" or otherwise "an abuse of discretion." 5 U.S.C. § 706(2)(A). The Department of Education, in adopting the Publication Decision and the 2026 ICR, has acted in an arbitrary and capricious manner in multiple independent respects.

108. First, the Publication Decision and 2026 ICR reflect an unjustified reversal of the Department of Education's prior position. An agency that changes position must display an awareness that it is changing position, supply a reasoned explanation for the change, and where its prior policy has engendered serious reliance interests, provide a justification taking those interests

into account. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 569–70 (2025); *Dep't Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28–31 (2020); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). ED's prior position, expressed repeatedly in 2020 and 2023, is that donors' identities are categorically not part of the public disclosure report required by Section 117 and therefore would be withheld. ED has not justified the reversal beyond merely asserting that the prior nondisclosure assurance "was a policy determination based in part on the representations by certain institutions that the information was protected by [FOIA] and other expressed concerns of institutions," and stating that "[a]t this point based on evidence from the Department and other reliable sources . . . the statutory inspection requirement outweighs countervailing confidentiality interests or FOIA-based objections." 2026 Comment Response, Ex. 6, at 3–4. But the prior and oft-stated Departmental position was not a "policy determination"; it was a statement of law about the Department of Education's own considered understanding of what Section 117 authorizes it to do. *See* 2020 Comment Response, Ex. 15, at 4 ("The Department does not consider the name and address it seeks under this information collection to be part of the disclosure report that must be made public under Section 117(e)" and so the new material in the 2020 ICR "is not information that Congress intended to be part of the public disclosure report"). If the Department of Education did not properly understand the prior basis for its position, it cannot have given a proper justification for its decision to reverse that six-year-long, multi-Administration position. Further, the little the Department of Education does say to try to justify this abrupt change in policy is no more than a broad and vague assertion that "evidence from the Department and other reliable sources" compels its action—opaque language that falls far short of *Fox*'s command. The Department of Education fails to identify any of the "evidence" that supposedly caused the

agency to change its position. And nowhere does the Department of Education actually explain why it changed its position about the scope of the "statutory inspection requirement."

109. Second, and relatedly, ED failed to consider most important aspects of the problem before it. To begin, ED failed to consider the safety of donors whose identities it will publish. Commenters warned in detail that publication "could have tragic, and even deadly, consequences for some foreign donors." ACE Letter, Ex. 8, at 3. ED did not dispute any of those warnings in any of its responses. It just dismissed the concern; the Department of Education reasoned instead that because recent Section 117 reports "reveal extensive and substantial foreign funding from countries of concern," then the "institutional concerns about the safety and human rights of natural person donors in those countries is apparently not a compelling concern to institutions." 2026 Comment Response, Ex. 6, at 4. That reasoning is a non sequitur twice over. Institutions accepted gifts from covered donors in countries of concern *in reliance on* ED's repeated promise that their identities would remain confidential—precisely so that "natural person donors" in those countries would not be harmed. And the volume of gifts reported reflects reliance on that promise, not indifference to safety. In any event, ED's reasoning evaluates the wrong party's interest; the risk of persecution falls on donors, not on the institutions, so the depth of institutions' concern is beside the point. The question the Department of Education was required to confront, and never did, is whether disclosure of their names on a public website would expose covered donors to harm—and, in the same vein, whether narrower options would allow the Department of Education to achieve its stated goals but without endangering donors. Nor did ED anywhere consider that at least one foreign adversary has criminalized the financing of the very institutions whose donor lists it will publish, even though all six of those AAU members had been designated as disfavored by that foreign government before ED announced its decision.

110. The Department of Education also failed to consider the message conveyed by the information it will publish, and relatedly the consequences of publishing errors that can never be recalled. ED's July 15 publication of the Section 117 Entity of Concern Data shows what is at stake. ED presents these entities as being especially concerning—indeed, it identifies them as "Entit[ies] of Concern"—even though some of the entities so listed were removed from any lists long before those entities gave gifts to or entered into contracts with the universities who reported associations with them. For instance, the July 15 publication identifies as counterparties of concern an Israeli public university whose export-control listing was removed years before the reported contract with the American university began, and an American-based conservation nonprofit, which appears solely by reason of a FARA registration that the nonprofit has publicly contested. Section 117 Entity of Concern Data, Ex. 2. And ED appended to the July 15 publication a disclaimer conceding that its own data "does not distinguish between those funds received before and after the foreign entity appeared on a U.S. Government List." Section 117 Dashboard, Ex. 1. In other words, ED made no effort to assess whether these foreign sources are "concerns" either currently or when their contributions were made to the reporting universities—and instead grouped them all together under an overbroad designation, regardless of the impact on the entities or the universities whose associations have been branded "concerning." Against this background, it is hard to imagine ED's publication of the far larger body of individual donor names slated for October 2 will not arbitrarily group or characterize donor names, particularly since ED has not indicated that it will provide any mechanism for universities to raise or correct errors before publication, or otherwise considered that a false or misleading identification, once posted to a federal government website, cannot be undone. An agency that makes a decision to publish personally identifying information irreversibly, without considering the impact of its publication,

has failed to consider one of the most important aspects of the problem. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

