**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ASSOCIATION OF AMERICAN UNIVERSITIES,

*Plaintiff,*

v.

U.S. DEPARTMENT OF EDUCATION, *et al.*,

*Defendants.*

Case No. 26-cv-3438

**PLAINTIFF ASSOCIATION OF AMERICAN UNIVERSITIES' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY OF AGENCY ACTION**

Pursuant to Federal Rule of Civil Procedure 65(b) and Local Civil Rule 65.1(a), Plaintiff Association of American Universities ("AAU") respectfully moves this Court to enter emergency relief before October 2, 2026 (1) temporarily restraining all Defendants,[1] their officers, agents, employees, and all persons acting in concert with them from publishing, disclosing, or otherwise making publicly available any previously undisclosed identifying information of foreign donors and contract counter-parties ("covered donors") that was reported by AAU's member institutions under Section 117 of the Higher Education Act, 20 U.S.C. § 1011f, and from taking any other action to effectuate the Department of Education's recent decision to publish such information (the "Publication Decision"); and (2) staying the effective date of the Publication Decision pursuant to

[1] Defendants include the Department of State as well as the Department of Education because the two agencies have signed an interagency agreement under which the State Department helps administer the reporting regime at issue here, including the collection and the publication of information covered by Section 117 of the Higher Education Act. *See* Compl. ¶ 26. To ensure the government does not evade a restraint on its publication of donors' personal information, Defendants bring suit against and ask for temporary relief that applies to both agencies.

5 U.S.C. § 705. AAU respectfully asks that this Court grant both forms of relief for 28 days to allow the parties time to brief the motion for a preliminary injunction and further Section 705 stay.

As set forth in the accompanying Memorandum of Law, AAU is likely to succeed on the merits of this suit. The Publication Decision is unlawful for many reasons, including that it (1) exceeds the Department of Education's statutory authority under Section 117; (2) is arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because the Department of Education failed to adequately and reasonably explain its reversal of position, did not meaningfully address important aspects of the problem (including the serious safety threats publication will create for many covered donors), provided internally inconsistent reasoning, and retroactively changed the legal consequences of prior informational submissions the universities made without meaningfully addressing the serious reliance interests the government's repeated past assurances of confidentiality engendered; (3) violates the First Amendment rights of AAU's members and their covered donors; (4) violates the Department of Education's own rules as set forth in the 2020 and 2023 ICRs; and (5) would disclose information protected by Exemption 4 of the Freedom of Information Act, in violation of the Trade Secrets Act and the FOIA regulation governing the disclosure of confidential business information, 34 C.F.R. § 5.11.

As also explained in AAU's Memorandum of Law, absent immediate relief tonight, AAU members and their donors will suffer immediate and irreparable injury. Publication of the identities of covered donors who gave gifts in reliance on the Department of Education's promises of confidentiality is irreversible. It exposes covered donors to risks of retaliation, harassment, and violence. And it inflicts a chilling effect on members' associational and expressive rights that itself constitutes irreparable harm. The balance of equities and the public interest also favor immediate relief. The government has kept the information at issue confidential for between six months and

six years and can identify no injury from maintaining the status quo for the time needed to resolve this suit, while AAU's members and their donors face harm that cannot be undone.

Given the Department of Education's publicly announced October 2, 2026 disclosure date, AAU respectfully requests that the Court consider this motion on an expedited basis and resolve it today. If a hearing would assist the Court, AAU requests that the Court schedule one at its earliest convenience. A proposed order is submitted herewith.

Pursuant to Local Rule 65.1(a), on September 30, 2026, Counsel for AAU emailed Esam Al-Shareffi, Michelle Bennett, and Alex Haas of the Federal Programs Branch, Civil Division, U.S. Department of Justice to provide notice that, if the Defendants did not postpone their publication decision, AAU would seek emergency relief. The government declined to do so at 8:49pm last night. At the government's own urging, however, AAU spoke with federal officials today to discuss the possibility of an extension—but the government refused to provide any written assurance that it would not publish donors' identifying information on October 2. Relief is thus urgently needed today to prevent imminent publication of that information.

On October 1, 2026, Counsel for AAU emailed Al-Shareffi, Michelle Bennett, and Alex Haas of the Federal Programs Branch, Civil Division, U.S. Department of Justice a copy of the Complaint, Motion for a Temporary Restraining Order, Preliminary Injunction, and Stay of Agency Action, and accompanying brief, declaration, exhibits, and proposed order at the following email addresses:

**Esam Al-Shareffi**, Federal Programs Branch, DOJ
Esam.K.Al-Shareffi@usdoj.gov

**Michelle Bennett**, Federal Programs Branch, DOJ
Michelle.Bennett@usdoj.gov

**Alex Haas**, Federal Programs Branch, DOJ
Alex.Haas@usdoj.gov

In addition, counsel for AAU submitted via Overnight Mail copies of the Complaint, Motion for a Temporary Restraining Order, Preliminary Injunction, and Stay of Agency Action, and the accompanying brief, declaration, exhibits, and proposed order, to the following entities contemporaneously with completing this electronic filing:

**U.S. Department of Education**
Attn: Linda McMahon
400 Maryland Avenue, SW
Washington, DC 20202

**U.S. Department of State**
Attn: Marco Rubio
2201 C Street NW
Washington, DC 20520

**Attorney General of the United States**
Todd Blanche
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

**United States Attorney's Office for the District of Columbia**
Jeanine Pirro
c/o Civil Process Clerk
601 D Street, NW
Washington, DC 20530

Dated: October 1, 2026

Respectfully submitted,

*/s/ Lindsay C. Harrison*
Lindsay C. Harrison (D.C. Bar No. 977407)
Ishan K. Bhabha (D.C. Bar No. 1015673)
Elizabeth Henthorne (D.C. Bar No. 1562688)
Michael J. Vernick (D.C. Bar No. 461811)
Amanda Shafer Berman (D.C. Bar No. 497860)
Anjali Motgi (D.C. Bar No. 90035091)
Kara V. Brandeisky (D.C. Bar No. 90020421)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000

lharrison@jenner.com
ibhabha@jenner.com
bhenthorne@jenner.com
mvernick@jenner.com
aberman@jenner.com
amotgi@jenner.com
kbrandeisky@jenner.com

Andrianna D. Kastanek (*pro hac vice pending*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com

Jeremy Feigenbaum (*pro hac vice pending*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
jfeigenbaum@jenner.com

*Counsel for Plaintiff Association of American Universities*

**CERTIFICATE OF SERVICE**

I hereby certify that following electronic filing of the foregoing document and accompanying materials with the Clerk of the Court for the United States District Court for the District of Columbia using the CM/ECF system, I will cause the document and accompanying materials to be served via email on counsel for the government (Diane Kelleher, Michelle Bennett, and Patrick Keating, Federal Programs Branch, Civil Division, U.S. Department of Justice) and via certified mail on the following parties:

U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Linda McMahon
Secretary of Education
400 Maryland Avenue, SW
Washington, DC 20202

U.S. Department of State
2201 C Street NW
Washington, DC 20520

Marco Rubio
Secretary of State
2201 C Street NW
Washington, DC 20520

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

United States Attorney's Office
for the District of Columbia
601 D Street, NW
Washington, DC 20530

Dated: October 1, 2026

*/s/ Lindsay C. Harrison*
Lindsay C. Harrison

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ASSOCIATION OF AMERICAN UNIVERSITIES,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION, *et al*.,

*Defendants*.

Case No. ____________

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF ASSOCIATION OF AMERICAN UNIVERSITIES' MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY OF AGENCY ACTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... ii

INTRODUCTION .................... 1

BACKGROUND .................... 5

LEGAL STANDARD .................... 11

ARGUMENT .................... 12

I. AAU Is Likely to Succeed on the Merits .................... 13

A. Section 117 Does Not Permit, Let Alone Require, the October 2 Publication .................... 14

B. The Publication Decision Is Arbitrary and Capricious .................... 17

1. ED Has Not Explained Its Reversal of Position .................... 17

2. ED Failed to Consider Important Issues, Including the Safety of Affected Donors .................... 20

3. The Publication Decision Is Internally Inconsistent .................... 23

4. The Publication Decision Is Impermissibly Retroactive .................... 24

C. The Publication Decision Violates the First Amendment .................... 26

D. The Publication Decision Violates ED's Own Regulations .................... 31

E. The Publication Decision Violates the Trade Secrets Act and the FOIA .................... 33

II. AAU Satisfies the Remaining Factors for a Temporary Restraining Order .................... 35

A. AAU's Members and their Donors Will be Immediately and Irreparably Harmed by the October 2 Publication .................... 35

B. The Balance of the Equities and Public Interest Favor AAU .................... 40

III. The Court Should Restrain, Enjoin, and Stay the Publication Decision .................... 42

CONCLUSION .................... 44

## TABLE OF AUTHORITIES[*]

**CASES**

*American Academy of Pediatrics v. United States Department of Health & Human Services*, 816 F. Supp. 3d 27 (D.D.C. 2026)....................39

*American Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99 (D.D.C. 2018), *aff'd sub nom. American Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020)....................44

*American Library Ass'n v. Sonderling*, 783 F. Supp. 3d 57 (D.D.C. 2025)....................12

*American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017)....................17

**Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021)....................27, 28, 29

*ANR Storage Co. v. FERC*, 904 F.3d 1020 (D.C. Cir. 2018)....................23

*Arkema, Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010)....................24

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)....................31

*Baggett v. Bullitt*, 377 U.S. 360 (1964)....................31

*Battle v. FAA*, 393 F.3d 1330 (D.C. Cir. 2005)....................31

*Bennett v. Spear*, 520 U.S. 154 (1997)....................14

*Bowen v. Georgetown University Hospital*, 488 U.S. 204 (1988)....................24

*Center for Biological Diversity v. EPA*, 141 F.4th 153 (D.C. Cir. 2025)....................22

*Chadmoore Communications, Inc. v. FCC*, 113 F.3d 235 (D.C. Cir. 1997)....................26

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)....................36

*Cigar Ass'n of America v. United States FDA*, 480 F. Supp. 3d 256 (D.D.C. 2020), *aff'd*, 5 F.4th 68 (D.C. Cir. July 20, 2021)....................21

*Clevinger v. Advocacy Holdings, Inc.*, No. CV 23-1159, 2023 WL 5220570 (D.D.C. Aug. 15, 2023), *aff'd*, 134 F.4th 1230 (D.C. Cir. 2025)....................35, 36

*CNA Financial Corp. v. Donovan*, 830 F.2d 1132 (D.C. Cir. 1987)....................33

---

[*] Authorities chiefly relied upon are marked with an asterisk.

