**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Association of American Universities,<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. Department of Education *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-3438-TSC |

# DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND STAY OF AGENCY ACTION

# TABLE OF CONTENTS

INTRODUCTION ..... 1

LEGAL STANDARD ..... 4

ARGUMENT ..... 5

I. PLAINTIFFS HAVE NOT ESTABLISHED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ..... 5

A. The "Publication Decision" is not Final Agency Action ..... 5

B. The Statute Compels Disclosure of Section 117 Reports ..... 6

C. The Statute Does Not Violate the First Amendment ..... 14

II. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO ESTABLISH THEY WILL SUFFER IRREPARABLE HARM ..... 16

III. THE BALANCE OF EQUITIES FAVORS THE GOVERNMENT ..... 18

IV. ANY RELIEF SHOULD BE LIMITED TO THE PARTIES BEFORE THE COURT ..... 18

CONCLUSION ..... 20

## TABLE OF AUTHORITIES

**Cases**

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) .......... 2, 5, 14, 15, 16

*Aviles-Wynkoop v. Neal*,
978 F. Supp. 2d 15 (D.D.C. 2013) .......... 4

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 5

**Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) .......... *passim*

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) .......... 12

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
48 F.3d 618 (1st Cir. 1995) .......... 16

*Cobell v. Norton*,
391 F.3d 251 (D.C. Cir. 2004) .......... 4

*Hi-Tech Pharmacal Co. v. FDA*,
587 F. Supp. 2d 1 (D.D.C. 2008) .......... 3

*HTH Corp. v. NLRB*,
823 F.3d 668 (D.C. Cir. 2016) .......... 13

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 8, 9, 11

*Munaf v. Geren*,
553 U.S. 674 (2008) .......... 4

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 4

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 12

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 20

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 19

*United States v. Texas*,
599 U.S. 670 (2023) .................... 20

*VanDerStok v. Garland*,
633 F. Supp. 3d 847 (N.D. Tex. 2022) .................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................... 4, 16

**Statutes**

5 U.S.C. § 552 .................... 12

5 U.S.C. § 702 .................... 5

5 U.S.C. § 704 .................... 5

5 U.S.C. § 705 .................... 19, 20

18 U.S.C. § 1905 .................... 12, 13

20 U.S.C. § 1101f ("Section 117") .................... *passim*

26 U.S.C. § 6103(a) .................... 9

**Administrative & Executive Materials**

34 C.F.R. § 5.11 .................... 12

Agency Information Collection Activities, Submission to the Office of Management and Budget for Review and Approval; Comment Request; Foreign Gifts and Contracts Disclosures,
85 Fed. Reg. 7540 (Feb. 10, 2020). .................... 10

**Legislative Materials**

Administrative Procedure Act,
S. Doc. No. 248, 79th Cong., 2d Sess. 36-37 (1946) .................... 22

**<u>Other Authorities</u>**

*The Department of War Releases Updated List of Foreign Institutions Engaging in Problematic Activities to Counter Unauthorized Technology Transfer* (July 23, 2026), https://www.war.gov/News/Releases/Release/Article/4553101/the-department-of-war-releases-updated-list-of-foreign-institutions-engaging-in/ ............................................. *passim*

Undersecretary of War for Research and Engineering Memorandum, *Fundamental Research Security Initiatives and Implementation* (Jan. 7, 2026), https://www.cto.mil/wp-content/uploads/2026/01/Fundamental-Research-Security-Initiatives.pdf ........................................................................................................ 15

## INTRODUCTION

This is a straightforward case to resolve an important question: Can years of reliance on a mistaken agency interpretation of a statute override Congress's unambiguous statutory command? The answer must be no. Congress makes the law of the land. Courts interpret it. Agency interpretation contrary to statute, even if relied upon, cannot undermine the statutory command.

As Plaintiff Association of American Universities ("AAU") makes clear, *see* ECF No. 2 at 12 n.3, AAU's motion solely concerns the "Publication Decision," i.e., the Department of Education's ("Department's[1]") intended publication for public inspection of Section 117 reports from 2020 to the present that include the names of foreign counterparties. The 2026 Information Collection Request ("ICR"), through which Defendants intend to publish for public inspection Section 117 reports to be submitted on January 31, 2027, is not before the Court in AAU's motion for a preliminary injunction and stay.

As an initial matter, the "Publication Decision" is likely not "final agency action" subject to judicial review under binding D.C. Circuit precedent, as it merely explains how the agency will administer a process established by existing statute and make explicit existing requirements. *See Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236 (D.C. Cir. 2026).

