**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ASSOCIATION OF AMERICAN UNIVERSITIES,

*Plaintiff*,

v.

U.S. DEPARTMENT OF EDUCATION, *et al*.,

*Defendants*.

Case No. 26-cv-3438 (TSC)

**PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION AND STAY OF AGENCY ACTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................... iii

INTRODUCTION .................... 1

ARGUMENT .................... 3

I. The Publication Decision Is Final Agency Action. .................... 3

II. AAU Is Likely To Succeed On The Merits. .................... 5

A. AAU Is Likely To Succeed On Its Statutory Argument. .................... 5

B. AAU Is Likely To Succeed On Its APA Arguments. .................... 10

C. AAU Is Likely To Succeed On Its First Amendment Argument. .................... 14

D. AAU Is Likely To Succeed On Its Two Remaining Claims. .................... 17

III. The Equitable Factors Likewise Compel Preliminary Relief. .................... 18

CONCLUSION .................... 23

## TABLE OF AUTHORITIES[*]

### CASES

*AAU v. Department of Energy*, 789 F. Supp. 3d 118 (D. Mass. 2025) ........ 22

*AAU v. NSF*, 788 F. Supp. 3d 106 (D. Mass. 2025) ........ 22

*Affirmed Energy, LLC v. FERC*, 166 F.4th 1070 (D.C. Cir. 2026), *petition for cert. filed*, 95 U.S.L.W. 3068 (U.S. Sept. 23, 2026) (No. 26-404) ........ 10

**Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) ........ 13, 14, 15, 16, 17, 19

*Arkema Inc. v. EPA*, 618 F.3d 1 (D.C. Cir. 2010) ........ 14

**Bennett v. Spear*, 520 U.S. 154 (1997) ........ 3

*Bridgeport Hospital v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024) ........ 23

**CAIR v. Gaubatz*, 667 F. Supp. 2d 67 (D.D.C. 2009) ........ 19

*Cannon v. Watermark Retirement Communities, Inc.*, 45 F.4th 137 (D.C. Cir. 2022) ........ 7

*Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026) ........ 2, 3, 5, 9, 12, 17

**Clevinger v. Advocacy Holdings, Inc.*, 2023 WL 5220570 (D.D.C. Aug. 15, 2023), *aff'd*, 134 F.4th 1230 (D.C. Cir. 2025) ........ 19

*Coalition for Independent Technology Research v. Rubio*, 836 F. Supp. 3d 215 (D.D.C. 2026), *appeal docketed*, No. 26-5324 (D.C. Cir. Sept. 16, 2026) ........ 23

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ........ 19

**DHS v. Regents of the University of California*, 591 U.S. 1 (2020) ........ 2, 4, 11, 12, 14

*Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904 (D.D.C. June 10, 2024) ........ 11, 17

*Epic Systems Corp. v. Lewis*, 584 U.S. 497 (2018) ........ 18

*FDA v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542 (2025) ........ 11

*Federal Education Ass'n v. Trump*, 795 F. Supp. 3d 74 (D.D.C. 2025), *appeal docketed*, No. 25-5303 (D.C. Cir. Aug. 20, 2025) ........ 21-22

---

[*] Authorities chiefly relied upon are marked with an asterisk.

*First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. 174 (2026) ....15, 20

*Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019) ....18

*FTC v. CCC Holdings Inc.*, 2009 WL 10631282 (D.D.C. Jan. 30, 2009) ....19

*Hospitality Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010) ....19

*HTH Corp. v. NLRB*, 823 F.3d 668 (D.C. Cir. 2016) ....10

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ....8, 10

*Montefiore Medical Center v. Kennedy*, 2026 WL 2547056 (D.D.C. Aug. 28, 2026) ....23

*Pharmaceutical Research & Manufacturers of America v. United States HHS*, 138 F. Supp. 3d 31 (D.D.C. 2015) ....4

*Planned Parenthood of Greater New York v. United States HHS*, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) ....4

*Rust v. Sullivan*, 500 U.S. 173 (1991) ....7

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ....14

*Texas v. United States*, 798 F.3d 1108 (D.C. Cir. 2015) ....17

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ....23

*United States v. Nordean*, 2022 WL 17583799 (D.D.C. Dec. 11, 2022) ....6

**STATUTES**

5 U.S.C. § 705 ....22

20 U.S.C. § 1011f(b) ....6, 7, 15

20 U.S.C. § 1011f(b)(1) ....5-6

20 U.S.C. § 1011f(b)(2) ....5-6

20 U.S.C. § 1011f(b)(3) ....5, 6, 9

20 U.S.C. § 1011f(c) ....7, 9, 15

20 U.S.C. § 1011f(c)(2) ....6

20 U.S.C. § 1011f(e) ....1, 6

20 U.S.C. § 1011f(g)..........10

## INTRODUCTION

At every turn, AAU gave the government the benefit of the doubt. AAU chose not to challenge the government's collection of donor information starting in 2020, even though the government had no right to mandate it, because the government said it needed access for national security reasons and promised not to publish donors' personal information. And AAU decided not to challenge the government's decision to release the names of 92 donor entities that it claimed implicated the same national security concerns. But now Defendants claim that they must publish everything else—information that they have no right to release to the world, that they only possess by virtue of their earlier repeated promises, and that has no hook to *any* national security rationale. AAU thus had no choice but to seek preliminary relief from this Court.