111. Third, the Publication Decision is internally incoherent. ED asserts that § 1011f(e) compels publication of covered donors' names, while in the same document withholding covered donors' addresses "as a policy matter" and claiming "the legal right to continue to collect and to disclose identities and addresses of all reported foreign sources," despite declining to exercise that right. 2026 Comment Response, Ex. 6, at 3–4. Publication cannot be both statutorily compelled and a matter of ED's discretion at the same time. ED's selective invocation of statutory command confirms that the Decision rests on an unjustified policy preference rather than on the statute—particularly since ED's decision not to publish donors' addresses was based on the same concern (donor safety) that commenters invoked in requesting that ED decline to publish their names.

112. Fourth, the Publication Decision is impermissibly retroactive. It applies exclusively to the identities of donors gathered years ago under a contrary assurance of nondisclosure. This reversal of course is impermissibly retroactive because it changes the legal landscape and alters the consequences that attach to regulatory compliance decisions made by AAU's members as long as six years ago, when ED first began collecting the names of universities' covered donors (despite the absence of statutory authorization) and AAU's members complied based on assurances that the information submitted would not be publicly disclosed. *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 271 (D.D.C. 2018). And ED wrongly did so with no meaningful discussion of the serious reliance interests its prior assurances of nondisclosure engendered, let alone a detailed justification for why retroactive application of its Publication Decision is warranted. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

113. The Publication Decision is "arbitrary, capricious, an abuse of discretion," and "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

**Count V**
**Violation of the Department of Education's Own Rules Governing Information Collected From 2020-26: the 2020 and 2023 ICRs**

114. Plaintiff realleges and incorporates the foregoing paragraphs.

115. The Publication Decision is also unlawful because it violates the agency's own rules to the great prejudice of impacted entities. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005); *Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1098–99 (D.C. Cir. 1985).

116. The 2020 and 2023 ICRs are rules that were issued by the agency pursuant to a prescribed regulatory process. Both directed universities to submit the names and addresses of covered donors, but both contained assurances that the Department of Education would not disclose that personal identifying information. Neither ICR was ever modified.

117. While the Department of Education has now issued a new ICR that indicates that all donor information might be disclosed publicly by ED going forward (*i.e.*, for the cycle of reporting that begins in January of 2027), even if that change in policy were lawful (it is not), the 2026 ICR does not and cannot change the rules that continue to apply to past submissions under the 2020 and 2023 ICRs—rules that ED itself articulated and included in those ICRs. The Department of Education has thus unlawfully violated its own rules by deciding to disclose the identities of covered sources submitted pursuant to the 2020 and 2023 ICRs.

**Count VI**
**Violation of the First Amendment—Equitable Claim for Injunctive Relief**
**U.S. Const. amend. I**

118. Plaintiff realleges and incorporates the foregoing paragraphs.

119. The Publication Decision and 2026 ICR both violate the First Amendment. Independent of the Administrative Procedure Act, federal courts may enjoin federal officers from violating the Constitution. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). This claim does not depend on the existence of final agency action or any other requirement of the APA.

120. For the reasons alleged in Count II, the Department of Education's publication of the identities of AAU's members' covered donors, whether retroactively in response to the Publication Decision or going forward based on the 2026 ICR, would violate the First Amendment rights of AAU's members and their donors; it is a facially overbroad compelled disclosure of the identities of universities' supporters that cannot survive exacting scrutiny, and that burdens both donors' and institutions' associational rights. Plaintiff is entitled to equitable relief enjoining Defendants, in their official capacities, from effecting that unconstitutional disclosure.