*Coalition for Independent Technology Research v. Rubio*, 836 F. Supp. 3d 215 (D.D.C. 2026) ....................43, 44

*COMPTEL v. FCC*, 910 F. Supp. 2d 100 (D.D.C. 2012) ....................34

*Council of Parent Attorneys and Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28 (D.D.C. 2019) ....................17–18

*Council on American-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67 (D.D.C. 2009) ....................36, 39

*CSL Plasma Inc. v. United States CBP*, 628 F. Supp. 3d 243 (D.D.C. 2022) ....................19

*Defense Distributed v. United States Department of State*, 838 F.3d 451 (5th Cir. 2016) ....................36, 40

*DHS v. Regents of the University of California*, 591 U.S. 1 (2020) ....................25

*Doctors for America v. OPM*, 766 F. Supp. 3d 39 (D.D.C. 2025) ....................37

*Doe No. 1 v. Reed*, 561 U.S. 186 (2010)....................27

*Doe v. United States Department of Justice*, 753 F.2d 1092 (D.C. Cir. 1985)....................31–32

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568 (1988) ....................17

*Electronic Privacy Information Center v. United States DHS*, 117 F. Supp. 3d 46 (D.D.C. 2015) ....................34

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................38

* *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ....................17, 24, 25

*Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009)....................30

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)....................26, 30

* *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)....................18, 19, 25

*FDA v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542 (2025)....................17

*FEC v. Cruz*, 596 U.S. 289 (2022)....................14

**First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174 (2026)....................26, 29, 38

*Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019)....................33

*General Chemical Corp. v. United States*, 817 F.2d 844 (D.C. Cir. 1987) .....24

*Hospitality Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010).....36

*Ibrahim v. DHS*, 669 F.3d 983 (9th Cir. 2012) .....30

*Kelly v. Hegseth*, 820 F. Supp. 3d 1 (D.D.C. 2026), *appeal docketed*, No. 26-5070 (D.C. Cir. Feb. 27, 2026) .....40

*Kirwa v. United States Department of Defense*, 285 F. Supp. 3d 257 (D.D.C. 2018) .....24, 26

*LC ex rel. Cali v. Trump*, No. 26-cv-688, 2026 WL 1329750 (D.D.C. May 13, 2026), *appeal docketed*, No. 26-5172 (D.C. Cir. May 20, 2026) .....30

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .....40

*Lopez v. FAA*, 318 F.3d 242 (D.C. Cir. 2003) .....32

*Make the Road New York v. Mullin*, 179 F.4th 16 (D.C. Cir. 2026) .....43

*Make the Road New York v. Noem*, No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .....43

*McCutcheon v. FEC*, 572 U.S. 185 (2014) .....28

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) .....39

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983).....21, 22

* *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) .....26, 29

*Natural Resources Defense Council v. United States NRC*, 879 F.3d 1202 (D.C. Cir. 2018) .....23

*National Endowment for Democracy v. United States*, 795 F. Supp. 3d 63 (D.D.C. 2025), *appeal docketed*, No. 25-5361 (D.C. Cir. Oct. 14, 2025).....40

*National Environmental Development Association's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) .....34

*New Hampshire Right to Life v. United States Department of Health & Human Services*, 778 F.3d 43 (1st Cir. 2015).....34

*New Jersey v. United States Department of Transportation*, 835 F. Supp. 3d 477 (S.D.N.Y. 2026) .....31

*Nken v. Holder*, 556 U.S. 418 (2009) .....12, 40

*PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194 (D.C. Cir. 2005) ....................................21

*Ranjan v. United States DHS*, 747 F. Supp. 3d 192 (D.D.C. 2024) .............................................30

*Retail, Wholesale & Department Store Union, AFL-CIO v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972) ..........................................................................................................24

*RFE/RL, Inc. v. Lake*, 772 F. Supp. 3d 79 (D.D.C. 2025) ...........................................................11

*Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988)..........................................................................................................................29

*Russello v. United States*, 464 U.S. 16 (1983) ...............................................................................15

*Sunoco Pipeline, L.P. v. United States Department of Transportation*, No. 21-CV-1760, 2023 WL 11195824 (D.D.C. Sept. 29, 2023) ...........................................................34

*Taylor v. Trump*, 823 F. Supp. 3d 17 (D.D.C. 2026)......................................................................38

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)......................................................................................43

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ............................................31

*United States Sugar Corp. v. EPA*, 830 F.3d 579 (D.C. Cir. 2016).......................................20–21

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)..............................................................30

*Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008).............................33, 35

*Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) .....................29

*West Virginia v. EPA*, 597 U.S. 697 (2022).......................................................................................16

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)................................11–12

*World Shipping Council v. Federal Maritime Commission*, 152 F.4th 215 (D.C. Cir. 2025) .................................................................................................................................23

**STATUTES**

5 U.S.C. § 552(b)(4) ...........................................................................................................................7

5 U.S.C. § 705..............................................................................................................4, 13, 42, 43, 44

5 U.S.C. § 706(2)(B).............................................................................................................................31

18 U.S.C. § 1905...................................................................................................................................33

20 U.S.C. § 1011f .........................................................................................................................1, 5, 28

20 U.S.C. § 1011f(a) .......................................................................................................5

20 U.S.C. § 1011f(b).......................................................................................................2

20 U.S.C. § 1011f(b)(1) ...............................................................................................5, 15

20 U.S.C. § 1011f(b)(2) ...............................................................................................5, 15

20 U.S.C. § 1011f(b)(3) ...............................................................................................5, 14

20 U.S.C. § 1011f(c)(2) ...............................................................................................5, 15

20 U.S.C. § 1011f(e).............................................................................................5, 14, 23

20 U.S.C. § 1011f(f) .......................................................................................................16

**OTHER AUTHORITIES**

34 C.F.R. § 5.11 .............................................................................................................34

Agency Information Collection Activities; Comment Request; Foreign Gifts and Contracts Disclosures, 91 Fed. Reg. 20,156 (Apr. 15, 2026) ..............................................9

Off. of Info. & Regul. Affs., Off. of Mgmt. & Budget, Notice of Action, OMB Control No. 1845-0172, ICR Reference No. 202604-1845-006 (Aug. 6, 2026) .....................11

Transparency Regarding Foreign Influence at American Universities, Exec. Order No. 14282, 90 Fed. Reg. 17,541 (Apr. 23, 2025) ..........................................................8

U.S. Dep't of Educ., *Section 117 Foreign Gift and Contract Reporting: FAQs*, Fed. Student Aid, https://fsapartners.ed.gov/knowledge-center/topics/section-117-foreign-gift-and-contract-reporting/resources/frequently-asked-questions (question PD-Q2) (modified June 18, 2026)...........................................................23

## INTRODUCTION

This motion seeks immediate relief to avoid the government's imminent publication—this Friday, October 2—of sensitive personal information that the government lacks the authority to disclose and repeatedly promised, across multiple Presidential Administrations, not to make public. Institutions of higher education, including members of the Association of American Universities ("AAU"), provided this information, including the identities of their own foreign donors and their contract counter-parties ("covered donors"), despite the government's lack of authority to request it and based on the government's repeated promises it would not be published. The government now plans to break those promises and publish years of confidential donor information.

Once published, this information will irrevocably put countless donors around the world at risk of retaliation, harassment, and, in some cases, physical danger, including from foreign governments hostile to the free exchange of ideas embraced by American universities. The Department of Education ("ED") previously acknowledged these profound risks, which will materialize if it moves forward with its publication on Friday and can never thereafter be remedied. AAU asked the government to postpone its publication by just another week to provide the Court more time to consider this motion, but at 8:49pm on September 30, the government declined. AAU therefore seeks an emergency order temporarily restraining and staying the government's decision to publish covered donors' identifying information ("Publication Decision"), to preserve the status quo and prevent irreparable harm while this Court reviews AAU's claims.

Under Section 117 of the Higher Education Act of 1965, 20 U.S.C. § 1011f, institutions of higher education must disclose certain information about funding received from non-U.S. citizens, nationals, and entities to ED, which it must make available to the public. But, as relevant here, the statute requires institutions to report only the "aggregate dollar amount" of donations "attributable

to a particular country," *id.* § 1011f(b), not the identities of covered donors. Six years ago, ED deviated from the statute to request that institutions *also* provide individual donor and contractor names and addresses, on the theory that this information was necessary to ensure that universities were fulfilling their aggregate reporting obligations under the statute. ED, however, repeatedly made an important promise: It would not make this information public. In reliance on that promise and in the spirit of cooperation with the government, AAU members elected to provide this information even though reporting it is not required by law. But they did so based on ED's repeated and unambiguous assurances that covered donors' identifying information would not be publicized.

ED now plans to break its promise. In July 2026, with virtually no explanation, ED announced it would publish the identities of every covered donor that institutions have reported since 2020—all submitted in reliance on a promise of confidentiality that ED has now abandoned. Although it deferred full implementation of that Publication Decision repeatedly, ED did make a limited publication of donor information on July 15, publishing the identities of 92 covered donors it labeled as "counterparties of concern" because they appeared on one of the many lists maintained by a federal agency (though, as ED acknowledged, some of the gifts were made before the foreign source appeared on any such list). The government now threatens to publish all remaining covered donor identities, including individual donors for whom publication would violate their privacy and threaten their safety. And while ED postponed publication several times, it publicly announced on September 25, 2026, that full remaining publication would occur just one week later—on October 2, 2026. Immediate relief is thus necessary to avoid irreparable harm to AAU's members and their donors and preserve the status quo for the time necessary to resolve this action.

AAU meets all the requirements for the relief it seeks. As to AAU's likelihood of success, the merits here are neither complicated nor close, and AAU is likely to succeed for the reasons

below and in the Complaint. To begin, neither Section 117 nor any other statute authorizes ED to make the disclosures challenged here. Rather, Section 117 identifies the limited circumstances in which identities of covered donors may be publicly disclosed, and as a matter of statutory text and structure, ED is not free to publish the identities of *other* donors that it wishes Congress had given it authority to publish as well. Next, ED's Publication Decision is a violation of the Administrative Procedure Act ("APA"). ED reneged on promises of confidentiality it made to induce the disclosure of the information it now seeks to publicize, with no serious explanation for why retroactive disclosure is warranted, and without grappling with how this about-face destroys the reliance interests of institutions that voluntarily disclosed information and gravely threatens individuals' safety. The Publication Decision also violates the First Amendment rights of AAU's members and their donors. The Supreme Court has repeatedly held that compelled disclosure of an organization's supporters is an improper burden on its associational rights and therefore subject to exacting scrutiny—a demanding test ED is far from satisfying. The Publication Decision further violates ED's own rules, as well as the Trade Secrets Act and the Freedom of Information Act.

The evidence of irreparable harm, and consideration of the overall equities, also point powerfully in favor of a court order briefly freezing the status quo. It is difficult to overstate the looming irreparable harm. The publication of previously private and confidential information is definitionally irreversible: Once donors' identifying information is posted to ED's public website, it can and will likely be copied, indexed, and republished within hours. No later ruling by this Court can restore the confidentiality that ED's publication will destroy. Indeed, courts in this Circuit and around the country have held that publication of confidential personally identifying information ("PII") is a *per se* irreparable injury. But the threat of irreparable injury is especially powerful here, where the donors—including individuals with family, property, or business

interests in countries whose governments monitor and disfavor those associated with U.S. institutions, and who gave to AAU members understanding that the gifts would not be made public—face threats of retaliation, harassment, and in some cases even physical danger from the imminent disclosure of their names. The retroactive public exposure of the identities of covered donors thus imposes an irreparable injury both to AAU's members and to their donors, punishing past constitutionally protected conduct and chilling future exercises of core associational rights.

The balance of the equities and public interest are in accord. While AAU, its members, and their donors face imminent and irreparable harm, there is no urgency to ED's invented October 2 publication deadline. The donor identities ED plans to publish were collected between six months and six years ago. ED has held these identities in confidence, consistent with its written assurances, for the entirety of that period. No statute, regulation, or court order requires publication on October 2, 2026; none contemplates this disclosure at all. And since ED already disclosed the identities of 92 covered donors who appeared on various other government lists, it cannot claim that there is some urgent or security-related need to disclose the remaining covered donors tomorrow. Instead, the equities favor preserving decades of settled practice across Administrations for the limited time judicial review requires, rather than permitting ED to irrevocably break its promises.