At the heart of this case is the disclosure requirement in Section 117, codified as 20 U.S.C. § 1011f. "All disclosure reports required by this section shall be public records open to inspection and copying during business hours." § 1011f(e). The disclosure requirement is clear, broad, and contains no carve out. Section 117 reports that AAU member institutions submit must be made

[1] AAU's complaint and motion for preliminary injunction also names the Department of State as a Defendant, citing an interagency agreement between the Departments of Education and State. *See* ECF No. 1, ¶ 26; Ex. 16. To the extent that the Department of State has been properly named as a Defendant, the government concedes that any preliminary relief ordered by this Court against the Department of Education would apply to the Department of State as well.

available as public records. AAU tries to read the words "required by this section" as limiting the scope of disclosure to only the contents of the disclosure report set out in § 1011f(b). But that is not what the statute says—it does not say, for instance: "The required contents of disclosure reports in this section shall be public records . . ." Rather, "required by this section" simply references Section 117 reports. Section 1011f(b) contains the same "required by this section" language, stating that "[e]ach report to the Secretary required by this section shall contain . . ." which again refers to the Section 117 report. The required contents of the Section 117 report are denoted by the mandatory "shall" language, not by the "required by this section" language. Section 1011f(e) thus requires that Section 117 reports must be available as public records without limitation.

AAU also alleges various First Amendment associational rights are burdened by the disclosure the statute demands. But unlike the regime in *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), Defendants' disclosure here would survive exacting scrutiny review, because the government interest in the publication of foreign counterparty information is paramount as it implicates national security and foreign relations, and because it is narrowly tailored by the high threshold requirement (of $250,000 per calendar year) to trigger disclosure.

If this Court reaches the same statutory interpretation of § 1011f(e) and is satisfied that the statute meets the exacting scrutiny standard laid out in *Bonta*, then AAU cannot show a likelihood of success on the merits. AAU's further arguments invoking the APA are irrelevant since reliance on a faulty interpretation of the statute (or agency practice that is contradicted by statute), even ossified for years, cannot shield AAU's member institutions from adherence to the statutory command. As the D.C. Circuit recently held, "[o]nce the court determines the meaning of [a statute], there is no reason to seek an agency's explanation as to why it may have changed its view on the meaning of the statute. The court's judgment is the final word." *Bessent*, 167 F.4th at 1237.

Neither are AAU's arguments about FOIA exemptions or the Trade Secret Act availing, since any conflict between those broad general statutes and § 1011f(e)'s specific disclosure requirements must be resolved in favor of the latter.

Nor can AAU succeed in showing irreparable harm. Although AAU devotes much space and rhetorical effort lamenting the fate of foreign sources it claims may suffer harm, AAU may not rely on alleged harms to third parties to demonstrate irreparable harm. In any case, AAU presents no competent evidence to support its speculation that foreign source donors are at risk.

AAU guesses that its members will face a pocketbook injury if past donor and contractor foreign source identities are revealed. Even if AAU members' asserted pocketbook harms are not speculative, they are hardly irreparable. "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citations omitted). AAU has failed to demonstrate that reportable foreign source funding is so significant to its member institutions that its loss would be catastrophic, let alone that a significant percentage of future foreign source funding is jeopardized by Defendants' planned disclosure of foreign source identities.

As to the public interest and balance of equities, both tip in favor of denying injunctive relief. The public interest is particularly slight when it comes to the funding of private research institution members of AAU, which are driven by their own priorities. The public interest is decidedly indifferent as to whether such institutions experience a decrease in foreign source gifts and contracts as a result of the disclosure of those relationships. The public interest in the optimal funding of public research AAU member institutions may be greater, reflecting the public good such institutions aim to achieve, but this is also limited by the public harm that foreign source donations and contracts may cause in influencing the priorities of public research institutions to

reflect those foreign interests. By contrast, the public interest and equities opposing an injunction are vast. The public interest is paramount in seeing that the laws passed by Congress are properly adhered to and are not undermined by faulty interpretations in their execution. There is also tremendous public interest in transparency, particularly when it comes to the funding of institutions of higher learning by large gifts from or contracts with foreign sources, including the interest in a more informed public assessment of whether specific foreign sources (identified by name) hold undue influence over such institutions.

## LEGAL STANDARD

The standard for issuance of the "extraordinary and drastic remedy" of a preliminary injunction is well-established. *Munaf v. Geren,* 553 U.S. 674, 689 (2008). It is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citation omitted).