The government fails to rehabilitate the Department of Education's ("ED") unlawful and harmful Publication Decision. Its opposition never denies multiple key points: that ED had for six years collected the relevant donor names and addresses based on explicit promises that this personally identifying information ("PII") would not be made public; that ED understood such PII to fall outside Section 117's publication obligation; that ED made a sudden and retroactive about-face in 2026, deciding to release all of this private information, without providing any process to affected institutions or donors; and that publication could never be unwound in a subsequent final judgment. The government instead largely responds that ED is doing what Section 117 instructs. But that oft-repeated rejoinder fails: the government is misreading the statute, and that sole argument cannot excuse its multiple other legal violations anyway.

Section 117 does not allow, and certainly does not compel, the Publication Decision. ED can only publish the "reports required by this section." 20 U.S.C. § 1011f(e). Congress made clear what those required reports entail: three kinds of information, two of which pertain to aggregate donor information, and the third based on foreign ownership or control over the institution itself.

The government never argues otherwise. It instead twists its broken promises to argue that if ED can convince schools to include *other* information by promising not to make it public, ED must go back on its word and disclose it anyway. That is inconsistent with Section 117(e), which directs disclosure not of any report from a school, but only one "required by this section." And it would mean information accidentally included (no matter how private or sensitive) must be disclosed and that schools would be subject to different publication rules depending on whether they submit the donor names through ED's reporting portal or via a separate email. Congress did not adopt such a senseless regime, particularly where grave associational and privacy concerns are at stake.

Nor does the government's refrain that it is simply following a statute justify its remaining violations. The government never argues that ED considered AAU members' or donors' reliance interests. It never argues ED considered the safety of donors. And the government does not dispute that ED's decision to treat donor names differently from addresses is inconsistent with its view of the law. It simply argues that none of this matters where ED is following a statute. But an agency must still satisfy the APA—including by considering reliance—where it is not merely interpreting but actually implementing the statute. *See, e.g.*, *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020). Indeed, ED has been exercising discretion in implementing Section 117, including to withhold addresses; having done so, it must exercise such discretion consistent with the APA. The government's responses to AAU's remaining claims fare no better.

Although the government repeatedly retreats to *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), that case is distinguishable many times over. That decision involved a facial challenge to a memorandum of understanding ("MOU") between the Internal Revenue Service ("IRS") and Department of Homeland Security ("DHS") merely "outlining procedures" to govern future informational requests from one agency to the other. 167 F.4th at 1223.

The challengers conceded the MOU was a general "policy statement." *See id.* at 1235–36. Their challenge involved the transfer of information within the Executive Branch, not publication of information for all the world to see. It involved the interpretation of a statute that explicitly mentioned individuals' addresses and made clear those are not the kinds of information the IRS should withhold, *id.* at 1230—unlike Section 117, which does not mention collection and disclosure of covered donors' individual names and addresses. The challengers in *Bessent* abandoned an arbitrary-and-capricious claim, *see id.* at 1235; here, AAU advances contrary-to-law and arbitrary-and-capricious theories. Nor did *Bessent* involve, as here, a series of discretionary choices by an agency on how to implement a statute. The government's resort to *Bessent* merely shows it has nothing else.

Preliminary relief remains necessary to stave off irreparable harm. This Court's TRO will expire on October 29, 2026, allowing ED to release the names of covered donors for the world to see. Courts, including this Court, have recognized the serious harms that follow from disclosures, let alone global publications, of private associational information. The preliminary record makes such harms clear—including both concerns about donor safety and privacy and the chilling effects on future associations. And the harms are definitionally irreparable: no one, including the government, could unwind the damage. Since ED is unwilling to defer implementation of the Publication Decision any further, this Court should grant a preliminary injunction and a stay.

## ARGUMENT

### I. The Publication Decision Is Final Agency Action.

ED's Publication Decision is quintessential final agency action: it marks the consummation of ED's decision-making process and will have real-world impacts with legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The government does not dispute that ED has committed to publishing covered donor identifying information, even choosing a date certain for

that publication, and does not suggest there is any further internal review or administrative appeal of that decision. The government does not and cannot deny covered donor identities will be irrevocably disclosed if it is allowed to implement the Publication Decision. AAU thus easily satisfies the *Bennett* factors, and it is telling that the government hardly engages with them.

The government's two responses fail as a matter of law and a matter of fact. *See* ECF No. 21 ("Opp.") 5–6. The government first argues that the Publication Decision fails *Bennett*'s first step because it does not "mark[] the end of formal rulemaking" and ED never "characterized it" as a rule. *Id*. But the legal question is not whether the agency action is *formal*; the question is whether the agency action is *final*. *See, e.g.*, *Planned Parenthood of Greater N.Y. v. U.S. HHS*, 2025 WL 2840318, at *17–18 (D.D.C. Oct. 7, 2025) (rejecting government's argument that finality requires notice-and-comment process, collecting cases, and confirming action can "be final despite taking a more informal form. … [t]he crux of the inquiry is whether the action is official and presently in effect"). *Bennett* itself involved a challenge to an agency opinion that did not go through formal rulemaking.

The government next argues (seemingly as to *Bennett*'s second prong) that if agency action rests on an interpretation—or a reinterpretation—of what a statute requires, it cannot be final action subject to challenge. *See* Opp. 6 (arguing that the Publication Decision is nonfinal since it "merely expresses [ED]'s view of what the law requires"). But agencies frequently claim actions are compelled by a statute yet have been subject to challenge. *See, e.g.*, *Regents*, 591 U.S. at 8–9. Rather, the question is whether the action has real-world consequences. *See Pharm. Rsch. & Mfrs. of Am. v. HHS*, 138 F. Supp. 3d 31, 40–41 (D.D.C. 2015) (collecting cases). In any event, the Publication Decision does not "merely express[]" a view of "what the law requires," *contra* Opp. 6; it declares

ED's decision to implement Section 117 by affirmatively publishing particular information (and not other information, like donor addresses) on a specific date—for all the world to see.