**Count VII**
**Trade Secrets Act and FOIA Exemption 4**
**18 U.S.C. § 1905; 5 U.S.C. § 552(b)(4)**

121. Plaintiff realleges and incorporates the foregoing paragraphs.

122. Publication of covered donor names on October 2, 2026, pursuant to the Publication Decision, violates both FOIA and the Trade Secrets Act. An agency's definitive determination to release submitted information to the public is reviewable action, and review is available before disclosure occurs; no request under FOIA is required. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317–18 (1979); *Taylor Energy Co. LLC v. U.S. Dep't of the Interior*, 734 F. Supp. 2d 112, 124 (D.D.C. 2010). The Trade Secrets Act, 18 U.S.C. § 1905, likewise prohibits federal officers from disclosing, "to any extent not authorized by law," submitted information that concerns, among other things, the "identity" and the "amount or source of any . . . expenditures" of any person, and

its prohibition is coextensive with the information that is protected by FOIA Exemption 4, *see* 5 U.S.C. § 552(b)(4). *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1151–53 (D.C. Cir. 1987).

123. The covered donor identities ED proposes to now publish are confidential under Exemption 4. Information is confidential where it is "customarily and actually treated as private by its owner" and was "provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019). Both conditions are satisfied here. Institutions and donors closely hold their donor identities; many gifts were made on the express condition that their identities not be made public; and the information was submitted under the Department of Education's express written assurances of nondisclosure and through a designation mechanism ED itself provided for identifying this very information as confidential and exempt.

124. The covered donor identities are also commercial, as required by Exemption 4. As the Department of Education has historically recognized, nonprofit organizations like colleges possess commercial information within the meaning of this Exemption. *See N.H. Right to Life v. U.S. Dep't of Health & Hum. Servs.*, 778 F.3d 43, 49–50 (1st Cir. 2015). Courts have also recognized that names and identities can fall within Exemption 4. *E.g.*, *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 117 F. Supp. 3d 46, 62–65 (D.D.C. 2015).

125. The Department of Education has long treated foreign source gift agreements, when required by Section 117, as Exemption 4 "confidential business information," triggering mandatory notice-and-objection procedures under 34 C.F.R. § 5.11(d)–(f) before disclosure. ED has therefore classified Section 117 submissions containing the same source-identifying information as protected by Exemption 4. Indeed, until January 2026, ED encouraged institutions to designate their submissions—including the source names and addresses required after 2020—as protected by Exemption 4. And ED has never suggested that this information is *not* confidential

business information—only that, under ED's new reading of Section 117, this blanket disclosure of all the information contained therein is somehow required by law.

126. But as explained above, in Count I, no law authorizes the disclosure. Section 117(e) does not authorize, let alone require, publication of covered donor identities. The Department of Education itself long maintained that covered donor identities are not part of the public disclosure report. Nor may ED disclose in a manner other than that prescribed by its own regulation: 34 C.F.R. § 5.11 conditions any disclosure of designated information on notice, an opportunity to object, and a reasoned written statement, none of which ED has provided to the universities here. *See Venetian Casino Resort*, 530 F.3d at 934–35.

127. The October 2 publication would disclose information protected by the Trade Secrets Act and Exemption 4 of the FOIA, in violation of those statutes.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Declare the Publication Decision is contrary to law and arbitrary and capricious;

b. Declare the 2026 ICR is contrary to law and arbitrary and capricious;

c. Vacate and set aside the Publication Decision under 5 U.S.C. § 706(2);

d. Vacate and set aside the 2026 ICR under 5 U.S.C. § 706(2);

e. Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert with them and at their direction from publishing, disclosing, or otherwise making publicly available the names or other identifying information of foreign sources reported to the Department of Education in Section 117 reports to date, including the publication announced for October 2, 2026, excluding the names of the 92 foreign entities published on July 15, 2026;

f. Stay the Publication Decision under 5 U.S.C. § 705;

g. Award Plaintiff its costs and reasonable attorneys' fees under any applicable law; and

h. Grant such further relief as the Court deems just and proper.

Dated: October 1, 2026

Respectfully submitted,

*/s/ Lindsay C. Harrison*

Lindsay C. Harrison (D.C. Bar No. 977407)
Ishan K. Bhabha (D.C. Bar No. 1015673)
Elizabeth Henthorne (D.C. Bar No. 1562688)
Michael J. Vernick (D.C. Bar No. 461811)
Amanda Shafer Berman (D.C. Bar No. 31597)
Anjali Motgi (D.C. Bar No. 90035091)
Kara V. Brandeisky (D.C. Bar No. 90020421)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com
ibhabha@jenner.com
bhenthorne@jenner.com
mvernick@jenner.com
aberman@jenner.com
amotgi@jenner.com
kbrandeisky@jenner.com

Andrianna D. Kastanek (*pro hac vice pending*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com

Jeremy Feigenbaum (*pro hac vice pending*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
jfeigenbaum@jenner.com

*Counsel for Plaintiff Association of American Universities*