This Court should issue a temporary restraining order ("TRO") enjoining all Defendants from publishing the identifying information (including but not limited to names and addresses) of any covered donors reported by AAU's member institutions since 2020 that have not been previously disclosed, together with a stay of ED's Publication Decision under 5 U.S.C. § 705, before ED irrevocably publishes donor identifying information on October 2. And it should, after full briefing, then issue a preliminary injunction, again together with a Section 705 stay.

## BACKGROUND

***Statutory and Regulatory Overview***

Section 117 of the Higher Education Act, 20 U.S.C. § 1011f, governs universities' disclosures about foreign funding to ED. The statute requires all institutions of higher education to submit the aggregate amount of foreign gifts and contracts greater than $250,000, identified by country of origin. *See id.* § 1011f(a), (b)(1)–(2). By contrast, Congress requires submission of *the identity* of a foreign source of a gift or a contract in only two narrow circumstances: where the foreign source actually owns or controls the institution, *see id.* § 1011f(b)(3), and where a foreign government makes a restricted or conditional gift or contract, *see id.* § 1011f(c)(2). Section 117, in turn, makes all the disclosure reports that are required by statute—and only the reports required by the statute—open to inspection by the public. *See id.* § 1011f(e).

For nearly four decades, ED administered its Section 117 program exactly as Congress designed it, publishing aggregate amounts of gifts received by each reporting institution by country—but not requiring or publishing the identities of foreign sources, including individual donors, except as directed by Section 117(b)(3) and (c)(2). *See* Decl. of Barbara Snyder, President, AAU, Ex. A ("AAU Decl.") ¶ 15; *see also* ECF No. 1, ¶¶ 27, 28, 33 ("Compl.").

In 2019, under the leadership of then-Secretary Betsy DeVos, ED began asking institutions to report the names and addresses of individual covered donors of gifts and contracts, in addition to the statutorily mandated aggregate data. Compl. ¶¶ 34–35. But when it revised the information collection request ("ICR") for Section 117 reporting,[1] ED expressly and repeatedly said it was collecting the names solely for enforcement purposes—specifically, to aid in assessing whether

[1] An ICR is a submission an agency makes under the Paperwork Reduction Act ("PRA") to obtain approval from the Office of Management and Budget ("OMB") for a new or revised method of collecting information.

institutions were generally in compliance with Section 117—and that it would never publicly disclose them. Compl. ¶¶ 35–36. ED told universities explicitly that it "does not consider the name and address it seeks under this information collection to be part of the disclosure report that must be made public under Section 117(e)," and that the names and addresses of individual covered donors are "not information that Congress intended to be part of the public disclosure report." 2020 Comment Response at 4, Compl. Ex. 15. Then, in the application it filed with OMB to obtain approval for the new collection, ED stated, without qualification, that it "will not make the names and addresses provided through this information collection request part of the publicly available disclosure report." 2020 Supporting Statement at 5, Compl. Ex. 14. That document functioned as the agency's official statement of the data's uses—and its statement about how the data would *not* be used could not have been more unambiguous.

In 2023, ED submitted a new ICR to OMB for approval, in which it renewed the collection of donor names and addresses and repeated its assurances of confidentiality nearly verbatim. Compl. ¶¶ 39, 40. ED again committed to withholding names and addresses from an institution's publicly disclosed Section 117 report, confirming it would "not make the names and addresses provided through this information collection request part of the publicly available disclosure report." 2023 Supporting Statement at 5, Compl. Ex. 12; *see also* 2023 Comment Response at 2, Compl. Ex. 11 (ED again "assur[ing] submitting institutions" it "will withhold the foreign source party's name and address (excepting country) from the public disclosure report"). And it promised to follow its own FOIA procedures—giving each institution notice, an opportunity to object, and a written explanation before disclosing any information that the institution flagged as confidential commercial information. 2023 Supporting Statement at 5, Compl. Ex. 12. In furtherance of these protections, ED built a checkbox into its reporting portal through which each institution could

designate a transaction as confidential and exempt from public disclosure under FOIA. *See* Compl. ¶¶ 42, 48; ACE Letter at 3, Compl. Ex. 8; *see also* 5 U.S.C. § 552(b)(4).

***Reliance on ED's Assurances of Confidentiality***

Many universities passed these assurances on to affected supporters, and covered donors gave in reliance on them. *See* AAU Decl. ¶¶ 11, 16–18, 26–27. Multiple AAU members received gifts made by covered donors based on the understanding those gifts would not be made public due to donors' fear of retribution or reprisal, including from their hostile foreign governments. *See id*. ¶¶ 15, 24–30. Higher-education associations have communicated these concerns to the ED in writing, explaining that publication "could have tragic, and even deadly, consequences for some foreign donors"—including for political dissidents, individuals with family in countries where the government monitors contacts with U.S. institutions, and donors who fund causes unpopular with their home governments. ACE Letter at 3, Compl. Ex. 8. ED has never disputed the accuracy of these safety concerns. 2026 Comment Response at 4, Compl. Ex. 6. Nor could it: hostile foreign governments have made clear such associations have consequences: Russia, for one, made it a crime to finance American universities that it has blacklisted—including at least six AAU members or their programs. *See* AAU Decl. ¶¶ 28–29; Compl. ¶¶ 12, 23, 75, 96.

ED's longstanding promise not to publicly disclose the names of donors also protects AAU members' associational interests, including their rights to solicit and receive funding from donors of their choosing, and to develop relationships with those donors. *See* AAU Decl. ¶¶ 12, 17, 26–28, 33. Those rights have always existed in parallel with ED's Section 117 compliance efforts; AAU members have voluntarily complied with ED's requests for information when the agency has deemed such information necessary to assess Section 117 compliance, even though donors expressed concern about their identifying information being provided to the federal government.

*Id.* ¶¶ 9, 16–17. But AAU's members have always done so in reliance on ED's promise that it would not share that information with others. *Id.* ¶ 16.

***Recent Developments***

Shortly after taking office in 2025, President Trump issued an Executive Order announcing his administration's policy "to end the secrecy surrounding foreign funds in American educational institutions." Transparency Regarding Foreign Influence at American Universities, Exec. Order No. 14,282, § 1, 90 Fed. Reg. 17,541, 17,541 (Apr. 23, 2025). The Order directed the Secretary of Education to "take all appropriate actions to enforce the requirements of [Section 117]," including by requiring "complete and timely disclosure by higher education institutions of foreign funding" and "universities to more specifically disclose details about foreign funding, including the true source and purpose of the funds." *Id.* § 2(b), 90 Fed. Reg. at 17,541. The Order further directed that "the Secretary shall provide the American people with greater access to information about foreign funding to higher education institutions." *Id.* § 2(c), 90 Fed. Reg. at 17,541. The Order did not, however, direct publication of individual covered donors' names.

In January 2026, ED launched a new Section 117 reporting portal, as well as a new public-facing website (www.foreignfundinghighered.gov), which made available the statutorily mandated aggregate data about each institution's foreign gifts on a "Section 117 Foreign Gift and Contract Public Transparency Dashboard." *See* Compl. ¶ 49; AAU 2026 Comment at 3–4, Compl. Ex. 9. The new reporting portal, however, did not include the checkbox that had previously permitted institutions to designate their reports confidential under FOIA's Exemption 4. *See* ACE Letter at 3, Compl. Ex. 8. Other than that modification, however, ED did not purport to change its longstanding position across Administrations on the confidentiality of donor identities.

A few months later, on April 15, 2026, ED published a notice proposing to revise the Section 117 ICR in which it asserted for the first time that publication of donor identities is required by Section 117(e). *See* Agency Information Collection Activities; Comment Request; Foreign Gifts and Contracts Disclosures, 91 Fed. Reg. 20,156 (Apr. 15, 2026) (Docket No. ED-2026-SCC-1354); April 2026 Supporting Statement at 5, Compl. Ex. 10. ED declared for the first time its plans to require individuals submitting the Section 117 reporting form to certify that the institution for whom they are submitting it is in compliance with Section 117. Compl. Ex. 10 at 5. These changes appeared to be prospective only; ED stated that, when making submissions on ED's new collection portal, universities would be warned that "the Department intends to publish the contents of reports made by institutions . . . including publication of details about specific counterparties, such as the counterparty's name." *Id.*

Following a sixty-day comment period required by OMB regulations, on June 29, 2026, ED posted a response to comments it received on its proposed revisions to the ICR and a slight alteration to its ICR proposal. 2026 Comment Response, Compl. Ex. 6.[2] Tucked away on page 4 of its comment responses—a regulatory document posted only on OMB's website—ED stated that, on July 15, 2026, it would publish the names of all covered donors *previously* reported, and would continue to publish such names on an ongoing basis. *See* 2026 Comment Response at 4, Compl. Ex. 6. This buried statement went unnoticed by AAU members until July 6, 2026, when ED's Federal Student Aid Office ("FSA") issued a brief message to institutions—its first direct communication on the subject—styled as a routine "[r]eminder" of the upcoming Section 117

[2] The 2026 Comment Response also made a slight modification to ED's proposed revisions to the ICR. In response to concerns that individuals might be held liable for institutions' non-compliance as a result of the new certification requirement, ED altered the certification so that individuals submitting the Section 117 form would certify to compliance with the statute "on behalf of my institution." 2026 Comment Response at 6, Compl. Ex. 6.

submission deadline on July 31. July 6 Announcement, Compl. Ex. 4. The "reminder" informed universities that ED would be publishing "the names of all foreign sources from prior reporting cycles" on July 15, 2026. *Id.*

The reminder asserted, without any detail, that the decision to publish the names of covered donors was "[c]onsistent with previous public statements." *Id.* But prior to the June 29, 2026 comment response document, ED had never stated that it would publish the donor identities it had collected since 2020; every public statement addressing those identities said they *would not* be made public. The April 2026 notice is no exception: As explained above, it proposed prospective changes only and never indicated that ED would publish names it had previously collected. *See* Compl. ¶¶ 58, 59. And apart from the July 6 "reminder" from FSA, ED sent universities no further information, explanation, or opportunity for comment or objection—including as to any particular donor who may have an especially acute need for confidentiality—about its decision to imminently publish the identities of all donors (the "Publication Decision").

On July 15, 2026, ED made a limited publication on its Section 117 website of 92 foreign sources reported by institutions as counterparties for gifts or contracts since 2020 that had appeared on a "U.S. Government List." *Id.* ¶¶ 61–63. Other than cross-checking "U.S. Government Lists," ED did not appear to have carefully reviewed the information it published; the July 15 publication included the names of U.S.-based entities not properly deemed covered donors and therefore not subject to Section 117 reporting at all (but were likely reported by institutions out of an abundance of caution), *id.* ¶ 63(a), and also included several inaccuracies in dates and amounts of specific gifts and contracts listed as associated with the 92 counterparties. ED, in publishing this data, acknowledged that "[s]ome of the[] funds" at issue "were received by institutions of higher education before the foreign entity appeared on a U.S. Government List" and stated that ED was

unable to "distinguish between those funds received before and after the foreign entity appeared on a U.S. Government List." *Id.* ¶ 62 (quoting Dashboard, Compl. Ex. 1).