"To prevail, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013); *see also Winter*, 555 U.S. at 20. Where, as here, the government opposes a motion for emergency relief, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. PLAINTIFFS HAVE NOT ESTABLISHED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

Agency disclosure of counterparty information in the "Publication Decision" is required by statute. Section 1011f(e) provides that "[a]ll disclosure reports required by this section shall be public records open to inspection and copying during business hours." AAU's contrary reading of the statute is unsupported by its plain text. If this Court agrees with the government's interpretation of the disclosure statute, § 1011f(e), then AAU's arguments that the "Publication Decision" is arbitrary and capricious or otherwise contrary to the Administrative Procedure Act likewise fail, since reliance interests on a faulty statutory interpretation cannot trump the statutory command. Finally, AAU asserts First Amendment associational rights which it contends are burdened by Section 1011f(e). But the statute meets the "exacting scrutiny" standard articulated in *Bonta*. As such, AAU cannot establish a substantial likelihood of success on the merits.

#### A. The "Publication Decision" is not Final Agency Action

The APA supplies a cause of action in favor of persons "aggrieved by agency action." 5 U.S.C. § 702. "The APA authorizes courts to review only 'final agency action[s].'" *Bessent*, 167 F.4th at 1235 (second alteration in original) (quoting 5 U.S.C. § 704). "To be final and thus reviewable, an agency action must (1) mark the 'consummation' of the agency's decisionmaking process" and (2) determine 'rights or obligations,' or produce 'legal consequences.'" *Id.* (citation omitted) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "Each prong of *Bennett* must be satisfied independently for agency action to be final." *Id.* (citation modified). But neither prong is met here, because the Department's determination that Section 117 requires disclosure of foreign source identities neither marks the end of formal rulemaking nor determines rights, obligations, or legal consequences.

The "Publication Decision" is "not the product of notice-and-comment rulemaking" and the Department "has never characterized it as a 'rule.'" *Bessent*, 167 F.4th at 1236. Rather, the "Publication Decision" is an unreviewable policy statement. As relevant here, the "Publication Decision" "merely clarifies . . . existing duties under a statute." *Id.* (internal quotation and citations omitted). Specifically, the "Publication Decision" clarifies the Department's existing duty under Section 1011f(e) to make all Section 117 reports part of the public record and open to inspection. "An agency's statement that 'merely expresses its view of what the law requires' is not final, and not reviewable." *Id.* (citations omitted).

AAU's arguments to the contrary, *see* ECF No. 2 at 14, n.4, fail to address *Bessent*'s analysis. AAU claims, for instance, that the "Publication Decision" is promulgated in a "formal regulatory document," and is "final" despite stating that the "publication of counterparty names will occur on July 15, 2026." *Id.* AAU thus fails to address that the Department has never characterized it as a "rule" (e.g., a formal rule published in the Federal Register with a clear effective date). More importantly, AAU asserts that the "Publication Decision is one from which significant consequences flow and by which rights are determined." *Id.* Not so. The "Publication Decision" is a Department policy statement which merely expresses the Department's view of what the law requires, specifically with regards to the disclosure requirements of Section 1011f(e). Any significant consequences or determination of rights is a function of Section 1011f(e) itself, not the Department's interpretation thereof.

As the "Publication Decision" is likely not final agency action, AAU's APA claims necessarily fail.

**B. The Statute Compels Disclosure of Section 117 Reports**

**1.** Section 117 of the Higher Education Act, codified as 20 U.S.C. § 1011f, requires institutions, including all of AAU's member institutions, to "file a disclosure report" on "January

31 or July 31" of each year to disclose receipts of gifts from or contracts entered with a "foreign source" where the value of the gift or contract "is $250,000 or more" when considered alone or in aggregate with all other gifts or contracts from that foreign source in a calendar year. § 1011f(a). The statute further states: "All disclosure reports required by this section shall be public records open to inspection and copying during business hours." § 1011f(e). The statutory command is clear: all Section 117 reports filed by institutions, including AAU member institutions, must be made public.

The disclosure requirement in § 1011f(e) is clear, broad, and contains no carve out. Section 117 reports that AAU member institutions submit must be available as public records. AAU tries to read the words "required by this section" as limiting the scope of disclosure to only the contents of the disclosure report set out in § 1011f(b). *See* ECF No. 2 at 14-17. But that is not what the statute says—it does not say, for instance: "The required contents of disclosure reports in this section shall be public records . . ." Rather, "required by this section" simply references Section 117 reports. Section 1011f(b) contains the same "required by this section" language, stating that "[e]ach report to the Secretary required by this section shall contain . . ." which again refers to the Section 117 report. The required contents of a Section 117 report are denoted by the mandatory "shall" language, not by the "required by this section" language. Section 1011f(e) thus requires that Section 117 reports must be available as public records without limitation.