This is the first of many ways the government's reliance on *Bessent* fails. *Bessent* involved an MOU between the IRS and DHS "outlining procedures" to govern requests made under a part of the tax code for addresses of persons subject to criminal investigation. 167 F.4th at 1223. The challengers conceded the MOU was a general "policy statement" subject to the caselaw involving merely interpretive rules. *See id.* at 1235–36. Neither party even argued that the IRS relied on the MOU "to justify its actions." *Id.* at 1236. Here, by contrast, the Publication Decision does not outline internal procedures; it reflects ED's express and final decision to take action and publish covered donor information, with profound real-world harms.

## II. AAU Is Likely To Succeed On The Merits.

### A. AAU Is Likely To Succeed On Its Statutory Argument.

Section 117 does not authorize ED to publish the covered donor names that it long promised not to release. *See* ECF No. 2 ("PI Br.") 14–17. The government principally says not just that ED can publish individual donor information, but that it *must*, on a theory that Section 117 compels the disclosure of anything and everything included in any institution's "report." Opp. 1–2, 7 (quoting 20 U.S.C. § 1011f(e)). That "gotcha" argument—breaking the promise that ED made for six years, on which institutions relied—is contrary to the statute's text and structure. The government's backup argument, that ED has discretion to make these disclosures, fares no better.

1. To begin, the government's interpretation of subsection (e) is inconsistent with Section 117's plain language. Congress made clear precisely what institutions must submit in their disclosure reports to ED: "[e]ach report to [ED] required by this section shall contain" two categories of aggregate information by country, and a third category of individualized information—including identity—to be provided only if a university is owned or controlled by a foreign source. 20 U.S.C.

§ 1011f(b)(1)–(3). Congress then made clear precisely what information would be available to the public, using four words to limit the scope of publication: "[a]ll disclosure reports *required by this section*." *Id.* § 1011f(e) (emphasis added). It is telling that Congress used the identical "required" framing twice—to describe what must be disclosed to the government, and to describe what must be published, indicating that they are one and the same. 20 U.S.C. § 1011f(b), (e); Opp. 7 (emphasizing Congress's use of "the mandatory 'shall' language" to describe Section 117 reports). That is, in repeating the identical term, Congress created a parallel collection and disclosure regime: what Congress required institutions to produce is all it required be available to the public.

The government's contrary view—in which the "report" Section 117 "required" is not just the substantive materials Congress chose to require, but also anything that happens to be placed in that same formal document whether accidentally, voluntarily, or as a result of Executive Branch coercion or compulsion—would require taking the text out of its statutory context. The context of Section 117 is clear. Congress was precise on what it wanted the Executive to collect and to release, and especially precise about when it wanted the Executive to have and disclose names of covered donors: only (1) when a foreign source owns or controls the reporting institution, or (2) when the institution receives a conditional gift and the counterparty is a foreign government entity. 20 U.S.C. § 1011f(b)(3) & (c)(2). But there is no provision allowing the Executive to request covered donor information beyond those constraints, or to include additional information in a published report. Had Congress wanted to provide the Executive with such leeway, it easily could have. *See United States v. Nordean*, 2022 WL 17583799, at *5 (D.D.C. Dec. 11, 2022) ("Where Congress knows how to say something but chooses not to, its silence is controlling.").

Although the government emphasizes that Congress said in subsection (b) that the reports must "contain" those three categories of information (suggesting this is only a baseline and more

may be included), it ignores the reason why: because subsection (c) requires further disclosures if a covered institution receives a conditional gift. *See* 20 U.S.C. § 1011f(b)–(c). That is not carte blanche to read "contain" to also cover any information institutions submitted accidentally, voluntarily, or because of Executive coercion or compulsion—and the government gives no reason why Congress, having been so specific on the contents of Section 117 reports, including on exactly when individual identities must be disclosed, would have meant to allow the Executive to publish whatever else it decided to later demand from schools, including other identities. It is particularly difficult to read Congress's careful statute the government's way given the profound First Amendment and privacy implications its reading would produce. *See Rust v. Sullivan*, 500 U.S. 173, 190–91 (1991) ("[A] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.").

Indeed, the government's position also produces absurd practical consequences. *See Cannon v. Watermark Ret. Cmtys., Inc.*, 45 F.4th 137, 149 (D.C. Cir. 2022) ("[S]tatutes should be interpreted to avoid ... unreasonable results, or unjust and absurd consequences."). For one, if an institution accidentally or voluntarily included employees' or students' PII in a submission, including someone's address or even more personal information, ED must publish it—even if doing so would violate other federal privacy laws like the Family Educational Rights and Privacy Act ("FERPA").[1] For another, it would produce the strange result that a school that provides individual donor information using ED's Section 117 reporting portal would have its promises of

---

[1] This concern is particularly salient because ED has repeatedly insisted that tuition payments by foreign students' families must be reported where they cross the financial threshold, as could happen for a family that has multiple children attending the same school. *E.g.*, Compl. Ex. 15 (2020 Comment Response) at 10 ("the institution received the benefit [of the contract] (i.e., the money for tuition) and, therefore, the institution must report this transaction").

confidentiality broken, but a school that provides only the required information via the portal and sends a separate email with individual donor information would not (because that is not the "required" "report" on the government's view). The government does not offer any reason to believe Congress chose to adopt such a hyper-formalist and illogical regime to govern such sensitive information, especially where ED never warned schools of the differences between these two kinds of submissions.