Unfortunately, ED now insists on moving forward with the remainder of the Publication Decision—even though all remaining donor identities, by definition, do not appear on any "U.S. Government List." On August 6, 2026, ED published a Notice of Action that the revised ICR had been adopted as proposed—meaning that the forward-looking 2026 ICR, which seeks university submission of donor identities without the same promise of confidentiality going forward, is now final. *See* Off. of Info. & Regul. Affs., Off. of Mgmt. & Budget, Notice of Action, OMB Control No. 1845-0172, ICR Reference No. 202604-1845-006 (Aug. 6, 2026). And ED reaffirmed its plans to post online, for the world to see, the full six years of names it collected pursuant to the 2020 and 2023 ICR. Compl. ¶¶ 64–65 (quoting Dashboard, Compl. Ex. 1). Indeed, on September 25, ED declared that it will publish all remaining covered donor names on October 2. *Id.* ED offered no rationale for the specific publication dates—either its original July 15 date, or its current final date of tomorrow, October 2. As of 8:49pm last night, it refused to extend that date any further, rejecting AAU's request for just one additional week. Compl., Ex. 17. AAU then (at the government's urging) spoke with federal officials on October 1 at 11:45am to discuss possible further extensions, but the government refused to provide any written assurance of further extensions. Ex. B (Email from Lindsay Harrison to Federal Officials, Oct. 1, 2026).

In short, the government is poised to imminently publish, on a website accessible to anyone in the world, the names of all covered donors to universities, reported since 2020 under the ED's express and unequivocal assurances of confidentiality.

**LEGAL STANDARD**

A TRO and/or preliminary injunction should be granted where "1) the movant is likely to succeed on the merits; 2) the movant is likely to suffer irreparable harm unless preliminary relief

is granted; 3) the balance of the equities favors a TRO or preliminary injunction; and 4) a TRO is in the public interest." *RFE/RL, Inc. v. Lake*, 772 F. Supp. 3d 79, 83 (D.D.C. 2025) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Am. Libr. Ass'n v. Sonderling*, 783 F. Supp. 3d 57, 59 n.2 (D.D.C. 2025) (the "same standard applies to both temporary restraining orders and to preliminary injunctions"). Where, as here, the government is a party, the latter two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

AAU now seeks a TRO and a stay, and ultimately a preliminary injunction and a stay, of the Publication Decision to prevent ED's flagrantly unlawful final decision from forever harming AAU's members and threatening their donors' safety.[3] Every U.S.-based AAU member institution has received gifts and contracts valued at $250,000 or more from foreign sources, and is therefore subject to Section 117 reporting requirements, as reflected on the public Section 117 Dashboard. *See* AAU Decl. ¶ 10. AAU members have also been providing ED with names and addresses of covered donors since 2020, consistent with ED's 2020 and 2023 ICRs. *Id.* ¶¶ 9, 16. When covered donors to AAU's members expressed concern that they might face political retaliation, adverse government attention, or even violence in their home country if their identities as donors to these institutions are revealed, many AAU members made assurances of confidentiality based on ED's prior representations that it would not disclose those identities. *Id.* ¶¶ 11, 16–18, 26–30. AAU members will thus be immediately and directly affected by ED's October 2 publication.

[3] Although AAU's complaint also challenges the forward-looking 2026 ICR, that is not the subject of this motion because the 2026 ICR applies to the information reporting cycle that begins in January 2027. This motion solely seeks relief from the Publication Decision, pursuant to which the Department will, tomorrow, publish donor identities *already* collected over the last six years.

This is an unusually straightforward case for emergency relief. The government intends to disclose a wealth of private donor information tomorrow, October 2, 2026. It refuses to move that date by even another week. That publication will work extraordinary harms—harms ED repeatedly recognized, throughout the last six years, when promising confidentiality. Because publication can never be undone, its harms are permanent. There is no reason for the government to move forward tomorrow, October 2. Nor will the government be harmed by a judicial order maintaining its own six-year status quo for a few weeks longer while this Court reviews the merits of this case.

And the merits are overwhelming. The Publication Decision flouts ED's limited statutory authority to collect and publish only aggregated donor information and violates other privacy- and information-related laws; relies on reasoning that is arbitrary and capricious and impermissibly imposes a retroactive burden ED promised not to inflict; and violates bedrock requirements under the First Amendment and other laws that protect donors and the associations to which they donate. This Court should swiftly prevent ED from further implementing its Publication Decision and stay that action under 5 U.S.C. § 705 to avoid these profound harms while it reviews this case.

## I. AAU Is Likely to Succeed on the Merits.

AAU is overwhelmingly likely to succeed on the merits of this challenge to the Publication Decision. First, ED has acted well beyond its authorized statutory bounds. The statutory provision authorizing publication of donor information to universities is limited; Congress authorized ED to seek and publish *aggregate* donor information, but only gave it the power to obtain and publish *individual donor identities* in one inapposite circumstance. Second, the government's unexplained and retroactive reversal of position is paradigmatically arbitrary and capricious action. Third, the October 2 publication would violate core associational rights protected by the First Amendment, and the government is nowhere close to satisfying the exacting scrutiny the Supreme Court has

demanded. Fourth, disclosure would contravene binding ED documents. And fifth, publication would violate multiple federal privacy- and information-related statutes, including FOIA and the Trade Secrets Act.

**A. Section 117 Does Not Permit, Let Alone Require, the October 2 Publication.**

AAU is likely to succeed on its first count: that ED is acting beyond its limited statutory authority in publishing these donor names. "An agency . . . literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up). Here, ED's sudden decision to publish the names of all previously collected covered donors has no basis in Congress's circumscribed Section 117 and clearly exceeds ED's authority under that statute.[4]

Section 117 is express as to what ED may publicly disclose, and that statute does not supply authority to publicly disclose donor identities except in limited circumstances. That section makes

[4] ED's Publication Decision is plainly final agency action reviewable under the APA. The Publication Decision marks the consummation of ED's decisionmaking process as to publication of donor information collected over the last six years, which is final action. The Department of Education announced its decision in unequivocal terms in a formal regulatory document and again an announcement sent straight to the institutions who reported these names: "[T]he Department is making a change to the publication parameters. The publication of counterparty names will occur on July 15, 2026." 2026 Comment Response at 4, Compl. Ex. 6. Although the date on which the Department will fully effectuate its Publication Decision has been repeatedly postponed, there is no uncertainty that the second part of this publication is coming: The Department has stated that publication will now occur on October 2, 2026. Compl. ¶¶ 8, 65. Nor has it left any avenues for an affected party to seek reconsideration or any relief from this blunderbuss disclosure, and has even refused requests as recently as last night to extend the date further. And the Publication Decision is one from which significant consequences flow and by which rights are determined. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). By withdrawing the assurance of nondisclosure under which institutions submitted six years of donor identities, the Department has now deemed donor names to be required public reporting under Section 117(e) and communicated that decision to universities, through the July 6, 2026 Electronic Announcement and in subsequent announcements, without any opportunity for them to assert specific interests in confidentiality for particular donors or countries. Information that it legally treated as private and confidential is now being treated as subject to mandatory disclosure—for all the world to see.

public only "disclosure reports required by th[at] section." 20 U.S.C. § 1011f(e). In turn, Section 117 requires that institutions provide a foreign source's *identity* in disclosure reports in only one instance—when an institution is "owned or controlled by a foreign source." *Id.* § 1011f(b)(3). Congress did not otherwise authorize disclosure of donor identities. Instead, for gifts received from (or contracts entered into with) a foreign source or a foreign government, Congress required public reports to include only the "aggregate dollar amount of such gifts and contracts attributable to a particular country" and "aggregate amount of such gifts and contracts received from each foreign government," respectively. *Id.* § 1011f(b)(1)-(2). Congress also required the "name of the foreign *government*" to be reported for "restricted or conditional" gifts and contracts, *id.* § 1011f(c)(2) (emphasis added)—but again, not individual donor identities.

The text and structure of Section 117 thus make clear that ED has gone beyond its limited mandate. Congress carefully crafted a scheme spelling out precisely when a university is required to disclose individual names and when ED may disclose them, using "particular language in one section of a statute" (collecting names in one instance) while "omit[ting] it in another section of the same Act" (collecting just aggregate information from everyone else). *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Where Congress does this, a court should presume that "Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Id*. ED cannot amend the statute to permit publication of additional information, as an executive agency possesses no roving authority to enlarge the categories Congress enumerated.

Indeed, ED itself previously agreed that Section 117 did not require publication of donor names. As ED put it in no uncertain terms, the donor names it began collecting in 2020 are not "part of the disclosure report that must be made public under Section 117(e)" because that "is not information that Congress intended to be part of the public disclosure report." 2020 Comment

Response at 4, Compl. Ex. 15; *see also, e.g.*, Compl. ¶ 59 (illustrating that as recently as January 2026, ED did not deem covered donor names part of the Section 117(e) public disclosures); 2020 Supporting Statement at 5, Compl. Ex. 14 ("The Department will not make the names and addresses provided through this information collection request part of the publicly available disclosure report."). Nor did ED explain—in any of its materials supporting the 2020 ICR, the 2023 ICR, or the proposed 2026 ICR—its new view that Section 117 requires the collection and disclosure of names. That ED never before attempted to use that authority is a strong indication that it lacks the authority to do so. *See West Virginia v. EPA*, 597 U.S. 697, 725 (2022) ("[J]ust as established practice may shed light on the extent of power conveyed . . . , so the want of assertion of power . . . is equally significant in determining whether such power was actually conferred." (citation omitted)). ED was right about Section 117 at all prior times—and it is wrong now.

Section 117's enforcement provision, 20 U.S.C. § 1011f(f), does not change this analysis. That provision merely permits the Department of Justice to bring a civil action, at the Secretary's request, to compel compliance where a university has failed to submit information required already by the statute. It does not authorize even the *collection* of foreign source identities beyond what the statute otherwise permits. And even if it did, the enforcement provision does not authorize the *publication* of any identities so collected. Publication has nothing to do with the only thing the enforcement provision authorizes—a civil action for noncompliance with the rest of Section 117. ED does not even claim that the enforcement provision supports its October 2 publication threat; its pronouncements instead state that ED is publishing the names "[*c*]*onsistent with* . . . Section 117's transparency requirement." July 6 Announcement, Compl. Ex. 4 (emphasis added). But as explained, Congress already determined what is required for transparency—and that requirement does not extend to publication of covered donor identities.

Section 117's straightforward structure is dispositive: Congress required institutions to disclose certain enumerated categories of information, which is mostly aggregate information, and instructed ED to publicly disclose that information and that information alone.[5] As such, the Publication Decision is not only unauthorized by Section 117 but foreclosed by it.

**B. The Publication Decision Is Arbitrary and Capricious.**

The decision to publish is also arbitrary and capricious in violation of the APA for at least four reasons. First, ED completely reversed its earlier position without explaining that fundamental shift—or considering the significant reliance interests on its prior position. Second, ED failed to give any consideration to critical aspects of the issue, including the real risks disclosure creates for donors. Third, ED's explanation is internally inconsistent, simultaneously insisting that Section 117 itself compels disclosure of donor identities while also asserting that it has policy discretion to withhold other collected information. And fourth, the decision is impermissibly retroactive.

**1. ED Has Not Explained Its Reversal of Position.**

When an agency changes positions, it must "display awareness" that it is doing so and "provide a reasoned explanation for the change." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)); *see Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923-24 (D.C. Cir. 2017). It is obliged to "'provide a more detailed justification than what would suffice for a new policy created on a

[5] At a minimum, this Court must construe Section 117(e) to avoid the thorny constitutional questions that the Department's novel reading would raise. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Interpreting the provision to require across-the-board production of covered donors' names would vitiate the exacting scrutiny the First Amendment requires for burdens on associational speech. *See infra* Section I.C. By contrast, the statute's plain meaning—which informed the Department's decades-long view that individual donor names were not a part of public reports identified by Section 117(e)—avoids these constitutional concerns.

blank slate' by providing 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy.'" *Council of Parent Att'ys & Advocs., Inc. v. DeVos*, 365 F. Supp. 3d 28, 51 (D.D.C. 2019) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)). ED has done none of the above. It has not justified its about-face or explained why its interests outweigh the profound reliance interests at stake.