That Section 1011f(e) requires publication of a disclosure report without being limited by the text of subsection (b) is borne out by statutory context. Subsection (d)(2) provides that the reporting institution may substitute the disclosure with one provided to any other federal agency, provided that the alternative disclosure "*contain[s]* requirements substantially similar to those required under [Section 1011f]" (emphasis added). Had Congress meant to only permit the disclosure of information required under subsection (b), it could have said so. It could have also

said in subsection (d)(2) that the alternative federal form should be redacted to only include that information. It did not, because no such prohibition exists in the text of the statute.

Likewise, neighboring subsection (d)(1) provides that the reporting institution may use the same form it gives to its local state government, provided that the state "has enacted requirements . . . that are substantially similar to the requirements of this section," and provided the State gives assurances that the public disclosure would be consistent with State law. Here again, statutory context points to a bottom line rather than a rigid regime. A state must "enact[]" substantially similar requirements, but the text does not suggest that only these common pieces of information may be disclosed. Rather, subsection (e) requires that the entire Section 117 report be made a public record.

AAU offers several other arguments against this interpretation, but none are meritorious. First, AAU contends that the Department of Education's own statutory interpretation and agency practice, stretching back to 2020, favors AAU's view. But that is not relevant. "[A]gencies have no special competence in resolving statutory ambiguities. Courts do." *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024). Further, the proper interpretation of Section 1011f(e) requires no special expertise or technical knowledge to comprehend where the Department's past practice may prove instructive to a court. The disclosure statute merely requires the Department to make Section 117 reports publicly available. It grants no discretion to the Department, so it does not rely on the Department's expertise to place limits on disclosure. Therefore, past practice cannot override the clear statutory mandate. *See Bessent*, 167 F.4th at 1237 ("Once the court determines the meaning of [a statute], there is no reason to seek an agency's explanation as to why it may have changed its view on the meaning of the statute. The court's judgment is the final word.").

This case shares many similarities with *Bessent*. In *Bessent*, plaintiffs challenged the

Internal Revenue Service's disclosure of taxpayer addresses to the Department of Homeland Security, arguing both that the statute involved, 26 U.S.C. § 6103(a), did not authorize the disclosure, and that IRS's change-of-position (having previously interpreted the statute did not authorize disclosure of taxpayer addresses) was arbitrary and capricious. *Bessent*, 167 F.4th at 1224-25. The *Bessent* court first analyzed the challenged statute, concluding that the statute authorized the disclosure of taxpayer addresses. *Id.* at 1234-35. The *Bessent* court then rejected plaintiffs' APA change-of-position argument, holding that "[n]o explanation could justify or make lawful the agency's new interpretation of the statute. The agency must act pursuant to the court's best reading of the statute." *Id.* at 1238. Post *Loper*, once a court interprets a challenged statute, "there is no reason to seek an agency's explanation as to why it may have changed its view on the meaning of the statute. The court's judgment is the final word." *Id.* at 1237. In other words, an APA arbitrary and capricious challenge asserting that an agency changed its position as to the interpretation of a statute is no longer viable after *Loper*, since the court's interpretation of the statute is the only relevant consideration. In this case, if the Court agrees with Defendants' interpretation of 20 U.S.C. § 1011f(e) as authorizing disclosure of foreign source identities, then Defendants' prior interpretations of the statute are irrelevant and any challenge on arbitrary and capricious grounds necessarily fails.

Second, AAU argues that the statute does not authorize the collection of foreign source identities, let alone their publication. As an initial matter, even if the Department lacked a statutory basis to request foreign source identities, their provision by institutions as part of their Section 117 disclosure reports makes them part of the "disclosure reports" which Congress mandated be public records. § 1011f(e). Regardless, the Department has statutory authority to request foreign source identities, by virtue of Section 1011f(g), which grants the Secretary of Education authority to "promulgate regulations to carry out this section." The Department used this authority in 2020 to

require the reporting of names and addresses of foreign source identities in Section 117 reports to "ensure that the Secretary receives sufficient information about gifts or contracts involving a foreign source . . . to be able to enforce 20 U.S.C. 1011f." 85 Fed. Reg. 7540, 7541 (Feb. 10, 2020). If institutions, including AAU members, had qualms about the legality of the Department's actions, they should have sued prior to providing the information the Department requested as part of their Section 117 reports. They did not do so. Whatever the Department's past understanding of the statute or assurances made thereto, the Department was always compelled—and will now follow—Section 1011f(e)'s mandate to make all Section 117 reports public.