It is particularly clear that the government's reading cannot be right because ED has never believed it and still refuses to follow it. When ED promised not to publicize names, it agreed names were "not … part of the disclosure report that must be made public under Section 117(e)" and "not information that Congress intended to be part of the public disclosure report." Compl. Ex. 15 (2020 Comment Response) at 5. The government does not deny this; it just says ED's longstanding view is "irrelevant." Opp. 8–9; *contra Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (noting "longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is"). Worse still, even now ED refuses to follow the reading of Section 117 that the Department of Justice ("DOJ") says is so obvious: although DOJ argues ED "has no discretion to withhold from disclosure any part of the Section 117 reports, including foreign source addresses," Opp. 10, ED continues to "withhold foreign counterparty addresses" in its planned publication. Compl. Ex. 6 (2026 Comment Response) at 3 n.1. Nor is this the exclusive inconsistency between the government's purported mandatory interpretation and ED's own action: ED posted a statement on October 2, after this Court issued a TRO, claiming that the agency actually "planned to include only non-natural person foreign counterparty entities in the publication," Reply Ex. A (ED website)—even though that is not what the Publication Decision represents, what

DOJ argued at the TRO hearing or in its opposition brief, or how Section 117 must work on DOJ's view. Even ED will not follow the interpretation the opposition brief claims to be mandatory.

The government's responses are unavailing. The government points to subsections (d)(1)-(2), which allow institutions to submit disclosures to a state or another agency under "requirements" "substantially similar" to Section 117's. Opp. 7–8 (quoting 20 U.S.C. § 1011f(d)). The government argues that Congress did not say that only information "common" to the required contents of Section 117 reports could be disclosed, and it leaps to the conclusion that subsection (e) thus requires public disclosure of everything submitted. But the latter does not follow from the former. Although ED is authorized to accept other similar forms of reporting, the agency remains constrained by the definition of the Section 117 report in subsections (b) and (c) as limited to certain information when disclosing information under subsection (e). That is the only approach consistent with the other available structural evidence from subsections (b)(3) and (c), which spell out when Congress determined individualized information must be provided: if the institution "is owned or controlled by a foreign source," 20 U.S.C. § 1011f(b)(3), or for "[a]dditional disclosures" when the gifts are conditional, *id.* § 1011f(c). Congress was clear where it sought to publish individualized information; subsection (e) is not a catch-all for the Executive Branch to mandate more.

The government brings up *Bessent*, but it again has no bearing. In *Bessent*, the statute was "crystal clear" that taxpayer addresses can be disclosed to other agencies under certain conditions because they are not "taxpayer return information": one subsection stated that "a taxpayer's identity shall not be treated as taxpayer return information," and another defined a taxpayer's identity to include their "mailing address." 167 F.4th at 1230. Section 117, by contrast, does not include *any* language authorizing ED to collect donors' names or addresses in this situation. Instead,

Section 117 includes a reticulated scheme that requires the submission and publication of *other*, aggregate information. *Bessent* is irrelevant.

2. The government's "alternative" position that ED has discretion to decide what falls under the "report" fares no better. Opp. 13–14. *Chevron* deference is, as the government stresses, no more. *See Loper Bright*, 603 U.S. at 412. So the government resorts to generic language that ED "may promulgate regulations to carry out this section." 20 U.S.C. § 1011f(g). But that empowers ED to implement the command Congress gave; it does not delegate to ED authority to rewrite the text. *Cf. Loper Bright*, 603 U.S. at 394–95 (assessing whether Congress "expressly" delegated to an agency "authority to give meaning to a particular statutory term" or "fill up the details of a statutory scheme" (citations omitted)). Nor does the government get further citing *HTH Corp. v. NLRB*, 823 F.3d 668 (D.C. Cir. 2016), for the proposition that ED "likely possesses statutorily implicit authority to carry out" the Section 117 scheme. Opp. 13. *HTH* rejected an agency's invocation of implicit authority to award litigation expenses, explained that "it is wrong to speak of agencies as having *any* inherent authority," and gave examples of limited implicit powers including correcting clerical errors and policing practitioners' behavior, *see* 823 F.3d at 679–81—hardly akin to publicizing private information the agency previously committed not to disclose.

**B. AAU Is Likely To Succeed On Its APA Arguments.**

This Court has preliminarily found that ED did not satisfy the APA's reasoned decision-making requirement, *see* ECF No. 12 ("TRO Op.") 2–3, and there is no evidence that ED considered reliance interests, *see, e.g.*, *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1087 (D.C. Cir. 2026), *petition for cert. filed*, 95 U.S.L.W. 3068 (U.S. Sept. 23, 2026) (No. 26-404). The government does not argue otherwise—it just says no such analysis was necessary because ED is following a statute. *See* Opp. 1–2, 5, 10–11. But that is wrong, on the law and the facts. And the government offers nothing else to rebut AAU's APA claim.

1. Agencies cannot escape the obligation to engage in reasoned decision-making by claiming their position is compelled by a statute.[2] *See FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 567–69 (2025). Indeed, in *Regents*, the government claimed it was terminating Deferred Action for Childhood Arrivals ("DACA") because the Immigration and Nationality Act required it to do so. The Supreme Court even accepted for purposes of the case that was correct. 591 U.S. at 24–25. Yet the Court held that DHS still had to consider reliance interests when implementing the statute, rejecting the dissent's view that DACA's illegality made reliance irrelevant. *Id.* at 29–33. This Court has thus held that even if an agency changes its policy to "bring it into conformity with the statutory text," it must "discuss any reliance interests or consider any regulatory alternatives that would conform to the statutory text while also protecting the interests of" affected entities in the implementation of that new interpretation. *Endo Par Innovation Co., LLC v. Becerra*, 2024 WL 2988904, at *6 (D.D.C. June 10, 2024). Where an agency is not merely interpreting but implementing a statute—as DHS was doing in *Regents* and as ED is attempting to do here—that agency must follow the APA's requirements.