ED made clear in both 2020 (under Secretary DeVos's leadership) and 2023 that it would not disclose the identities of individual covered donors because that information was not "intended to be part of the public disclosure report." 2020 Comment Response at 4, Compl. Ex. 15. ED explained that it was collecting individual donors' identifying information solely for enforcement purposes. *Id.* ED was unequivocal: ED promised to "strictly adhere to th[e] prohibition" on publishing identifying information of individual covered donors collected through the 2020 ICR. 2020 Supporting Statement at 5, Compl. Ex. 14. And in renewing and revising the ICR in 2023, ED repeated that promise, hewing to its view that Section 117 did not require *or even permit* disclosure of individual-foreign-source information in the public report. 2023 Supporting Statement at 5, Compl. Ex. 12. Indeed, it even provided a new mechanism for institutions to designate information as protected by Exemption 4 of FOIA, and pledged a panoply of protections before it would disclose information so designated. *Id.* In response to comments objecting that disclosure of individual source information would chill First Amendment rights, too, ED emphasized there was no reason for concern given that disclosure was being made to ED alone—again, not for public disclosure. *Id.*

ED's paltry statement in connection with its departure from this longstanding, consistent practice utterly fails to justify backtracking on these assurances. The statement describes the six-year confidentiality regime, during which it repeatedly promised that individual names would not

be part of the public report, as the "period[] before the Department was specific about its intent to publish natural person donor identity." 2026 Comment Response at 3, Compl. Ex. 6. But ED *was* specific during this period—just in the opposite direction. ED repeatedly stated—unambiguously and in writing, and without ever designating its approach as preliminary or temporary—that it would not publish donor names. ED cannot carry its burden to explain its change when it fails to even *acknowledge* that change. *See Fox Television Stations*, 556 U.S. at 515 ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.").

ED's reasoning fails again when it says that its "previous policy to not publish names and addresses was a policy determination based in part on the representations by certain institutions that the information was protected by the [FOIA] and other expressed concerns of institutions." 2026 Comment Response at 3, Compl. Ex. 6. This is not a fair characterization of ED's actual prior statements, which unequivocally promised confidentiality based on the statutory framework—and did so to elicit the universities' voluntary disclosure of information that the government could not compel. Nor did ED tell universities in 2020 and 2023 that confidentiality could be subject to shifts in policy preference. It said this information would not be published because there is no statutory basis for publication, and it was being collected for enforcement purposes only. *See* Compl. ¶¶ 35–40. ED again cannot carry its burden to explain this reversal in its prior position by inaccurately rewriting what supported that prior and longstanding policy. Nor has it explained what "concerns of institutions" it previously credited but no longer finds compelling, or whether or why its view that this information may be protected by FOIA's Exemption 4 has changed.

Further, even on its own terms, ED's newly surfaced explanation for public disclosure is insufficient. An agency must explain a policy shift with, at minimum, some acknowledgment of

the interests it is upending and a reasoned basis for disturbing them. *See CSL Plasma Inc. v. U.S. CBP*, 628 F. Supp. 3d 243, 261 (D.D.C. 2022) (explanation must "at least address why the policy shift outweighs" reliance on former policy and "explain its good reasons" for the change (internal quotation marks and citations omitted)). Judged against that standard, ED's explanation here is woefully insufficient. ED's new view is that it *always* has had discretion to publish, depending on its own ever-shifting balance of competing interests. But even if ED had that discretion (and it does not), ED offers no credible explanation of why its balance suddenly shifted. ED baldly claims that "based on evidence from the Department and other reliable sources—including, without limitation, Congressional committees and national security assessments—the statutory inspection requirement outweighs countervailing confidentiality interests or FOIA-based objections." 2026 Comment Response at 3–4, Compl. Ex. 6. What that "evidence" or "national security assessments" are—or what that "[]weigh[ing]" actually looked like—is anyone's guess. ED's explanation is also incoherent. ED notes that in 2020, "the Department was clear that FOIA requires the Department to balance, on a case-by-case basis, an individual's privacy interests against the public's interest in disclosure." *Id.* at 4. Even setting aside the revisionist nature of this account of what the FOIA requires, ED's new policy of blanket public disclosure does not permit individualized balancing "*on a case-by-case basis*," *id*. (emphasis added)—it is categorical.

In short, ED owes institutions an explanation for why, despite its repeated and unequivocal promises to the contrary and its consistent prior view that Section 117 did not mandate publication, it is upsetting the settled expectations of institutions and their donors—and doing so imminently and without recourse. What ED gave institutions instead was a denial that it had made any previous guarantees of confidentiality and a refusal to explain its new policy and its sudden implementation. That is textbook arbitrary-and-capricious agency action.

### 2. ED Failed to Consider Important Issues, Including the Safety of Affected Donors.

ED also violated a second black-letter requirement of the APA when it "entirely failed to consider an important aspect of the problem." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In 2020 and 2023, and again in 2026, institutions sounded the alarm especially as to one issue—that revealing the names of covered donors, some of whom are former students, "could have tragic, and even deadly, consequences for" them. ACE Letter at 3, Compl. Ex. 8; *see* Compl. ¶¶ 14, 52, 74, 109. ED originally acknowledged that serious concern, making assurances of confidentiality and installing FOIA-based mechanisms that would ensure donors' information would not be published without significant process. *See* Compl. ¶¶ 37–39, 41–47.

ED has now summarily changed course while offering only a conclusory justification for declining to consider safety interests of donors. ED claims that recent Section 117 reports reveal "substantial" funding to universities from donors from "countries of concern," making "concerns about the safety and human rights of natural person donors in those countries" "apparently not . . . compelling." 2026 Comment Response at 4, Compl. Ex. 6. But this non-sequitur reflects no serious engagement with the concerns raised. By questioning commenters' sincerity rather than addressing the substance of their concern, ED ignored a key aspect of the problem. Agencies must do more than dismiss comments "in a conclusory manner," *Cigar Ass'n of Am. v. U.S. FDA*, 480 F. Supp. 3d 256, 279 (D.D.C. 2020), *aff'd*, 5 F.4th 68 (D.C. Cir. July 20, 2021); agencies must respond to comments that "on their face seem legitimate," *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (citations omitted). ED has not done so here.

ED's accusation also makes little sense. An institution's acceptance of funds from donors in countries with imperfect human rights records does not somehow disprove the risks the donor

faces by the publication at issue here. For one, as the universities have emphasized, the very reason the publication of donor names (on October 2 or any other date) would pose danger is that these kinds of covered donors are *especially* vulnerable to risks to their safety, family, and property when their associations with American universities are revealed. *See* AAU Decl. ¶¶ 26–30. Several countries outlawed philanthropic giving to disfavored organizations or causes, including abroad, and at least one (Russia) specifically criminalized giving to U.S. universities—including at least six AAU members or their constituent institutions. *See* Compl. ¶¶ 73–75. This is precisely the type of concern ED was required to confront and account for but never did. For another, there is no merit to the argument that a decision to donate or to accept donations subjectively undermines the concerns about public disclosure of those donations; after all, these decisions to donate or to accept donations were made during a period in which ED itself was promising confidentiality. They imply nothing against the sincerity of concerns about publication from this 180-degree reversal.[6]

ED gets no further by withholding the addresses of donors, while publishing names—and ED does not explain why revealing identities but not addresses would protect them sufficiently. A government or individual inclined to retaliate against a donor for their giving to U.S. universities can do that without knowing their address. ED's arbitrary line-drawing is not enough to satisfy its obligations to address this core concern. *See Ctr. for Biological Diversity v. EPA*, 141 F.4th 153,

[6] To the extent that the Department's skepticism about danger to donors from countries of concern is driven by a suspicion about the motives or conduct of those donors, it *already* possesses all information it would need to investigate those covered donors, by virtue of the universities' cooperation with its request to provide identities and addresses. For the government, publication of that information will not shed any more light on those donors. And, in any case, it has now published every foreign source identity on any federal government list of entities of concern—so whatever force this rationale had before July 15 has now been blunted by the Department's publication on that date.

168–69 (D.C. Cir. 2025) (agency's explanation must include "a rational connection between the facts found and the choice made" (quoting *State Farm*, 463 U.S. at 43)).

### 3. The Publication Decision Is Internally Inconsistent.

Internal inconsistency is another hallmark of arbitrary-and-capricious action. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1026 (D.C. Cir. 2018); *see World Shipping Council v. FMC*, 152 F.4th 215, 221 (D.C. Cir. 2025) ("[O]f course, it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'" (quoting *Nat. Res. Def. Council v. U.S. NRC*, 879 F.3d 1202, 1214 (D.C. Cir. 2018))). ED's explanation is flatly inconsistent.

ED's frontline justification for its Publication Decision is that it has no choice but to publish the covered donor identities because the statute demands this publication. *See, e.g.*, 2026 Comment Response at 2, Compl. Ex. 6 (representing explicitly that "publication is required by the statute"); *id.* ("The requirements of the statute take precedence over any potential disincentive to qualifying foreign gifts or contracts, as well as to any State laws or institutional policies protecting donor confidentiality."); *id.* (again stating it is "statutorily required" to publish the information collected pursuant to Section 117); *see also* U.S. Dep't of Educ., *Section 117 Foreign Gift and Contract Reporting: FAQs (question PD-Q2)*, Fed. Student Aid, https://fsapartners.ed.gov/knowledge-center/topics/section-117-foreign-gift-and-contract-reporting/resources/frequently-asked-questions (modified June 18, 2026) ("Consistent with the public inspection requirements of Section 117, the Department shall publish the contents of disclosure reports made by institutions as required by 20 U.S.C. § 1011f(e), including publication of material details about counterparties, such as counterparties' identities as reported to the Department by institutions.").

Even leaving aside that ED is wrong about what Section 117 requires, *see supra* Section I.A, its position is inconsistent across its own statements justifying this change. The very document

that claims Section 117 mandates disclosure announces—on the very next page—that, in ED's discretion, it will "as a *policy matter* . . . only publish the name of foreign sources of qualifying gifts and contracts and not the[ir] addresses," which it "has the legal *right* to continue to collect" but not disclose. 2026 Comment Response at 4, Compl. Ex. 6 (emphasis added). That makes no sense: an inflexible statutory obligation to publish in one paragraph became a discretionary policy decision by the next. Publication cannot be both statutorily compelled and a "policy matter" left to the agency's discretion. This inconsistency reflects that ED's Publication Decision is, at bottom, an unjustified and unexplained preference. *See Encino Motorcars*, 579 U.S. at 222 ("'unexplained inconsistency' in agency policy" makes agency decision making arbitrary and capricious (citation omitted)); *see also Gen. Chem. Corp. v. United States*, 817 F.2d 844, 855 (D.C. Cir. 1987) ("The confusing and inconsistent analysis [the agency] offered was so incomplete and conclusory as to fall below the standard of reasoned decisionmaking."). That, too, is sufficient reason to temporarily restrain and stay, and ultimately preliminarily enjoin, the Publication Decision.