Third, elsewhere in its motion and in a slightly different context, AAU makes the claim that the Department is being "internally inconsistent" in stating that disclosure of Section 117 reports is a statutory command which removes its discretion from withholding foreign source names from disclosure while also asserting that as a "policy matter," the Department will not publish foreign source addresses. *See* ECF No. 2 at 23-24 (citing Ex. 6). That criticism is well-founded but does not help AAU. The Department has no discretion to withhold from disclosure any part of the Section 117 reports, including foreign source addresses, because full disclosure is compelled by Section 1011f(e). Any policy decision to withhold foreign source addresses (or other material from Section 117 reports) may expose the Department to potential legal action to fully enforce the disclosure requirement. But that has no impact on the current litigation regarding the disclosure of foreign source identities, which the Department intends to fully comply with, consistent with the statutory command.

Fourth, AAU asserts numerous other arguments regarding failure to consider donor safety issues, retroactivity, and a supposed failure to comply with ED's own regulations in the 2020 and 2023 ICRs. *See* ECF No. 2 at 21-23 (donor safety), 24-26 (retroactivity), 31-33 (internal regulations).

As to donor safety, as an initial matter, AAU does not explain any legal basis for AAU to represent the safety interest of donors. Nor has any donor sought intervention in this litigation to make that assertion. But even if AAU had standing to represent those interests, its representations fall short of demonstrating any real pending harm. First, AAU has not provided any evidence that the July 15, 2026, disclosure of 92 entities on government lists had resulted in any safety concerns for those entities or the people who head or work for them. Second, AAU's asserted harms are merely speculative. For instance, AAU notes that Russia has blacklisted several AAU member institutions and criminalized donations to them. Yet AAU offers no evidence that any of those institutions has filed a Section 117 report listing a donor whose public disclosure will expose them to legal risk. AAU also asserts that certain donors fear for their personal safety if criminals infer they are wealthy based on disclosures that they have donated over $250,000 to an AAU member institution. That claim beggars credulity. Third, and most importantly, the disclosure statute does not vest Defendants with discretion to prevent the publication of portions of Section 117 reports where a donor may suffer some risk of harm from disclosure. Therefore, any claim that Defendants failed to consider this aspect of the problem is simply not relevant.

As to retroactivity, the same important argument applies, namely that the Department of Education lacks discretion to cabin the disclosure statute to apply only to future Section 117 reports. The disclosure statute requires that "[a]ll disclosure reports" be made public. § 1101f(e).

As to adherence to contrary internal regulations, the plaintiffs in *Bessent* made a similar unsuccessful argument. In *Bessent*, plaintiffs relied on IRS's prior determinations in IRS Publication 4639 and IRS Memorandum No. 94505 to argue that the challenged statute prohibited the disclosure of taxpayer addresses for immigration enforcement. *See Bessent*, 167 F.4th at 1226. However, the *Bessent* court rejected that argument, finding that post-*Loper*, the "agency must act pursuant to the court's best reading of the statute." *Id.* at 1238. So too here. Whatever the

Department's position in the 2020 and 2023 ICRs[2], all that matters is the correct interpretation of the disclosure statute as determined by this Court.

Fifth, AAU asserts that even if disclosure is required by statute, FOIA Exemption 4 (and the Department's FOIA regulation) and the Trade Secrets Act would still prohibit disclosure. But these arguments fail. Both FOIA Exemption 4 and Trade Secrets Act are general provisions, whereas the statutory command in Section 1011f(e) is a specific and limited one. Common sense and Supreme Court application of the *lex specialis* canon of statutory interpretation asserts that the specific statute will govern the general. *See, e.g., RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general. . . . The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one.") (internal quotation and citation omitted).

Moreover, FOIA Exemption 4, 5 U.S.C. § 552(b)(4), simply exempts the disclosure of commercial or financial information in the context of FOIA requests. "Congress did not design the FOIA exemptions to be mandatory bars to disclosure." *Chrysler Corp. v. Brown*, 441 U.S. 281, 293-94 (1979) (further concluding that "the exemptions were only meant to permit the agency to withhold certain information, and were not meant to mandate nondisclosure."). The Department's FOIA regulation, 34 C.F.R. § 5.11, similarly creates no affirmative nondisclosure obligation. Likewise, the Trade Secrets Act, 18 U.S.C. § 1905, only prohibits the disclosure of information

[2] In responding to comments in the 2020 ICR, the Department did note that "there are no guarantees that a future administration would not change its Section 117 policy". *See* ECF No. 1, Ex. 15 at 5. Of course, what is relevant in this litigation is not the Department's Section 117 policy, but whether this Court interprets Section 117(e) (§ 1011f(e)) to require disclosure of foreign source identities.

that is "not authorized by law." Clearly, if the Court interprets Section 1011f(e) to require disclosure of foreign source identity data in Section 117 disclosure reports, such disclosure *is* authorized by law and would not implicate the Trade Secrets Act.