Indeed, this is a case where ED is exercising discretion in how it implements Section 117, and doing so in ways that are flatly inconsistent with the government's own purportedly mandatory statutory interpretation, making the government's argument doubly irrelevant. Despite the government's claim that ED lacks authority to do anything but publish all information submitted, *see* Opp. 8, 10–11, ED made a series of discretionary choices and continues to do so, including not to publish certain information. ED chose to publish names but to "withhold foreign counterparty addresses,"

---

[2] The government's backup argument—that ED has discretion to allow publication—fares no better. *See* Opp. 13. If Section 117 allowed such discretion, then even the government would have to acknowledge that ED must exercise that discretion in a reasoned way and consider, *inter alia*, its change in position and the reliance interests.

Compl. Ex. 6 at 3 n.1, even though both are in the same submission. DOJ *agrees* this inconsistency argument is "well-founded" and just argues that ED's decision violates the law and could result in future suits. Opp. 10. But that is the point: ED is making a policy decision regarding which information to affirmatively disclose and which to await a future suit as it implements Section 117. ED also now claims that it intends to publish only names of "entities (not persons)." *See* Reply Ex. A. That is not what the Publication Decision, the opposition brief, or counsel at the TRO hearing all say. But if true, it is more evidence of ED exercising discretion in implementing its view of Section 117—discretion which must be exercised consistent with the APA.

Yet again, *Bessent* is not remotely on point. *Bessent* involved an internal agency document addressing how it would resolve future information requests from another agency—not what it would publish to the world on some date certain. 167 F.4th at 1223, 1235. The challengers were attacking nonfinal agency action and abandoned their arbitrary-and-capricious claim. *Id.* at 1235. And *Bessent*'s dicta about the viability of arbitrary-and-capricious claims where a statute gives an agency *zero* "degree of discretion" in carrying out its responsibilities has no bearing. *Id.* at 1238 (noting challengers agreed IRS had no discretion in how to implement the contested statutory provision). Here, the Publication Decision does not merely reflect the government's interpretation of a statute, but ED's decisions on how to implement it—whether to affirmatively publish the information or await requests, whether to publish all information or withhold addresses (and/or names of natural persons), and when to publish it. *See* Compl. Ex. 6 (2026 Comment Response) at 4 (ED acknowledging its "policy" decision to implement Section 117 by "only publish[ing] the name of foreign sources … and not the[ir] addresses"). That is not akin to *Bessent*, but rather to *Regents*, where the agency still had to comply with the APA in making implementation decisions. 591 U.S. at 29–33; *cf. Bessent*, 167 F.4th at 1238 (recognizing that courts must still "ensure the agency has

engaged in reasoned decisionmaking" when it is exercising discretion). ED had to reasonably address issues like donor safety, reliance, and retroactivity.

2. Stripped of the argument that ED's interpretation of Section 117 allows it to evade bedrock APA requirements when implementing that statute, the government offers nothing more. It says twice that ED need not consider schools' and donors' "reliance on a faulty interpretation of [a] statute" that ED itself had endorsed for six years because "reliance interests on a faulty statutory interpretation cannot trump the statutory command," Opp. 2, 5—*i.e.*, the argument rebutted above. The government does not otherwise address *Regents*, or argue that ED actually considered reliance at all. Indeed, the only place ED appeared to consider reliance is when, "in deference to the community's concerns about risk to individuals, [it] agree[d] as a policy matter that it will only publish the name of foreign sources of qualifying gifts and contracts and not the addresses (or similar PII)." Compl. Ex. 6 (2026 Comment Response) at 4. This just highlights the problem—ED is inconsistent on when it can decline to publish information, with no explanation for why the reliance and safety concerns failed to likewise justify protecting donor names. So despite this Court's opinion identifying reliance interests at stake here, *see* TRO Op. 2–4, the government offers nothing.

Though that is dispositive of the APA analysis, there is more. As to ED's failure to consider donor safety, the government first argues that AAU cannot legally "represent the safety interest of donors." Opp. 11. That argument is irrelevant: Donor safety is a consideration ED had to account for, and did not. It is also incorrect: Courts have repeatedly considered donors' harms in compelled disclosure cases brought by organizations, especially because those harms would lead donors to self-censor their associations. *See infra* at 18–20; *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618–19 (2021) ("*APF*"). The government next claims that donor safety concerns are "merely speculative." Opp. 11. But these post hoc rationalizations, which ED never made during its

decisional process, cannot be considered. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). And the post hoc rationalizations fail regardless; unrebutted preliminary record evidence makes clear the safety risks donors would likely face. *See* PI Br. 35–39.[3]

Finally, as to retroactivity, the government never denies that if an action "is 'substantively inconsistent' with a prior agency practice and attaches new legal consequences to events completed before its enactment, it operates retroactively." *Arkema Inc. v. EPA*, 618 F.3d 1, 7 (D.C. Cir. 2010) (citation omitted). ED merely says it can bypass such concerns where it is complying with a statute, Opp. 11—again, the argument rebutted just above. The government has nothing else to say.

### C. AAU Is Likely To Succeed On Its First Amendment Argument.

The government concedes that exacting scrutiny applies, Opp. 14–16, but argues the statute satisfies it. But AAU challenges ED's Publication Decision, not Section 117, and the government comes nowhere close to showing that publication of donors' identifying information is "narrowly tailored" to serve a "sufficiently important governmental interest," *APF*, 594 U.S. at 607–08.