**4. The Publication Decision Is Impermissibly Retroactive.**

Finally, the arbitrariness of ED's Publication Decision is compounded by its retroactive sweep. The focus of the Publication Decision set for October 2 applies exclusively to the identities of donors gathered years ago under a contrary assurance of nondisclosure. This is precisely the kind of unanticipated, retroactive effect that courts have long treated as especially indicative of arbitrary agency action. *Cf. Retail, Wholesale & Dep't Store Union, AFL-CIO v. NLRB*, 466 F.2d 380, 390 (D.C. Cir. 1972); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220, 223 (1988) (Scalia, J., concurring) (explaining that, absent congressional authority, an agency cannot retroactively change its rule). ED's reversal of its interpretation of Section 117 is "impermissibly retroactive" because it "'changes the legal landscape,'" *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp.

3d 257, 271 (D.D.C. 2018) (quoting *Arkema, Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010)), while ignoring the "serious reliance interests" of AAU members and their donors. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citations omitted).

As explained above, since ED began collecting the names and addresses of covered donors in 2020, it has repeatedly assured institutions that it would not publicly disclose covered donors' identities—and, in reliance on those assurances, AAU's members have reported identifying information of their covered donors to ED. *See* AAU Decl. ¶¶ 16–18; Compl. ¶¶ 21, 37–38, 45–46. Many identified the qualifying transactions as exempt from disclosure under FOIA, confirming they expected to disclose their donors' identities only to ED—not to the public. *See* 2026 Comment Response at 4, Compl. Ex. 6. AAU's members have also communicated ED's assurances to their donors. *See* AAU Decl. ¶ 17. Their donors, in turn, relied on those same promises; many covered donors would not have given to AAU's members but for the understanding those gifts would be confidential due to risks they may face in their home countries if their identities become known. *See id.* ¶ 11. Now, for the first time, ED will publicize identities of covered donors that universities have reported since 2020, including those who donated with the understanding they would not be identified. This drastic change in the legal landscape works a manifest injustice on AAU members and their donors, who had no ability to anticipate such a change and who made significant financial and associational decisions in reliance on ED's assurances.

Courts have held that when such a prior policy engenders serious reliance interests, a more detailed justification for the agency's change is warranted. *See Fox Television Stations*, 556 U.S. at 515. Here, ED has failed to supply any meaningful discussion of the reliance interests at issue, let alone a more detailed justification for why retroactive application of its Publication Decision is warranted. *Encino Motorcars*, 579 U.S. at 221–22. ED has not explained why the new change in

statutory interpretation must apply retroactively instead of prospectively, nor has it considered the reliance interests that the prior interpretation engendered. ED has not explained why, after waiting nearly thirty years to begin collecting covered donors' names and an additional six before deciding to publish them, it must now immediately publish all names in its possession. It has not explained why that publication must happen without meaningful notice—let alone fair notice, *cf. FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012), to AAU members or their donors. And it identified no "sufficiently significant statutory interest[] to counterbalance" the "'resulting inequities'" that will follow reversal. *Kirwa*, 285 F. Supp. 3d at 271 (quoting *Chadmoore Commc'ns, Inc. v. FCC*, 113 F.3d 235, 240 (D.C. Cir. 1997)).

After collecting six years of donor identities under a regime of confidentiality, ED cannot now blindside AAU members and their donors, who thought universities were making disclosures only to the government, not to the world. ED's reversal is impermissibly retroactive and therefore arbitrary and capricious.

### C. The Publication Decision Violates the First Amendment.

ED's decision to publish the identities of all covered donors violates AAU members' First Amendment rights of association and expression, as well as the First Amendment rights of their donors—which AAU and its members can themselves assert. The Supreme Court has repeatedly held that compelled disclosure of an organization's supporters can constitute an improper restraint on its First Amendment rights. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). As the Court observed earlier this year, freedom to associate requires an element of "'privacy in one's associations.'" *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 185 (2026) (quoting *NAACP*, 357 U.S. at 462). Further, without the ability to be "together free from governmental oversight and intrusion, . . . the freedom to associate may become no freedom at all."

*Id*. And so "exacting scrutiny" applies to compelled disclosure that may burden associational rights. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). That means "there must be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,'" *id.* (quoting *Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)), which at minimum requires that the strength of the governmental interest "reflect the seriousness of the actual burden on First Amendment rights," *Doe No. 1*, 561 U.S. at 196. The disclosure regime, in turn, must be "narrowly tailored to the government's asserted interest." *Ams. for Prosperity*, 594 U.S. at 608.

***The Strength of the Governmental Interest***. To start, ED makes little effort to connect its sudden and compelled publication of donor names to any purported governmental interest at stake here—let alone to show they have a "substantial relation." ED's stated justification for collecting donors' names and addresses was to "support its enforcement activities." 2020 Comment Response at 4, Compl. Ex. 15. ED now claims a compelling government interest in "the ability to examine substantial foreign financial ties with domestic institutions of higher education, including research institutions involved in the taxpayer-funded development of critical and emerging technologies." 2026 Comment Response at 2, Compl. Ex. 6. But ED's supposed enforcement interests are fully satisfied by its confidential collection of the same information, as it has done for six years. Compl. ¶ 99. And any additional interest relating to donors or contractors of heightened concern has now been vindicated by the limited July 15 publication. Publication of foreign donor and foreign source names tomorrow—which are, by ED's own assessment, the names of individuals and entities who are *not* of concern to any federal agency—serves no public interest whatsoever.

***Narrow Tailoring to Minimize Burden on Institutions' Associational Rights***. Nor is publication of specific donor names narrowly tailored to facilitate public understanding of "foreign financial ties with domestic institutions of higher education" writ large. Indeed, the scheme enacted

by Congress, which publicizes the aggregate amounts of foreign gifts and contracts received by each institution by country of origin, already achieves that. *See* 20 U.S.C. § 1011f. And while ED asserts that it is "in the best interests of the United States' national security to provide access to the identities of qualifying foreign nationals and entities that provide gifts to, or enter into contracts with, institutions of higher education," it never explains how publishing these identities serves the national security, or why national security is implicated by every foreign donor to nearly every university. 2026 Comment Response at 2, Compl. Ex. 6. Even if they were compelling, neither the government interests in enforcement of Section 117 specifically nor its interest in national security more generally appear to be served by the *publication* of these donors' names—particularly when everyone the government itself deemed of specific concern has already been named.

Even if some governmental interest were served by publication, "[i]n the First Amendment context, fit matters." *Ams. for Prosperity*, 594 U.S. at 609 (quoting *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014)). In *Americans for Prosperity*, the Court invalidated California's requirement that charities file unredacted donor lists with the state attorney general—there, too, purportedly for enforcement purposes—because the blanket disclosure requirement was a "dramatic mismatch" with the State's enforcement interest: the State could not identify "'a single, concrete instance" in which up-front collection of donor information had advanced its "investigative, regulatory or enforcement efforts." *Id.* at 613 (quoting district court); *id.* at 602–04, 616–18. The mismatch here is even more stark. The disclosure in *Americans for Prosperity* was only to the *State*; here, the government intends to disclose donor information to the *world*. *Id.* at 616; Compl. ¶ 92. And the Publication Decision "indiscriminately sweep[s] up the information of every major [foreign] donor," *Ams. for Prosperity*, 594 U.S. at 616–17, including any who, for entirely personal or cultural reasons, wish "to remain anonymous," and whose wishes institutions have honored as a

matter of ordinary donor stewardship. Accepting a gift from a foreign supporter is a paradigmatic associational act; once any such gift may place the donor's name on a public government website, the predictable result is self-censorship, as institutions forgo lawful, beneficial associations rather than subject their supporters to unwanted public exposure—even though neither has done anything wrong. That "unnecessary risk of chilling" is only "heightened in the 21st century," as "anyone with access to a computer [can] compile a wealth of information about" anyone else once a donor's name, nationality, and institutional affiliation appear on a public government website. *Id.*

***Narrow Tailoring to Minimize Burden on Other First Amendment Rights***. Moreover, charitable fundraising is itself protected speech. *Ams. for Prosperity*, 594 U.S. at 618; *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632–33 (1980); *see also First Choice*, 608 U.S. at 190 & n.2. The government cannot impinge on AAU members' fundraising in ways that would have "the predictable result that such solicitations will prove unsuccessful." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 799–800 (1988). Here, public identification of donors, particularly where the recipients of those funds have promised confidentiality, burdens AAU members' ability to solicit support and donors' willingness to respond. *See* AAU Decl. ¶ 11 (explaining that donors rely on promise of confidentiality in order to donate).

ED's Publication Decision will also significantly burden covered donors' First Amendment rights, which institutions can assert on behalf of their supporters. *See NAACP*, 357 U.S. at 462. Many covered donors give based on the understanding their identities would remain confidential, Compl. ¶ 23; would not have given otherwise, *id.*; and face "a risk of reprisals if their affiliation with" AAU members is disclosed, *see Ams. for Prosperity*, 594 U.S. at 606–07 (discussing *NAACP* and describing the threats of "economic reprisals and violence" faced by NAACP members should their association become known); AAU Decl. ¶¶ 11, 28–30 (explaining that some covered donors

to AAU members have described a fear of retaliation against themselves, their families, and their properties if their identities become public). Publication of all covered donors' names against their wishes will deter contributions and undoubtedly chill association going forward.

Though foreign nationals are entitled to weaker constitutional protections than American citizens, those with "substantial connections" do have First Amendment rights. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). For example, if a donor is a green-card holder, resides in or owns property in the United States, or is a current or former student at a U.S. institution—categories into which many members' donors, a group that includes alumni, fall—they enjoy constitutional rights, including the right of association burdened by ED's Publication Decision. *See, e.g.*, *Ibrahim v. DHS*, 669 F.3d 983, 996–97 (9th Cir. 2012); *Ranjan v. U.S. DHS*, 747 F. Supp. 3d 192, 199 (D.D.C. 2024); *cf. LC ex rel. Cali v. Trump*, No. 26-cv-688, 2026 WL 1329750, at *8 (D.D.C. May 13, 2026) (foreign national had "substantial connections" to United States for purposes of First Amendment rights in part because she "was affiliated with several U.S. universities"), *appeal docketed*, No. 26-5172 (D.C. Cir. May 20, 2026).

***Punishment for Past Speech***. Worse, retroactive publication announced by ED compounds the constitutional harm by punishing donors who relied on explicit assurances of confidentiality by ED in determining when and how to exercise their right to associate with AAU members. Courts have held that punishment for past speech is itself a First Amendment violation. *See, e.g.*, *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). Furthermore, retroactive application of restrictions on First Amendment rights raises due process considerations, requiring at a minimum "fair notice." *See Fox Television Stations*, 567 U.S. at 254 (holding that sudden change in agency interpretation of decency standards failed to provide fair notice and explaining that determination "would be true with respect to a regulatory change this abrupt on any subject, but it is surely the case when applied

to . . . regulations that touch upon 'sensitive areas of basic First Amendment freedoms'" (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964))). Here, the limited notice to donors—and to the institutions—was hardly "fair," particularly since neither donor nor institution was given any opportunity to object to publication, either broadly or as to any particular donor. By both chilling future associations and punishing institutions and donors for the associational choices they have already made, the Publication Decision infringes doubly on their First Amendment rights.

Because the Publication Decision applies indiscriminately to every foreign source reported by every institution over six years, without individualized justification, and imposes significant and ongoing burdens on the associational rights of institutions and their donors, it cannot survive the exacting scrutiny the First Amendment requires. Plaintiff is therefore likely to succeed on its First Amendment claim, both as an APA claim under 5 U.S.C. § 706(2)(B) and as an independent equitable claim for injunctive relief against Defendants' unconstitutional conduct. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

### D. The Publication Decision Violates ED's Own Regulations.

The Publication Decision also violates ED's own binding rules, as set forth in the 2020 and 2023 ICRs pursuant to which the information at issue was collected. Both prior ICRs reflect ED's promise that donor identities would be kept confidential, and neither has been amended.