**2.** In the alternative, that is, if the disclosure statute, § 1101f(e), is interpreted by this Court as not compelling the disclosure of the entirety of the Section 117 reports submitted by institutions, the "Publication Decision" whereby the Department intends to publish previously submitted Section 117 reports that identify foreign source identities, would still be valid.

First, determination of what information previously provided by institutions as part of their Section 117 disclosure obligations is part of the Section 117 report itself (and thus subject to disclosure) or is ancillary material (not required to be disclosed) is properly a matter for the Department. Although there is no explicit statutory support for the Department's assertion of discretion in making that determination, the Department likely possesses statutorily implicit authority to carry out Congress's statutory scheme. *See HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016) (endorsing the view that "agencies enjoy some powers that were not *expressly* enumerated by Congress" and collecting cases). Given that Congress charged the Department with making Section 117 reports public, presumably to further the public interest of disclosing connections between foreign sources and institutions of higher learning, it is appropriate for the Department to publish foreign source identities (but to withhold their addresses) to effectuate Congress's statutory scheme.

Second, while the Department has previously made a policy decision to withhold from disclosure foreign source identities included in Section 117 reports, the Department warned that this policy was subject to change. In 2020, at least one commenter on the Department's 2020 ICR "noted that it is possible in the future a different administration will take a different view of the confidential nature of the disclosure." *See* ECF No. 1, Ex. 15 at 5. In response, the Department

stated that "there are no guarantees that a future administration would not change its Section 117 policy." *Id.* While the Department was "confident" in 2020 that such disclosure would not take place, *id.*, both institutions and the Department understood that future disclosure was possible. That institutions provided foreign source identities regardless undermines AAU's assertion that the Department "would never publicly disclose" foreign source identities. *See* ECF No. 2 at 6.

Moreover, it is unclear that institutions viewed foreign source identity data as particularly sensitive. Despite the provision of a "checkbox" in the Department's Section 117 reporting portal whereby institutions "could designate a transaction as confidential and exempt from public disclosure under FOIA", *see id.* at 6-7, few institutions utilized the checkbox. "[I]n the period from July 2023 through December 2025, only 21% of the transactions reported by institutions were designated by institutions as exempt under FOIA and only 18% of the institutions reporting identified one or more qualifying transactions as exempt under FOIA." ECF No. 1, Ex. 6 at 4. At the very least, with respect to the vast majority of transactions, institutions were not concerned about the public disclosure of foreign source identities – they provided the data and did not indicate foreign source gifts or donation transactions were viewed as confidential or necessary to protect from disclosure.

**C. The Statute Does Not Violate the First Amendment**

In *Bonta*, the Supreme Court reviewed the California's Attorney General's collection of "Schedule B" information from registered and renewed charities, which "require[d] organizations to disclose the names and addresses of donors who have contributed more than $5,000 in a particular tax year (or, in some case, who have given more than 2 percent of an organization's total contributions"). *Bonta*, 594 U.S. at 602. The Court concluded that these types of "compelled disclosure requirements are reviewed under exacting scrutiny," *id.* at 608, which requires that "there must be a substantial relation between the disclosure requirement and a sufficiently

important government interest," *id.* at 607, and that "[w]hile exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *Id.* at 608.

Here, and unlike in *Bonta*, the government's compelled disclosure requirement survives exacting scrutiny. First, there is a substantial relationship between the disclosure requirement and the government interest at play, namely one of transparency as to significant foreign sources of funding to American institutions of higher learning. The right of public inspection in § 1011f(e) is the right that allows Congress, the media, non-governmental organizations, and non-profit agencies, as well as individual members of the public, the ability to access counterparty identity information. In turn, Congressional investigations and oversight, media reporting, studies conducted by interested NGOs and non-profits, as well as decisions by the voting public, are all informed by the disclosure of Section 117 reports.