First, the government has not identified a "sufficiently important governmental interest" it is advancing. When ED announced its decision in 2020 to *collect* covered donors' names and addresses, it emphasized its interest in information that would allow the government to enforce federal laws—including to ensure that institutions are complying with reporting requirements. Compl. Ex. 14 (2020 Supporting Statement) at 3. That rationale is not available for the Publication

[3] In discussing FOIA Exemption 4 rather than the APA, the government also strangely repurposes statistics about the use of the exemption checkbox to argue institutions of higher education did not care about confidentiality. *See* Opp. 14. Of course, this is not a reason ED gave in its decision-making process, so it goes beyond "the grounds that the agency invoked when it took the action." *Regents*, 591 U.S. at 20. In any event, a number of institutions likely did not believe they needed to mark as confidential information ED had specifically promised would remain confidential regardless; in fact, it is quite striking that the government acknowledges over 20% still *did* check the box to obtain certainty twice over. *See* Opp. 14.

Decision, because the government already has this information. Instead, the government just generally asserts an interest in "transparency"—the supposed need of media, NGOs, and non-profits to use private information in "Congressional investigations and oversight, media reporting, studies … and [voting] decisions." Opp. 15. But ED cites no case recognizing an interest in publishing donor information to third parties to use as they see fit, let alone to justify disclosing such doubly First-Amendment-protected information. *See* PI Br. 27–30 (explaining both AAU members and donors have First Amendment interests in the information). Were it otherwise, agencies could always assert a generic transparency interest in letting media and voters know about private financial associations with organizations, contrary to the Supreme Court's decisions. *See APF*, 594 U.S. at 618–19; *First Choice Women's Resource Ctrs., Inc. v. Davenport*, 608 U.S. 174, 186 (2026) (collecting cases). And it is particularly nonsensical here, where Congress explicitly defined the appropriate level of transparency: aggregate amounts by country, which implicate none of the same individual associational concerns. *See* PI Br. 5, 8.

While the government briefly invokes national security, Opp. 15–16, that asserted interest has been served thrice over. Congress decided what information the government and public need: aggregate donations by country, and circumscribed examples involving foreign governments. 20 U.S.C. § 1011f(b)–(c). Schools voluntarily complied with six years of requests for ED to see more granular covered donor information, based on the government's claims of security-related concerns and promises that such information would not be made public. Compl. Ex. 14 (2020 Supporting Statement) at 2, 5. And any claimed national security need has been served by ED's publication in July of the 92 entities on preexisting U.S. government lists. The government's generic reference to "foreign efforts to acquire critical and emerging technologies," Opp. 15, hardly proves the required security interest—particularly where confidentiality is essential to institutions' First

Amendment rights. *See APF*, 594 U.S. at 607 (reiterating "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights").[4]

Second, the Publication Decision is not at all "narrowly tailored." Opp. 16. The government argues otherwise based solely on comparing the disclosure threshold—$250,000, as opposed to $5,000 in *APF*. *Id*. But regardless of the threshold, the Publication Decision runs into the same problems as in *APF*: It is the same "dragnet for sensitive donor information" untethered to specific concerns about a particular institution or a particular donor. *See* 594 U.S. at 613–14 (emphasizing government could have used individualized subpoenas instead of blanket disclosure regime). ED's decision is actually *less* tailored than the regulation in *APF*, since the latter applied only to disclosures to the government, while this case involves a deliberate decision to publish donor information to the world. Tellingly, ED does not have a single example of how its approach furthers its purported national security interests. *See id.* at 602–04, 616–18 (faulting state for failing to provide examples of how disclosure of donors' identities furthered its interests).

Still worse, the Publication Decision cannot be narrowly tailored because ED did not consider, and the government in its opposition brief does not even try to confront, alternative ways to advance its interests. ED could do what Congress decided: publish aggregate information by country. Or ED could make information that it collects prospectively public while tailoring disclosures not to include information for which it had explicitly promised confidentiality. Or ED could release, as it now has, individualized information limited to entities on preexisting U.S. government lists.

[4] The publications the government cites as substantiating its concerns provide no cover. *See* Opp. 15–16. The July 23, 2026 list names 130 foreign institutions that the government already cautioned U.S. industry and academia about as appearing on the Department of Defense's Section 1286 list. But ED included donations from entities appearing on the Section 1286 list in its July disclosure. And the January 7, 2026 memorandum simply announces research-security measures.

Or ED could provide individualized notice and an opportunity to object, consistent with how FOIA Exemption 4 works. The government does not claim to have considered these alternatives, and Supreme Court precedent makes that failure fatal to the tailoring analysis in this compelled disclosure case. *See APF*, 594 U.S. at 613 (faulting state where it "had not even considered alternatives to the current disclosure requirement").

Finally, the government concedes the rest of AAU's First Amendment arguments. It does not respond to the argument that retroactively publishing names collected under express assurances of confidentiality punishes past association and denies fair notice. PI Br. 30–31. It thereby concedes those points, at least at this stage. *See Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) (noting "if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded" (citation omitted)); *Endo Par*, 2024 WL 2988904, at *4 (treating unaddressed merits argument "as conceded" in PI context).

**D. AAU Is Likely To Succeed On Its Two Remaining Claims.**

The government barely responds to the fact that ED failed to follow its rules (namely, the 2020 and 2023 Information Collection Requests (ICRs)) by deciding to publish the precise information that both ICRs repeatedly stated would not be disclosed. *See* PI Br. 31–33 (discussing *Accardi v. Shaughnessy*, 347 U.S. 260 (1954)). The government again clings to *Bessent*, arguing the D.C. Circuit brushed aside a similar argument by saying the agency must follow the statute. Opp. 11 (citing 167 F.4th at 1238). But once again, *Bessent* is inapplicable, including because ED is not following an unambiguous statutory mandate and is exercising its discretion in implementing Section 117. And the two IRS documents the government points to from *Bessent* were a "Reference Guide" and a 1999 internal memorandum, *see* 167 F.4th at 1226, not the result of a notice-

and-comment process like the 2020 and 2023 ICRs. Just as *Bessent* cannot excuse ED from following the APA, it does not excuse ED from following its prior regulatory decisions.