It is well established that an agency must abide by its own rules and may not violate them to the prejudice of other entities. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005); *cf. New Jersey v. U.S. Dep't of Transp.*, 835 F. Supp. 3d 477, 512 (S.D.N.Y. 2026) (agreeing "as a general matter, an agency acts contrary to law when it acts 'contrary to existing valid regulations'" (citation omitted)). That includes even "internal, procedural regulations," and "even when those regulations provide more

protection than the Constitution" or other relevant laws. *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1098 (D.C. Cir. 1985). If the agency wants to change its rules, including via an ICR promulgated through the notice and comment process, it must make that change that through the prescribed process. The agency cannot simply retroactively eliminate key safeguards on the very regulatory requirements that it itself had previously imposed. *See Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003) ("[A]gencies cannot 'relax or modify' regulations that provide the only safeguard individuals have against unlimited agency discretion …").

That is precisely what ED did here. At the end of two full three-year reporting periods, ED announced—quietly, in a line buried in a comment document in its proposal to renew the ICR for the reporting cycle beginning in 2026—that it would not keep the past six years of donor identity information confidential as ED had repeatedly promised. This about-face flouts the regulatory restrictions imposed by ED on itself in the 2020 and 2023 ICRs in order to get the information it wanted from universities. When taking those prior actions, ED stated it would "strictly adhere to th[e] prohibition" on publishing names of individual names. 2020 Supporting Statement at 5, Compl. Ex. 14; *see also* 2023 Supporting Statement at 5, Compl. Ex. 12 (stating ED would "not make the names and addresses provided through this information collection request part of the publicly available disclosure report"). ED must be held to its own rules.

Nor do ED's amendments to the 2026 ICR satisfy *Accardi*. While an agency can amend the operative legal rules that bind it, that is not what ED did here. ED's 2026 ICR—challenged in this case, but not the subject of this emergency relief motion—makes *forward-looking* changes, setting the terms for collecting information for the next three-year cycle but without the same prior promise of confidentiality. *See* Compl. ¶¶ 49, 53, 103, 105. It does not purport to modify the terms of the 2020 and 2023 ICRs. In other words, for information covered by those ICRs, the government

is still bound by its own legal documents that it adopted to govern those collections. Those binding documents promise confidentiality. ED cannot flout those unamended ICRs under *Accardi*.

**E. The Publication Decision Violates the Trade Secrets Act and the FOIA.**

Finally, the disclosure contemplated here would contravene both the FOIA and the Trade Secrets Act. That Act prohibits federal officers from disclosing, "to any extent not authorized by law," information submitted to the government that concerns, among other items, the "identity" and the "amount or source of any . . . expenditures" of any person. 18 U.S.C. § 1905. This includes the disclosures the government intends to make on October 2. Disclosing the identity of covered donors is not authorized by—and is contrary to—the governing statute and regulation. *See supra* Section I.A. So the October 2 publication would violate the Trade Secrets Act out of the gate.

Moreover, the Trade Secrets Act has long been held to be at least as protective as FOIA Exemption 4. *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1142, 1151–52 (D.C. Cir. 1987) ("To the extent that such data as trade secrets and confidential financial information are excepted from mandatory disclosure by one or more of the exemptions that Congress has incorporated into FOIA, the Trade Secrets Act will bar a discretionary release unless, after notice and comment, an agency, possessing delegated power to do so, promulgates a contrary rule having the force of law."); *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 932 (D.C. Cir. 2008). As such, the Trade Secrets Act generally bars disclosure of information that is protected by FOIA Exemption 4. The identities of covered donors are confidential commercial information within the meaning of Exemption 4 and are thus protected against discretionary release under the Trade Secrets Act.

Information is confidential where it is "customarily and actually treated as private by its owner" and was "provided to the government under an assurance of privacy." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019). There can be no doubt that both conditions are satisfied here; universities safeguard donors' privacy, including their names, carefully, and ED has

for years provided assurances those identities would not be disclosed. *See* AAU Decl. ¶¶ 15–18. That conclusion also accords with ED's own practice of permitting institutions to designate foreign source identities as being subject to FOIA Exemption 4 by checking a box when submitting that information. *See* Compl. ¶¶ 21, 42, 44–46, 104.

The names of covered donors are also "commercial" under FOIA Exemption 4, which is defined broadly to reach any information that "pertains to the exchange of good or services" and in which a submitter has a "commercial interest." *Sunoco Pipeline, L.P. v. U.S. Dep't of Transp.*, No. 21-cv-1760, 2023 WL 11195824, at *4 (D.D.C. Sept. 29, 2023) (citations omitted); *see also COMPTEL v. FCC*, 910 F. Supp. 2d 100, 115 (D.D.C. 2012). Courts have recognized that colleges may possess commercial information within the meaning of this Exemption. *See N.H. Right to Life v. U.S. Dep't of Health & Hum. Servs.*, 778 F.3d 43, 50 (1st Cir. 2015). The names of covered donors who make significant donations to AAU members fall within that scope, including because, as this Court has reasoned, disclosure of that information could have a "potential effect" on the monetary relationship between donors and universities. *Elec. Priv. Info. Ctr. v. U.S. DHS*, 117 F. Supp. 3d 46, 63 (D.D.C. 2015). That explains why, for six years and up until its unexplained reversal, ED invited universities to treat all this information as subject to Exemption 4, AAU Decl. ¶¶ 16, 18; Compl. ¶¶ 21, 44–46—which makes no sense if it was never actually covered.

The Publication Decision also runs afoul of ED's own FOIA regulation, 34 C.F.R. § 5.11, which establishes procedures protecting submitters of confidential commercial information from disclosures that would violate FOIA. *See Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic . . . that an agency is bound by its own regulations."). These procedures include notice of any contemplated disclosure, an opportunity to object, consideration of the objection, and a reasoned written statement before disclosure. Many

universities designated the identities of foreign sources as confidential business information under Exemption 4—at ED's own invitation. AAU Decl. ¶¶ 16, 18; Compl. ¶¶ 21, 42, 44. And while ED committed to procedures required by its FOIA regulations when it began to collect foreign source identities and at its renewal, *see* 2020 Comment Response at 5, Compl. Ex. 15; 2023 Comment Response at 2, Compl. Ex. 11, ED's Publication Decision does away with those protections. Even as publication is set to happen tomorrow, October 2, the universities did not receive any notice, opportunity to object (either broadly to the October 2 publication or specifically to the publication of any particular donor's identity), or any reasoned pre-disclosure explanation.

The Publication Decision thus violates § 5.11 and is arbitrary and capricious. *See Venetian Casino Resort*, 530 F.3d at 934–35 (concluding action allowing circumvention of a regulation implementing FOIA and pre-release notification requirement was arbitrary and capricious).

## II. AAU Satisfies the Remaining Factors for a Temporary Restraining Order.

The remaining factors—irreparable harm, balance of the equities, and the public interest—weigh overwhelmingly in favor of emergency injunctive relief. Plaintiff desperately needs relief to prevent an irrevocable and profoundly harmful blanket publication from happening tomorrow. ED has no similar need to publish all covered donor names on October 2.

### A. AAU's Members and their Donors Will be Immediately and Irreparably Harmed by the October 2 Publication.

Publication of the names of covered donors to AAU's member institutions—which, until now, have remained confidential—will cause immediate and irreparable harm to institutions of higher education across the country and their supporters.

First, as courts have repeatedly recognized, by its very nature the disclosure of personally identifying information and previously confidential information is quintessential irreparable harm. *See, e.g.*, *Clevinger v. Advoc. Holdings, Inc.*, No. 23-cv-1159, 2023 WL 5220570, at *2 (D.D.C.

Aug. 15, 2023) (gathering authorities), *aff'd*, 134 F.4th 1230 (D.C. Cir. 2025); *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 75–76 (D.D.C. 2009); *see also Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("This Court has recognized that the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature."). There is a good reason why this harm is "routinely treated as per se irreparable harm," *Clevinger*, 2023 WL 5220570, at *2: public disclosure cannot be undone, especially in a digital age where broad dissemination of confidential information can occur more or less immediately and permanently. So, too, here: The publication of donor names is definitionally irrevocable. The names, once published online by ED, will be republished by third parties, foreign governments, and the media—all far outside the reach of this Court's authority. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see also Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016) (refusing to enjoin laws barring online publication of specific files because "files posted … would remain online essentially forever, hosted by foreign websites … and freely available worldwide").

Second, beyond the irreparable harm that already inures in this kind of context, irreparable harm is especially profound here: exposure of this highly confidential PII threatens the safety of the covered donors to American universities, many of whom live under regimes that are adversarial to the United States and who justifiably fear political or personal reprisal for providing gifts to U.S. institutions and aligning themselves with particular universities. As commenters on the proposed 2026 ICR previewed, many donors abroad face a serious risk of violence or other persecution once publicly identified as supporters of a U.S. university. *See* 2026 Comment Response at 1, Compl. Ex. 6. That harm is substantial, attaches immediately after publication, and it cannot be remedied thereafter. ED itself has previously acknowledged these dangers, including in response to these

comments. *See id.* at 4 (acknowledging risk of "religious persecution" to identified donors); *cf., e.g.*, *Doctors for Am. v. OPM*, 766 F. Supp. 3d 39, 54 (D.D.C. 2025) (finding plaintiff organization showed its members would suffer irreparable harm if offending conduct was not enjoined). Indeed, some covered donors to AAU's members reside in, or have family, property, or business interests in, countries whose governments monitor, harass, and persecute individuals associated with U.S. institutions, independent scholarship, or disfavored causes championed by those institutions, and that these donors fear retribution against themselves and their families once their identities become known. *See* AAU Decl. ¶¶ 25–28; Compl ¶¶ 71–74 (describing laws criminalizing philanthropic giving to disfavored organizations in Russia, Belarus, and China).

To describe a few examples: One institution has heard from donors in India that political retaliation is a particular concern. Another institution has heard from covered donors that they fear disclosure of their gifts because of public pressure or shaming of the donor and their family for making gifts to a U.S. institution and not investing in their home country. Another institution has reported that a foreign donor expressed concerns about their giving becoming known to other members of their home community because public displays of wealth are viewed as improper in their collectively oriented community. An AAU member has also heard from a foreign donor that they do not want the fact they provided a gift through a particular religious foundation to be known. AAU Decl. ¶¶ 28, 30. These concerns are not abstract—they are imminent, and permanent. Further, at least one country (Russia) engages in financial surveillance and tracking to try to identify donors to groups it has designated as "undesirable"; publishing the identities of those donors on a website available to anyone the world over renders unnecessary those efforts—the U.S. government will instantly have handed Russia all that it needs to prosecute those donors. *See* Compl. ¶ 73.