Universities are frequent targets of foreign efforts to acquire critical and emerging technologies. Public disclosure of Section 117 reports can shed light on those efforts and their potential implications for national security. *See, e.g.,* Undersecretary of War for Research and Engineering Memorandum, *Fundamental Research Security Initiatives and Implementation*[3] (Jan. 7, 2026) (announcing new measures to protect research from "malign foreign influence, intellectual property theft, and other forms of research exploitation adverse to the United States"); *The Department of War Releases Updated List of Foreign Institutions Engaging in Problematic Activities to Counter Unauthorized Technology Transfer*[4] (July 23, 2026) (formally identifying

[3] Available at: https://www.cto.mil/wp-content/uploads/2026/01/Fundamental-Research-Security-Initiatives.pdf

[4] Available at: https://www.war.gov/News/Releases/Release/Article/4553101/the-department-of-war-releases-updated-list-of-foreign-institutions-engaging-in/.

"130 academic and research institutions located in China, Russia, and Iran" and advising "strict caution" for US industry and academia "when considering collaboration, funding, or data-sharing engagements with any institution named"). In *Bonta*, by contrast, no such transparency interest was at play, nor were there any national security implications regarding the potential targeting of institutions by foreign actors or the public's need to appreciate the national security threat.

Second, the requirement to disclose all Section 117 reports is narrowly tailored to the government's asserted interest. Section 117 reports (and in turn their disclosure) are only required when institutions, like AAU's members, receive sufficiently large gifts or contracts, to the tune of $250,000 or more in a calendar year. § 1011f(a). The reporting requirement is also limited to gifts or contracts from foreign sources, which include foreign governments and agencies, legal entities organized under the laws of a foreign state, individuals who are not citizens or nationals of the United States, or agents and subsidiaries acting on behalf of foreign sources. § 1011f(h)(2). Unlike in *Bonta*, where contributions from *every* donor who contributed a much lower threshold of $5,000 were subject to disclosure, the scope of the disclosure here is sufficiently tailored to disclose only significant donors or contractors who in turn have the potential to significantly influence the relevant institutions of higher education.

## II. PLAINTIFFS HAVE NOT MET THEIR BURDEN TO ESTABLISH THEY WILL SUFFER IRREPARABLE HARM

AAU cannot succeed in demonstrating irreparable harm. Although AAU devotes much space and rhetorical effort lamenting the fate of foreign sources it claims may suffer harm, AAU may not rely on alleged harms to third parties to demonstrate irreparable harm. The "issuance of a preliminary injunction requires a showing of irreparable harm *to the movant* rather than to one or more third parties." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) (emphasis added); *see also Winter*, 555 U.S. at 24 ("A plaintiff seeking a preliminary

injunction must establish . . . that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)).

In any case, AAU presents no competent evidence that any harm is forthcoming to even a single foreign source nor provides any legal theory that AAU is entitled to represent their safety interests. Nor has any foreign source sought to intervene in this matter to assert any such theoretical harm.

AAU files suit on behalf of its member institutions, which are public and private research universities in North America, receiving gifts from or contracting with foreign sources. *See* ECF No. 1 at ¶¶ 20-21. The only financial harm AAU alleges is speculative, tied to potential future donations or contracts. AAU does not allege that it must refund gifts to or rescind contracts with foreign donors because of any disclosure by Defendants. AAU merely worries that foreign sources will be less willing to provide gifts to or negotiate contracts with member institutions in the future if their names are disclosed. But such disclosure is compelled by statute—AAU must look to Congress, not this Court—to provide relief.

Moreover, what is missing from the record is any assertion that AAU members have already suffered irreparable harm from Defendants' disclosure of 92 foreign entities on government lists and their contracts or gifts with institutions. *See* ECF No. 1, Ex. 2 (listing, for example, that AAU member institution Massachusetts Institute of Technology received several eight-digit gifts from the Russia-based "Skolkovo Foundation," which appears on several government lists including the Department of Treasury's "Office of Foreign Assets Control Sanctions List."). Despite disclosure of that list on July 15, 2026, AAU offers no evidence or even argument that its members have suffered financial harm due to diminished donations from foreign sources nor alleged that AAU members' First Amendment associational rights have been violated.

## III. THE BALANCE OF EQUITIES FAVORS THE GOVERNMENT

The public interest and balance of equities both tip in favor of denying injunctive relief. The public interest is particularly slight when it comes to the funding of private research institution members of AAU, which are driven by their own priorities. The public interest is decidedly indifferent as to whether such institutions experience a decrease in foreign source gifts and contracts as a result of the disclosure of those relationships. The public interest in the optimal funding of public research AAU member institutions may be greater, reflecting the public good such institutions aim to achieve, but this is also limited by the public harm that foreign source donations and contracts may cause in influencing the priorities of public research institutions to reflect those foreign interests.