The government's responses to the FOIA Exemption 4 and the Trade Secrets Act claims fail too. The government's main response is that both are "general provisions" that fall to a "specific" "statutory command in" Section 117(e) to publicize donor names. Opp. 11–12. Of course, there is no such command in subsection (e), or anywhere else in Section 117. Regardless, application of this principle favors AAU: the government's interpretation of Section 117(e) as sweeping in any information disclosed to ED renders that the more "general" provision, whereas Exemption 4 and the Trade Secrets Act contain specific prohibitions on disclosure of identity and confidential commercial information—and specific procedures for disclosing it. *See* PI Br. 33–35. Also favoring AAU is the "canon against reading conflicts into statutes." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018). If the Court agrees Section 117 does not compel disclosure of all donors' names, there is no conflict at all between that reporting regime and these privacy laws.[5]

## III. The Equitable Factors Likewise Compel Preliminary Relief.

The government claims the statute requires publishing the names of every covered donor throughout the last six years—information ED received only because of ED's promises that it

[5] Amici's brief, which argues they should be entitled to access this information via a FOIA request, does not change this analysis. *See* ECF No. 23-1 (Amici Br.) at 19–25. Amici focus on the percentage of institutions that checked off the Exemption 4 box, but ignore that ED independently promised this information would be confidential, AAU Decl. ¶¶ 15–18, and that under Exemption 4, information is confidential if it is "customarily and actually treated as private by its owner" and "provided to the government under an assurance of privacy," *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 440 (2019). Amici offer no reason ED should be able to break its promises to schools—let alone to do so without following the processes laid out under the FOIA regulations. *See* PI Br. 34–35. If anything, Amici only underscore the importance of granting relief to avoid an improper agreement between ED and a requester to disclose donor information in contravention of the statute and donors' and schools' associational and privacy rights.

would not be published. That egg could never be unscrambled, as no future order by this Court would undo the harm from publication. *See* PI Br. 35–36. Indeed, the government does not dispute that publication is impossible to unwind. Nor would the government suffer analogous harm from being held to its word—the same word it followed for six years—to justify such harms.

1. Initially, the government's efforts to downplay schools' and donors' profound and irreparable injuries—both of which AAU has substantiated here—cannot withstand scrutiny.

The government challenges the legal and factual relevance of the donors' injuries, but neither attack lands. On the law, the government argues that AAU cannot rely on harm to donors. *See* Opp. 3, 16–17. But in cases where organizations alone challenged disclosure of donor information, courts emphasized the harms to the donors too. *See, e.g.*, *APF*, 594 U.S. at 604, 618 (discussing "burden on donors' associational rights," including risk that donors would face "retaliation in the future if their affiliations became publicly known"). On the facts, the government says AAU lacks "competent evidence that any harm is forthcoming." Opp. 17. But disclosure of PII and confidential information is "per se irreparable harm." *Clevinger v. Advoc. Holdings*, 2023 WL 5220570, at *2 (D.D.C. Aug. 15, 2023) (collecting cases), *aff'd*, 134 F.4th 1230 (D.C. Cir. 2025); *see also CAIR v. Gaubatz*, 667 F. Supp. 2d 67, 75–77 (D.D.C. 2009); *Hosp. Staffing Sols. v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010). Further, to the extent the government means AAU's submissions do not comport with the rules of evidence, such rules "do not apply to preliminary injunction hearings." *FTC v. CCC Holdings*, 2009 WL 10631282, at *1 (D.D.C. Jan. 30, 2009); *see also Cobell v. Norton*, 391 F.3d 251, 260–61 (D.C. Cir. 2004). And its opposition gives no reason to doubt the veracity of AAU's declaration, nor to disregard the additional record evidence of likely foreign government retaliation.

In any event, AAU is also relying on its members' own injuries, not just injuries to donors, including that donors will be chilled from associating with member schools. *See* PI Br. 38–39. The government discounts this harm, stating that AAU "merely worries" covered donors would be less likely to associate with schools. Opp. 17. But compelled disclosures of "private donor information 'inevitably' carry with them a 'deterrent effect on the exercise of First Amendment rights'"—the self-censoring of associations. *First Choice*, 608 U.S. at 186, 193. And donors have already raised concerns about publication of their names; institutions relied on ED's repeated promises to assure donors that their names would not be made public; and donors were less likely to donate if their identities would be made public. *Compare* ECF No. 2-1 ("AAU Decl.") ¶¶ 11, 17, 26, with *First Choice*, 608 U.S. at 189.[6]

Finally, it is irrelevant that AAU did not seek to enjoin ED's decision to publish the names of 92 covered donors on preexisting U.S. government lists. *Contra* Opp. 11, 17. AAU's decision not to challenge a targeted disclosure of information, hoping to avoid even more widespread harm, hardly concedes its rights to challenge the broader disclosure. Furthermore, that AAU provided no specific record of harms as to those 92 entities is inapposite, as there are key differences between those entities and the remaining donors. For one, the disclosure of the 92 entities did not reveal any individual person's associations; these 92 entities were all businesses or educational institutions. By contrast, the remaining list includes all the entities *not* on any U.S. government list, including natural persons and entities inextricably linked to natural persons, like a family trust or an individual's private foundation, such that disclosure would reveal and chill those individuals'

[6] Defendants' argument that AAU needs evidence of refund requests from donors is puzzling. *See* Opp. 17. Since refunds would not remove the covered donor from a previously submitted Section 117 report, Defendants would disclose their names anyway. So there is no reason to expect donors to seek refunds, and that hardly undermines the chill to these private associations.

associations with AAU member institutions.[7] So while AAU's members do face some irreparable harm from any publication, the threatened harms are far greater now.