Given that disclosure will also reveal that donors provided gifts to institutions exceeding over $250,000 in a calendar year, even donors in countries that are not United States adversaries may fear criminal threats to their personal and familial safety following publication. AAU Decl. ¶ 29. One institution reported, for instance, that donor families from Southeast and East Asia have expressed concerns about the safety of their children if their wealth is made public in this respect, including families with local political ties in their home countries that make them vulnerable to such safety concerns. Another institution has heard similar concerns for personal safety from many covered donors around the world, including, in particular, from donors in Brazil and India. *Id.*

Third, ED's October 2 publication of covered donor names will immediately chill and deter the named individuals from associating with and providing support to universities going forward, in violation of AAU members' and their donors' First Amendment associational rights, while also penalizing them for past associational conduct. Deprivation of First Amendment protections, even for minimal periods and certainly when done irrevocably, "unquestionably constitutes irreparable injury." *Taylor v. Trump*, 823 F. Supp. 3d 17, 40 (D.D.C. 2026) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Supreme Court has recognized that even the mere request for "private donor information" is "enough to discourage reasonable individuals from associating with a group," and that associational injuries commence from the moment the government makes it demand for donor information. *First Choice*, 608 U.S. at 198–99. Those injuries are made all the more acute where the government proposes not merely to hold the information but to publish it to the world. ED's October 2 disclosure unconstitutionally burdens AAU members and donors' constitutional rights and will cause irreparable harm through its chilling effect.

Fourth, public dissemination of covered donors' identities will irrevocably harm AAU's member institutions and the relationships they have fostered over time. Institutions have, until now,

been able to make good faith assurances that covered donors' identities would not become public *based on Defendants' own representations* made consistently over the last six years. Donors, in turn, have relied on those assurances and placed trust in institutions in making their contributions and forming relationships. Defendants' promised disclosure will dash those established reliance interests and destroy the base of trust that has helped to form and foster those relationships. As this Court has recognized, disclosure of "proprietary donor information" presents "particular" and "heightened concern[s]" given the "loss of trust and goodwill" that results when donors feel that their "personal information is not safe." *Gaubatz*, 667 F. Supp. 2d at 76 (citation omitted); *see also Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (finding irreparable harm for public disclosure of confidential information due to the "loss of the confidentiality of customer information and the concomitant loss of customer trust and goodwill"). Beyond the damage to institutions' specific relationships with publicly named covered donors, AAU's members are also likely to face broader reputational risk—as ED's repudiation of their confidentiality promise is imputed to them. *See Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 62 (D.D.C. 2026) (concluding that reputational injury established irreparable harm where it would damage relationships with partner organizations and the organization's status as a "trusted partner"). Those reputational harms are "impossible to quantify," *id.* (citation omitted), which contributes to the need for court relief to prevent them ex ante.

ED's imminent public disclosure of foreign donor identities warrants emergency relief—the only way to prevent these harms. *See, e.g.*, *Gaubatz*, 667 F. Supp. 2d at 79 (granting TRO that enjoined public disclosure of confidential information including proprietary donor lists).

**B. The Balance of the Equities and Public Interest Favor AAU.**

The balance of the equities and public interest—which merge when the government is the opposing party, *Nken*, 556 U.S. at 435—favor relief. The October 2 publication of covered donor identities will substantially burden AAU member institutions and grossly impair the public interest. The government, on the other hand, will face no harm from the relief AAU seeks.

To start, the government begins on sketchy ground: "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Instead, there is a substantial public interest in "having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (citation omitted). Nor can the government "suffer harm from an injunction that merely ends an unlawful practice." *Nat'l Endowment for Democracy v. United States*, 795 F. Supp. 3d 63, 73 (D.D.C. 2025) (citation omitted), *appeal docketed*, No. 25-5361 (D.C. Cir. Oct. 14, 2025). Especially so here, where "[p]rotecting the exercise of First Amendment freedoms is '*always*' in the public interest." *Kelly v. Hegseth*, 820 F. Supp. 3d 1, 23 (D.D.C. 2026) (emphasis added), *appeal docketed*, No. 26-5070 (D.C. Cir. Feb. 27, 2026). So right out of the gate, given the overwhelming merits showing already advanced above, the balance of equities would appear to tip sharply in AAU's favor.

But there is much, much more. As discussed, AAU, its members, and their covered donors face irreparable and imminent harm from the October 2 disclosure, including because once all this covered donor information is disclosed publicly, it will be forever available online worldwide. *See Defense Distributed*, 838 F.3d at 460 (finding equities favored barring publication of material that could remain forever online and be republished, since harm could never be undone). So everything described in the irreparable harm discussion above matters for the balance of equities too. And while these harms to AAU, its members, and their covered donors are already massive, the harms

redound to the public too, because deterring donations to universities through public disclosure of donor names will negatively impact the public. Universities rely on donations for groundbreaking research projects, critical research infrastructure, and funding for programs of scientific study. AAU Decl. ¶ 31. Identification would cause some covered donors to withdraw pledged or future support for such critical projects. *Id.* For instance, one institution stands to lose further support for a substantial scholarship if the donor's name is published. Disclosure could also jeopardize future support for an AAU member's particular scientific programs of study. *Id.* And put more generally, the consequences of tomorrow's imminent publication will thus undermine universities' ability to undertake research, support their faculty and students in a variety of academic and extracurricular activities, and manage the daily operations of campus life. Because the public has its own powerful interest in foreign philanthropic funding to U.S. universities to support research and scholarship programs, the public interest favors relief to prevent ED from breaking its promises.

The government, by contrast, can identify no harm from maintaining, for the few additional weeks judicial review will require, the same confidentiality it has maintained voluntarily for years. The donor identities the government intends to publish on October 2 were collected months and years ago—through and including the most recent reporting cycle—and ED expressed no need to publish it for the entirety of that period, until about three months ago. Likewise, in the nearly four decades since Section 117 was enacted, ED has never disclosed the donor names it contemplates publishing here. Nor has the government identified any law or rule that requires publication on October 2 or forecloses a brief delay to permit orderly review. Further, to the extent there is any urgent interest in publishing information related to foreign sources of particular national security concern, ED already published all that information on July 15. So even if the government can be harmed in some instances by restraints on its ability to effectuate the program of its choosing, that

interest is nil or especially slight here given that the status quo is squarely on AAU's side, there are no identified ED interests supporting this specific disclosure, and October 2 appears to have been selected as the disclosure date out of thin air.

Having waited years, ED cannot now claim urgency of its own making. Indeed, a public interest first articulated decades after the statute's enactment and contradicting the agency's own considered position for that entire prior period is entitled to little weight in the equitable balance, particularly when considered against the substantial and concrete reliance interests at issue here. AAU's members structured donor relationships based on ED's own express and repeated written assurances, and their donors gave (and some continue to give) understanding that their identities would not be disclosed. The public interest is also independently served by requiring ED to adhere to the assurances that induced the very disclosures the government now proposes to weaponize.

**III. The Court Should Restrain, Enjoin, and Stay the Publication Decision.**

Having demonstrated that the traditional test favors barring the government from disclosing donor information provided by AAU's members based on ED's promises of confidentiality, AAU seeks two forms of relief: (1) a TRO, and ultimately a preliminary injunction, barring Defendants[7] from publishing the identifying information of covered donors reported by AAU's member institutions; and (2) pursuant to 5 U.S.C. § 705, a stay postponing the effective date of the Publication Decision for the same period of time as the TRO and, ultimately, for the same time

[7] Defendants include not just the Department of Education but also the Department of State. There is a good reason why: while ED alone issued the Publication Decision, ED and the Department of State signed an interagency agreement—discussed in the Complaint—which lists in its purposes ensuring that the Department of State can assist in the collection and the publication of information covered by Section 117. *See* Compl. ¶26. ED, of course, now claims wrongfully that the covered donor identities are such information. To ensure that the government does not evade a restraint on its imminent publication by having the Department of State release covered donor information via the interagency agreement, Defendants include the Department of State and its Secretary too.

period as the PI. As discussed above, temporary and preliminary relief is needed and appropriate to protect Plaintiff's members from irreparable harm from imminent publication of the confidential donor information collected by ED over the past six years and not previously disclosed. But this Court should also exercise its authority to issue a full stay of the entire Publication Decision under 5 U.S.C. § 705, consistent with the precedent of this Court and of the D.C. Circuit.

Section 705 of the APA provides that courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights." 5 U.S.C. § 705. The D.C. Circuit has held that courts may issue Section 705 stays addressing the full agency action—not limited to redressing the Plaintiffs' own imminent harm. *See Coal. for Indep. Tech. Rsch. v. Rubio*, 836 F. Supp. 3d 215, 257–58 (D.D.C. 2026) (*CITR*) (discussing *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025) (statement of Millett and Childs, JJ.) and *Make the Rd. N.Y. v. Mullin*, 179 F.4th 16 (D.C. Cir. 2026)). After all, it is well established that vacatur—the default remedy at the end of a successful APA challenge to an agency action—applies universally. And a Section 705 stay in an APA case "is not the preliminary form of an injunction but of vacatur." *Id.* at 257. Although the Court recently held that "universal injunctions" "likely exceed the equitable authority that Congress has granted to federal courts," *Trump v. CASA, Inc.*, 606 U.S. 831, 837 & n.1 (2025), the Court declined to alter existing law on "whether the [APA] authorizes federal courts to vacate federal agency action," *id.* at 847 & n.10. Plaintiff seeks the latter here, and simply asks this Court to recognize that, just as universal vacatur is the remedy for APA violations at the end of a case, a Section 705 stay is appropriate at the start,

as it provides relief that "operate[s] on the legal status of the challenged agency action, suspending its force rather than ordering any party to act." *CITR*, 836 F. Supp. 3d 215 at 258.[8]

**CONCLUSION**

This Court should grant Plaintiff's Motion for a Temporary Restraining Order[9] and enter a stay of Defendants' Publication Decision pursuant to 5 U.S.C. § 705 before October 2, 2026. It should subsequently, after additional briefing, preliminarily enjoin and again stay the Publication Decision. A proposed order is submitted herewith.

[8] Staying the Publication Decision is especially critical here because that is the only way to ensure the vacatur remedy will be effective at the end of the case. Should Plaintiff ultimately prevail, under hornbook APA law, the Publication Decision must be vacated in full. But the point of the vacatur remedy is to return the parties to the status quo ante, as though the unlawful agency action had not occurred. *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103–04 (D.D.C. 2018) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect . . . ." (citation omitted)), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020). Here, however, that would be impossible absent preliminary relief: the status quo is confidentiality, which even depublishing identifying information at a later date could not restore. *See supra* Section II.A. So to ensure this Court can vacate the Publication Decision at the end of the case, it must stay that Decision now.

[9] If this Court grants the TRO on an ex parte basis by tonight (October 1) to prevent irreparable harm that will occur on October 2, 2026, Plaintiff suggests that it set the restraints and stay to last for 28 days, and set a briefing schedule on the preliminary-injunction motion that requires the Department to file its opposition brief by October 12, and Plaintiff's reply by October 19, to allow for a ruling by October 29. Plaintiff will subsequently file an expedited summary judgment motion to allow the Court to issue a final judgment—on both the Publication Decision and 2026 ICR—in January 2027, when the first information collection period subject to the 2026 ICR occurs.

Dated: October 1, 2026

Respectfully submitted,

*/s Lindsay C. Harrison*

Lindsay C. Harrison (D.C. Bar No. 977407)
Ishan K. Bhabha (D.C. Bar No. 1015673)
Elizabeth Henthorne (D.C. Bar No. 1562688)
Michael J. Vernick (D.C. Bar No. 461811)
Amanda Shafer Berman (D.C. Bar No. 497860)
Anjali Motgi (D.C. Bar No. 90035091)
Kara V. Brandeisky (D.C. Bar No. 90020421)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com
ibhabha@jenner.com
bhenthorne@jenner.com
mvernick@jenner.com
aberman@jenner.com
amotgi@jenner.com
kbrandeisky@jenner.com

Andrianna D. Kastanek (*pro hac vice pending*)
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com

Jeremy Feigenbaum (*pro hac vice pending*)
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
jfeigenbaum@jenner.com

*Counsel for Plaintiff Association of American Universities*