By contrast, as explained further *supra*, Section I.B., the public interest and equities opposing an injunction are vast. The public interest is high in seeing that the laws passed by Congress are properly adhered to and are not undermined by faulty interpretations in their execution. There is also tremendous public interest in transparency, particularly when it comes to the funding of institutions of higher learning by large gifts from or contracts with foreign sources, including in a more informed public assessment of whether specific foreign sources (identified by name) hold undue influence over such institutions. Therefore, the public interest and equities both tip in favor of the government.

## IV. ANY RELIEF SHOULD BE LIMITED TO THE PARTIES BEFORE THE COURT

If the Court is inclined to grant AAU's preliminary injunction motion, relief should be limited to the parties before the Court. This is consistent with the Court's Temporary Restraining Order, where the Court expressly limited injunctive relief to Section 117 reports "that [were] reported by AAU's member institutions." *See* Op. & Order, ECF No. 12 at 4. Any injunction should not prohibit the disclosure of foreign source identities in Section 117 reports filed by non-

AAU member institutions.

Further, AAU's request for a stay under 5 U.S.C. § 705 should be limited to the parties before the Court. Nothing in § 705 requires nationwide rather than party-specific interim relief. *Cf. Trump v. Hawaii*, 585 U.S. 667, 714 (2018) (Thomas, J., concurring) ("No statute expressly grants district courts the power to issue universal injunctions. So the only possible bases for these injunctions are a generic statute that authorizes equitable relief or the courts' inherent constitutional authority. Neither of those sources would permit a form of injunctive relief that is '[in]consistent with our history and traditions.'" (footnote omitted)); *id.* at 714 n.2 ("Even if Congress someday enacted a statute that clearly and expressly authorized universal injunctions, courts would need to consider whether that statute complies with the limits that Article III places on the authority of federal courts.").

Section 705 states, in relevant part: "*On such conditions as may be required and to the extent necessary to prevent irreparable injury*, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or *to preserve status or rights* pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphases added). The statute does not say courts must "postpone the effective date of an agency action" globally, as opposed to only for the parties before it. Critically, the statute limits its preliminary remedy to "such conditions as may be required and to the extent necessary to prevent irreparable injury" and sets out the goal of any preliminary remedy as "to preserve status and rights"—contemplating a limited remedy tailored to the injury before the court, rather than a global remedy, particularly in cases such as this one where no global injury has been presented to the court. The text of § 705 indicates that it confirms courts' authority to issue traditional equitable relief pending judicial review, not that it authorizes global vacatur of agency action—a remedy far

exceeding the traditional forms of equitable relief authorized in § 703, which sets out the remedies of the APA. *See United States v. Texas*, 599 U.S. 670, 700 (2023) (Gorsuch, J., concurring) (explaining that it is not clear that § 705 authorizes remedies at all, rather "it might just confirm courts' authority to issue traditional equitable relief pending judicial review"); *cf. Sampson v. Murray*, 415 U.S. 61, 69, n. 15 (1974) (explaining that § 705 was "primarily intended to reflect existing law"). The legislative history of the APA too confirms that § 705 is based on traditional equitable principles of party-specific rather than universal relief. *See Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946) (House report explaining that under this provision "[t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy" and that "[s]uch relief would normally, if not always, be limited to the parties complainant and may be withheld in the absence of a substantial question for review"); *id.* at 213 (Senate report stating that "[t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy").

District courts have denied nationwide stays under § 705. For example, a court in the Northern District of Texas refused to grant a § 705 stay where, as here, the effective date for the agency action had already passed, reasoning that § 705's allowance of a court "to postpone the effective date of an agency action" does not apply where the effective date has already occurred. *See VanDerStok v. Garland*, 633 F. Supp. 3d 847, 863 (N.D. Tex. 2022).

## CONCLUSION

For the reasons above, the Court should deny AAU's motion for a preliminary injunction and stay of agency action.

Dated: October 13, 2026

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC J. HAMILTON
*Deputy Assistant Attorney General*
*Civil Division*

MICHELLE RENEE BENNETT
*Assistant Branch Director*

/s/ *Esam K. Al-Shareffi*
ESAM K. AL-SHAREFFI
DC Bar No. 90010174
*Trial Attorney*
WILLIAM I. FRIEDMAN
NY Bar No. 4039509
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 598-7367
E-mail: esam.k.al-shareffi@usdoj.gov

*Counsel for Defendants*