Although ED did state on October 2 (after this Court's TRO order) that it only intended to publish the names of entities rather than natural persons, *see* Reply Ex. A, that does not solve the irreparable harm. First, that limit does not appear anywhere in the Publication Decision, the government did not commit to it at the TRO hearing or in its opposition brief, and it is inconsistent with the government's view of what Congress required in Section 117. But even were it true, it would merely highlight the inconsistencies and unreasoned discretion ED is exercising. *See supra* at 10–14. Regardless, it would not resolve the irreparable harms anyway, including because certain disclosures of entities (such as personal giving vehicles) would inexorably reveal and thus chill associations by particular natural persons. And even for other entities, publication could still reveal their private associations—contrary again to both First Amendment values and to the entities' own commercial interests. *See* AAU Decl. ¶ 32.

2. Nor does the government get any further arguing for harms on its side. The government cannot seriously claim that ED would suffer significant harm from maintenance of the status quo for a few months, where the agency waited nearly thirty years after passage of Section 117 to begin collecting covered donors' identities, and another six before deciding to publish it. *See Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 102 (D.D.C. 2025) (equities disfavor government where "the preliminary injunction would merely require the government to function as it has"), *appeal*

---

[7] There is a diverse range of entities—referred to later in this brief by the catch-all "personal giving vehicles"—for which disclosure would reveal the associations of individual natural persons. Such entities include a donor advised fund, a trust or an estate, a private foundation that receives all (or nearly all) its funding from a particular natural person or family, a family office, and/or any entity whose name contains the name or surname of the principally involved natural person.

*docketed*, No. 25-5303 (D.C. Cir. Aug. 20, 2025). Nor is there merit to the purported security concerns. The government cites nothing to suggest the Publication Decision would advance national security, and ED already published the 92 entities on U.S. government lists, meaning that the remaining donors are necessarily not on any of those lists.

The government's arguments on public interest also lack merit. Its suggestion that the public is "decidedly indifferent" as to donations supporting private institutions, Opp. 18, is bizarre and unfounded. The public has an interest in critical life-saving research from these institutions, not to mention in students having access to robust scholarship funds to attend such institutions regardless of means. *See, e.g.*, *AAU v. Dep't of Energy*, 789 F. Supp. 3d 118, 152 (D. Mass. 2025) (explaining "advancements [AAU members] make can and often do benefit the public in critically important ways, and any setback to that progress is to the detriment of the country as a whole"); *AAU v. NSF*, 788 F. Supp. 3d 106, 142 (D. Mass. 2025) (finding public interest in AAU members' "research aimed at improving human health and quality of life in addition to advancing this country's energy, economic, and national security"). And while even the government cannot deny the public interest in donations to public institutions, it relies on bald and baseless assertions that this interest is "limited by the public harm" donors may have "in influencing" school priorities. Opp. 18. The government cites nothing to support that speculation. All that aside, Congress already decided when publication benefits the public: for aggregate donor information alone.

3. Beyond the preliminary injunction, this Court should stay the Publication Decision. *See* PI Br. 42–44; 5 U.S.C. § 705. The government asserts that stays under Section 705 are inappropriate because they extend relief to nonparties. *See* Opp. 18–20. But it is well established in the D.C. Circuit and in this Court that universal vacatur is the presumptive remedy for all successful APA challenges—a congressionally endorsed remedy that operates on the unlawful agency action,

rather than on specific defendants like an equitable order does. *See, e.g.*, *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024); *Montefiore Med. Ctr. v. Kennedy*, 2026 WL 2547056, at *7–8 (D.D.C. Aug. 28, 2026). Because Section 705 stays are the preliminary-stage parallel to vacatur, like preliminary injunctions parallel permanent ones, stays operate on the agency action itself and are not constrained to a party. *See Coal. for Indep. Tech. Rsch. v. Rubio*, 836 F. Supp. 3d 215, 257–58 (D.D.C. 2026) (collecting cases), *appeal docketed*, No. 26-5324 (D.C. Cir. Sept. 16, 2026). The Supreme Court left these remedies untouched, *see Trump v. CASA, Inc.*, 606 U.S. 831, 847 & n.10 (2025), and the government's reliance on a few concurrences and one Texas district court decision cannot justify overcoming the instructions of the D.C. Circuit and repeated practice of this Court. *See* Opp. 20. The government offers no answer to this wealth of case law.

## CONCLUSION

This Court should grant a preliminary injunction and a Section 705 stay.

Dated: October 19, 2026

Respectfully submitted,

*/s/ Lindsay C. Harrison*

Lindsay C. Harrison (D.C. Bar No. 977407)
Ishan K. Bhabha (D.C. Bar No. 1015673)
Elizabeth Henthorne (D.C. Bar No. 1562688)
Michael J. Vernick (D.C. Bar No. 461811)
Amanda Shafer Berman (D.C. Bar No. 31597)
Anjali Motgi (D.C. Bar No. 90035091)
Kara V. Brandeisky (D.C. Bar No. 90020421)
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
lharrison@jenner.com
ibhabha@jenner.com
bhenthorne@jenner.com
mvernick@jenner.com
aberman@jenner.com
amotgi@jenner.com
kbrandeisky@jenner.com

Andrianna D. Kastanek
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com

Jeremy Feigenbaum
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
jfeigenbaum@jenner.com

*Counsel for Plaintiff Association of American Universities*