**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**ASSOCIATION OF AMERICAN UNIVERSITIES**,

*Plaintiff*,

v.

**U.S. DEPARTMENT OF EDUCATION**, *et al.*,

*Defendants*.

Civil Action No. 26-3438 (TSC)

# MEMORANDUM OPINION

Section 117 of the Higher Education Act requires institutions to disclose funds obtained from certain foreign sources to the Department of Education. After assuring universities for over half a decade that it would keep the identities of covered foreign sources confidential, the Department reversed course and declared its intention to publish their names online on October 2, 2026. When the Department refused to postpone the publication, Plaintiff Association of American Universities ("AAU"), an organization of over seventy public and private research institutions, sued on October 1 and moved for a Temporary Restraining Order ("TRO"), Preliminary Injunction, and Stay of Agency Action. ECF Nos. 1 & 2. The court convened a hearing that evening and entered a TRO enjoining the Department's anticipated publication. ECF No. 12. The court also set a briefing schedule on AAU's Motions for Preliminary Injunction and Stay, which are now before the court. *Id.* For the following reasons, the court will GRANT both motions, enter a preliminary injunction, and stay the Department's publication of the identities of covered foreign sources.

# I. BACKGROUND

## A. Legal Background

### 1. The Higher Education Act

Enacted in 1965, the Higher Education Act ("the Act") aimed to "strengthen the educational resources" of "colleges and universities and to provide financial assistance for students in postsecondary and higher education." Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219. In 1986, Congress amended the statute to, *inter alia*, impose financial disclosure requirements on institutions obtaining funds from certain foreign sources. Higher Education Amendments of 1986, § 1209, Pub. L. No. 99-498, 100 Stat. 1268, 1577–79. The disclosure provisions, which were later moved to Section 117, provide that an institution that "receives a gift from or enters into a contract with a foreign source, the value of which is $250,000 or more, considered alone or in combination with all other gifts from or contracts with that foreign source within a calendar year, . . . shall file a disclosure report" with the Department of Education. Higher Education Amendments of 1998, §§ 117, 117(a), Pub. L. 105-244, 112 Stat. 1581, 1593 (codified at 20 U.S.C. § 1011f). Congress also specified the information that the disclosure reports "required by this section shall contain." 20 U.S.C. § 1011f(b). "For gifts received from or contracts entered into with a foreign source other than a foreign government," the reports must include "the aggregate dollar amount of such gifts and contracts attributable to a particular country." *Id.* § 1011f(b)(1). Other types of gifts are subject to different (some more stringent) requirements. For example, institutions "owned or controlled by a foreign source" are required to report "the identity of the foreign source, the date on which the foreign source assumed ownership or control, and any changes in program or structure resulting from the change in ownership or control." *Id.* § 1011f(b)(3).

The Act provides that "[a]ll disclosure reports required by this section shall be public records open to inspection and copying during business hours." *Id.* § 1011f(e). It empowers the Department of Education to promulgate regulations to carry out Section 117. *Id.* § 1011f(g). And it permits the "Attorney General, at the request of the Secretary" of Education, to bring a civil action to enforce Section 117. *Id.* § 1011f(f)(1).

**2. The 2020 and 2023 Information Collection Requests**

For over three decades after the disclosure provisions were enacted, universities did not report more information about foreign donors than otherwise required by Sections 117(b) and (c). *See* Decl. of Barbara Snyder, President, AAU ¶ 15, ECF No. 2-1 ("Snyder Decl."). That changed in 2020. Lamenting that it had "not received sufficient information to meet Congressional requirements and/or enforce the statute," and that new evidence had emerged indicating that institutions were "failing to file required disclosures," the Department proposed changes to institutions' reporting procedures. U.S. Dep't of Educ., *Supporting Statement for Paperwork Reduction Act Submission* 1, 2 (revised Apr. 13, 2020), ECF No. 1-14 ("2020 Supporting Statement"). Among these changes was a new online portal that required schools to report the name and address of the foreign source. *See* U.S. Dep't of Educ., *Supplementary Document, Foreign Gifts and Contracts Disclosures* (OMB Control No. 1801-0006), OMB.report, https://omb.report/omb/1801-0006 (last visited Oct. 22, 2026); *see also* 2020 Supporting Statement, at 2–3.

As required by the Paperwork Reduction Act and implementing regulations, the Department published notices in the Federal Register seeking comment on the proposed changes. *See* 44 U.S.C. § 3506(c)(2); 5 C.F.R. 1320.8(d); *see also* 2020 Supporting Statement, at 5 (collecting citations and summarizing procedural history). Commenters raised several objections.

They argued, for example, that "Section 117 does not authorize the Department to collect names and addresses" of foreign sources. U.S. Dep't of Educ., *Foreign Gifts and Contract Disclosures: Summary of Public Comments with Responses* 4 (Feb. 10, 2020), ECF No. 1-15 ("2020 Comment Response"). They also insisted that "disclosure of a donor's identity in certain instances could put the donor in danger of being harmed by violence," and that "many donors in religiously persecuted countries will not want to take the risk of making a donation." *Id.*

Acknowledging these objections, the Department explained that it needed "the name and address of foreign sources to verify an institution's compliance with Section 117." *Id.* at 5. That information was "necessary for the Department to be able to fulfill its enforcement duty to refer to the Attorney General when it has determined an institution has failed to comply with the requirements of Section 117," it clarified. *Id.* Nonetheless, the Department assured institutions that it would withhold the names and addresses "from the public disclosure report and protect the confidentiality" of the foreign sources to the extent permitted by law. *Id.* It justified its decision not only on its concern for "the safety of donors in religiously persecuted countries and the strong privacy [interests] implicated in their personally identifiable information," but also because it did "not consider the name and address" to be "part of the disclosure report that must be made public under Section 117(e)." *Id.* at 4. The Department also explained that it was "required to withhold confidential business and financial information requested under the Freedom of Information Act pursuant to 5 U.S.C. § 552(b)(4) and 34 C.F.R. § 5.11," and that it would "strictly adhere to this prohibition." 2020 Supporting Statement, at 5.

In February 2020, the Department submitted the Information Collection Request ("ICR") to the Office of Management and Budget ("OMB"), the agency designated by the Paperwork Reduction Act to review and approve requests for information from the public. *See* 44 U.S.C.

§ 3507(a); Agency Information Collection Activities; Submission to the Office of Management and Budget for Review and Approval; Comment Request; Foreign Gifts and Contracts Disclosures, 85 Fed. Reg. 7540 (Feb. 10, 2020). OMB approved the Request in April 2020. *See* Off. of Info. & Regul. Affs., OMB, Notice of Action, OMB No. 1801-0006, ICR Ref. No. 202002-1801-002 (Apr. 13, 2020) ("2020 Notice of Action"). The Department's new reporting portal went live in June 2020. *See Section 117 Foreign Gift and Contract Data*, Fed. Student Aid, https://perma.cc/G36W-VY9X.

The 2020 ICR was set to expire in April 2023, *see* 2020 Notice of Action, and after an emergency extension, *see OMB Control Number History 1801-0006*, Off. of Info. & Regul. Affs., OMB, https://perma.cc/YK6Q-G95U, the Department submitted a new ICR to OMB in May 2023, *see OMB Control Number History 1845-0172*, Off. of Info. & Regul. Affs., OMB, https://perma.cc/M4ND-VNEY. This ICR was submitted under a different control number because it transferred responsibility for managing the information collection to the Office of Federal Student Aid ("FSA") instead of retaining administration within the Office of the General Counsel. U.S. Dep't of Educ., *Supporting Statement for Paperwork Reduction Act Submission: Foreign Gifts and Contracts Disclosures* 1 (Apr. 26, 2023), ECF No. 1-12 ("2023 Supporting Statement").

Like the 2020 ICR, the 2023 ICR required universities to report the names and addresses of foreign donors even though Section 117 does not require such disclosures. Once again, commenters objected, arguing that Section 117 did not authorize the Department to require disclosure of names and addresses, and that disclosure of such information would discourage donations. *See* U.S. Dep't of Educ., *Foreign Gifts and Contract Disclosures: Summary of Public Comments with Responses* 1 (June 20, 2023), ECF No. 1-11 ("2023 Comment Response"). Once

again, the Department responded that it "believe[d] it require[d] the name and address of foreign sources to assess an institution's compliance with Section 117." *Id.* at 2. "In the absence of this disclosure requirement," it explained, the Department "would be hindered in its ability to fulfill its enforcement responsibilities to verify an institution's compliance with Section 117." *Id.* at 3.

Nonetheless, the Department repeatedly "assure[d] submitting institutions" that it would "withhold the foreign source party's name and address (excepting country) from the public disclosure report to the extent permitted by law." *Id.* at 2; *see also* 2023 Supporting Statement, at 5. It reiterated that it would "strictly adhere" to the requirement of confidentiality imposed by Exemption 4 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(4), and the Department's implementing regulations, 34 C.F.R. § 5.11. 2023 Supporting Statement, at 5. The Department emphasized that universities could indicate on the reporting portal whether the name and address of a foreign source were considered confidential information under FOIA. *See* 2023 Comment Response, at 2. And it committed to notifying and providing the institution with an opportunity to object prior to any public disclosure. *See id.*

OMB approved the ICR in June 2023 for another three-year period. *See* Off. of Info. & Regul. Affs., OMB, Notice of Action, OMB No. 1845-0172, ICR Reference No. 202212-1845-003 (June 27, 2023).

### 3. The 2025 Executive Order, 2026 ICR, and Publication Decision

On April 23, 2025, President Trump signed Executive Order 14282, *Transparency Regarding Foreign Influence at American Universities*, Exec. Order No. 14282, 90 Fed. Reg. 17541 (Apr. 23, 2025). The President declared that "[p]rotecting American educational, cultural, and national security interests requires transparency regarding foreign funds flowing to American higher education and research institutions." *Id.* § 1. The President ordered the Secretary of

Education to "take appropriate steps to require universities to more specifically disclose details about foreign funding." *Id.* § 2(a). He also instructed the Secretary to "provide the American people with greater access to information about foreign funding to higher education institutions." *Id.* § 2(c).

The first relevant major agency action in the wake of the Executive Order came in January 2026, when the Department launched a new website for institutions to report information related to foreign funding, accompanied by a public-facing "Section 117 Foreign Gift and Contract Public Transparency Dashboard" that presented the financial data in a visual format. *See Foreign Funding Higher Ed*, U.S. Dep't of Educ., https://perma.cc/7KJX-Y2ND; *see also New Process for Amending Historical Section 117 Data (GENERAL-26-37),* Fed. Student Aid, https://perma.cc/7WP4-MKWR. The new reporting website eliminated the option for schools to mark donor names as confidential, however. *See* Am. Council on Educ., Comment Letter on Proposed Revisions to Information Collection Request, Docket No. ED-2026-SCC-1354, at 8 (June 15, 2026), ECF No. 1-8. The Department did not acknowledge this change, much less explain it, when the new website went live.

The following month, the Department entered into an interagency agreement with the State Department to "enhance capabilities to improve the accuracy and timeliness of Section 117 disclosures by IHEs [institutions of higher education], public inspection of those disclosures, and enforcement of Section 117's disclosure and public inspection requirements." *Interagency Agreement Between U.S. Department of Education and U.S. Department of State* 2 (Feb. 20, 2026), ECF No. 1-16. The agreement empowered the State Department to assist with the "[a]dministration of Section 117's IHE biannual reporting and collection provisions," and "Section 117's Public Inspection requirements for Disclosure Reports." *Id.* at 2–4.

Then, in April 2026, the Department of Education proposed a revision to the 2023 ICR that significantly departed from the 2020 and 2023 ICRs. *See* Agency Information Collection Activities; Comment Request; Foreign Gifts and Contracts Disclosures, 91 Fed. Reg. 20156 (Apr. 15, 2026). Even though the Department insisted that it sought "renewal for substantially the same information collection, utilizing a new, more user friendly portal," it also stated that it "intended to publish the contents of reports made by institutions to the fullest extent required by 20 U.S.C. § 1011f(e)," including "details about specific counterparties," i.e. foreign sources, "such as the counterparty's name." U.S. Dep't of Educ., *Supporting Statement for Paperwork Reduction Act Submission: Foreign Gifts and Contracts Disclosures* 2, 5 (Apr. 15, 2026), ECF No. 1-10 ("2026 Supporting Statement"). The Department maintained that the publication was "[c]onsistent with the requirements of Section 117," and indeed, that it was "clear on the face of the statute and in the legislative history of Section 117" that such "transparent reporting was necessary to counteract any distorting influence of foreign money on teaching, research, and culture," and "provide policymakers and the public with information to assess, detect, and respond to foreign influence operations under the guise of 'academic' activities." *Id.* Accordingly, the Department proposed to publish the information collected for Section 117 purposes "in the form it is received at www.foreignfundinghighered.gov." *Id.* at 10. The Department also proposed eliminating the checkbox on the reporting form permitting schools to designate certain information as confidential—a change that had already occurred months ago. *See* U.S Dep't of Educ., *Comparison of Disclosure Documents 2023 v. 2026*, Docket No. ED-2026-SCC-1354, at 2 (Apr. 15, 2026), https://perma.cc/S5FK-HRJ6.

Commenters, including AAU, raised myriad concerns. They pointed out that the "Department's stated intention to publicly disclose" covered foreign donors' names and addresses

marked "a significant reversal of the Department's own prior commitments outlined in previous ICRs," and that the Department had not "explained why the public disclosure of donor information is now necessary." AAU, Comment Letter on Proposed Revisions to Information Collection Request, Docket No. ED-2026-SCC-1354, at 3 (June 10, 2026), ECF No. 1-9. They also argued, among other things, that publicly disclosing "individual foreign donors' personally identifiable information" lacked a "statutory basis," raised "significant First Amendment implications," *id.* at 2, and presented safety risks to donors who wished to remain anonymous for fear of reprisals in their home countries, *see* Council for Christian Colls. & Univs., Comment Letter on Proposed Revisions to Information Collection Request, Docket No. ED-2026-SCC-1354, at 2 (June 5, 2026).

In response, the Department emphasized that "publication is required by the statute," and that the "requirements of the statute take precedence over any potential disincentive to qualifying foreign gifts or contracts." U.S. Dep't of Educ., *Foreign Gifts and Contract Disclosures: Summary of Public Comments with Responses* 2 (June 26, 2026), ECF No. 1-6 ("2026 Comment Response"). The Department acknowledged "the recommendation to establish a provision for donors who seek confidentiality because of potential risks of reprisal or persecution." *Id.* at 3. But it insisted that it "cannot determine the credibility of risk to donors," and that if a covered institution had "genuine concerns about the risks of disclosure," it was up to the "institution and foreign counterparty" to "determine whether there is such a risk and to act accordingly" because "the act of providing a qualifying gift or entering a qualifying contract is wholly voluntary." *Id.* The Department also rejected the First Amendment concerns, maintaining that "the national security benefits of providing for public inspection of the identities of qualifying foreign counterparties outweigh the associational and limited privacy interests of foreign nationals (natural and artificial persons)." *Id.* at 3.

Most relevant here, the Department stated that it intended to publish the identities of all covered foreign sources that had been reported to it since 2020 less than three weeks later, on July 15, 2026. *See id.* The Department defended this "Publication Decision"—which it characterized as the publication of data collected "before the Department was specific about its intent to publish natural donor identity"—as a policy shift. *Id.* It stated that "it has been clear that the previous policy to not publish names and addresses was a policy determination based in part on the representations by certain institutions that the information was protected by the Freedom of Information Act (FOIA) and other expressed concerns of institutions." *Id.* But it concluded that "[a]t this point based on evidence from the Department and other reliable sources—including, without limitation, Congressional committees and national security assessments—the statutory inspection requirement outweighs countervailing confidentiality interests or FOIA-based objections." *Id.* at 3–4.

Addressing the fact that it had previously assured universities that covered sources' information would remain confidential, the Department observed that in 2020, it had "specifically acknowledged that there were no guarantees that there would not be policy changes in future administrations with respect to publication of counterparty information." *Id.* at 4. The Department indicated that "as far back as 2020, one commenter noted the possibility over time that an administration could change its position vis-à-vis publication of name and/or address data." *Id.* In responding to that concern, the Department contended, it had been "clear that FOIA requires the Department to balance, on a case-by-case basis, an individual's privacy interests against the public's interest in disclosure," and that it would "continue to consider the safety of foreign donors and contractors in countries where religious persecution is known to occur and the privacy concerns implicated in their personally identifiable information." *Id.* The Department also stated

that it "continues to recognize and has considered these concerns as it balances them against the importance of statutorily mandated transparency and national security requirements." *Id.*[1] "In deference to the community's concerns about risk to individuals," the Department determined that "as a policy matter," it would "only publish the name of foreign sources of qualifying gifts and contracts and not the addresses (or similar PII)." *Id.* That was so even though in its view, the Section 117's "disclosure requirement does not include any qualifications for disclosure." *Id.* at 3 n.1.

In short, the Department concluded that "publication of th[e] names and addresses has always been consistent with the statutory transparency requirement. A prior policy not to publish that information—made under different circumstances and based on different consideration [*sic*]—cannot override the clear statutory requirements and intent of Section 117." *Id.* at 8. The Department submitted the ICR to OMB in June 2026, and it was approved in August 2026. *See* Off. of Info. & Regul. Affs., OMB, Notice of Action, OMB No. 1845-0172, ICR Ref. No. 202604-1845-006 (Aug. 6, 2026).

**B. Factual and Procedural Background**

The Department did not provide institutions further updates on its decision to publish the identities of covered foreign sources until July 6, 2026, nine days before the scheduled publication. On that date, it reminded institutions of their obligations to file disclosure reports by July 31, as required by Section 117. *See* Off. of Gen. Counsel, U.S. Dep't of Educ., *Reminder: Reporting Deadline for Section 117 of the Higher Education Act of 1965*, Fed. Student Aid (July 6, 2026),

[1] The Department noted that "concerns about the safety and human rights of natural person donors in those countries is apparently not a compelling concern to *institutions*," given the "extensive and substantial foreign funding" they received "from countries of concern." *Id.* (emphasis added).

ECF No. 1-4. In a subsequent paragraph of the announcement, it stated: "Consistent with previous public statements and Section 117's transparency requirements, the Department will be publishing its next public report of foreign source reporting, including the names of all foreign sources from prior reporting cycles, on July 15, 2026." *Id.*

Unsettled by the announcement, institutions sought to postpone the publication of the names, and on July 14, the Department "agreed to delay by two weeks—until July 29, 2026—its planned publication of the names of all 'foreign sources from prior reporting cycles.'" Off. of Gen. Counsel, U.S. Dep't of Educ., *Reminder: Reporting Deadline for Section 117 of the Higher Education Act of 1965*, Fed. Student Aid (updated July 14, 2026), ECF No. 1-3. The Department stated that it would nonetheless publish the names of ninety-two foreign entities that appeared on lists maintained by the U.S. Government the following day. *Id.* And it did so, posting a spreadsheet called the "Section 117 Entity of Concern Data" on the public-facing portion of its reporting website. *See Section 117 Entity of Concern Data – February 23, 2026*, U.S. Dep't of Educ., https://perma.cc/TK3P-X4VU.

Over the following weeks, the Department delayed publication of the remaining names five times. *See* Off. of Gen. Counsel, U.S. Dep't of Educ., *Reminder: Reporting Deadline for Section 117 of the Higher Education Act of 1965*, Fed. Student Aid (July 24, Aug. 10, Aug. 25, Sept. 11 & Sept. 25 updates), https://perma.cc/CV9J-ET48 ("FSA Publication Reminder"). On September 25, 2026, the Department stated it would publish the remaining names a week later, on October 2. *Id.* As the date approached, it became clear that the Department was unwilling to wait any longer. *See* E-mail from Esam Al-Shareffi, Trial Att'y, U.S. Dep't of Just., to Lindsay Harrison, Jenner & Block LLP (Sept. 30, 2026, at 20:49 ET), ECF No. 1-17.

On October 1, 2026, AAU sued the Department of Education, the State Department, the Secretary of Education, and the Secretary of State, claiming that the Publication Decision violated the Administrative Procedure Act ("APA"), the First Amendment, the 2020 and 2023 ICRs, FOIA and the Department's implementing regulation, and the Trade Secrets Act. *See* Compl. ¶¶ 80–127. AAU also moved for a TRO, Preliminary Injunction, and Stay of Agency Action. *See* ECF No. 2. The court convened a hearing that evening and entered a TRO shortly thereafter enjoining publication of the remaining names. *See* ECF No. 12. The court also set a briefing schedule for AAU's preliminary injunction and stay motions, which are now before the court. *Id.*[2]

## II. LEGAL STANDARDS

### A. Preliminary Injunction

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To make this showing, the movant must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted); *see also Clevinger v. Advoc. Holdings*, 134 F.4th 1230, 1233 (D.C. Cir. 2025). Where, as here, "the Government is the opposing party," the last two factors—the balance of the equities and the public interest—"merge" because the Government's interest *is* the

[2] After the TRO was granted, the Department updated the public-facing portion of the reporting portal to state that it "had planned to include only non-natural person foreign counterparty entities in the publication." *See Section 117 Data Downloads*, U.S. Dep't of Educ. (Oct. 2, 2026), https://perma.cc/2L24-C6PQ. But as counsel for the Department conceded at the hearing, the agency intends to eventually publish the names of all covered foreign sources. *See* Tr. of Mot. Hr'g at 35:9–16, ECF No. 31.

public interest. *See Ctr. for Taxpayer Rts. v. IRS*, 190 F.4th 990, 1011 (D.C. Cir. 2026) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### B. Stay of Agency Action

Section 705 of the APA authorizes district courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" on "such conditions as may be required and to the extent necessary to prevent irreparable injury." *See* 5 U.S.C. § 705. The standard for obtaining a Section 705 stay is the same as that for obtaining a preliminary injunction. *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam) (citing *Wash. Metro. Area Transit Auth. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). But the two remedies differ in nature, "with an injunction commanding a party and a stay suspending the agency action itself." *Coal. for Indep. Tech. Rsch. v. Rubio*, 836 F. Supp. 3d 215, 232 (D.D.C. 2026) (citing *Nken*, 556 U.S. at 428–29)).

## III. ANALYSIS

### A. Preliminary Injunction and Stay Factors

In the D.C. Circuit, the four preliminary injunction and stay factors—likelihood of success, irreparable harm, balance of the equities and the public interest—have "typically been evaluated on a 'sliding scale,'" such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (quoting *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)). But the Circuit has expressed skepticism about whether the sliding-scale approach survives the Supreme Court's opinion in *Winter*, which "can be read to require movants to establish each preliminary injunction factor

independently." *Clevinger*, 134 F.4th at 1235 (citing *Winter*, 555 U.S. at 20–22). It has not yet had occasion to decide whether the sliding-scale approach remains good law, however. *See Make the Rd. N.Y. v. Mullin*, 179 F.4th 16, 25 (D.C. Cir. 2026). Nonetheless, all four factors favor AAU here.

**1. Likelihood of Success on the Merits**

The first factor, the "likelihood of success on the merits, is the 'most important factor.'" *Friends of the Earth U.S. v. Exp.-Imp. Bank of the U.S.*, 187 F.4th 616, 625 (D.C. Cir. 2026) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). In the context of a preliminary injunction, "the 'merits' on which a plaintiff must show a likelihood of success encompass both substantive theories *and* establishment of jurisdiction." *Id.* (cleaned up) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

**i. Standing**

Although the parties did not brief the question of standing, the court has "an independent obligation to assure" itself of jurisdiction. *Ctr. for Biological Diversity v. EPA*, 189 F.4th 76, 83 (D.C. Cir. 2026) (citing *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012)); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). At the preliminary injunction stage, AAU must "'clearly' show that it is 'likely to establish each element of standing.'" *Nat'l Tr. for Historic Pres. in U.S. v. NPS*, 185 F.4th 1185, 1207 (D.C. Cir. 2026) (alteration omitted) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). An association like AAU has standing to sue on behalf of its members when "(A) at least one of its members would have standing independently, (B) the interests the association is suing to protect 'are germane to the organization's purpose,' and (C) the claim the association asserts and the relief it requests do not require 'the participation of individual members in the

lawsuit.'" *Id.* at 1208 (cleaned up) (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

AAU has clearly shown it is likely to establish all three requirements. Start with the last two. AAU seeks to represent its member universities' interest in soliciting funding from foreign sources and maintaining relationships with those sources. Those interests are germane to its mission of "advancing policies that sustain its members' ability to conduct research and education of the highest quality," because gifts from and contracts with foreign sources will help fund research and educational initiatives at the schools. Compl. ¶ 20; *see also* Snyder Decl. ¶ 13. What is more, "neither the claim[s] asserted nor the relief requested" by AAU will require participation of any member institution in the lawsuit. *Ctr. for Biological Diversity*, 189 F.4th at 84. Resolving AAU's claims will not turn on the individual circumstances of its member universities, nor will adjudicating its requests for "injunctive relief" and a Section 705 stay require "individualized proof." *Nat'l Tr. For Historic Pres.*, 185 F.4th at 1218–19 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)). Accordingly, the last two factors are met.

There is also a "substantial likelihood" that at least one of AAU's members has standing. *Mennonite Church USA v. DHS*, No. 25-5209, 2026 WL 3132807, at *4 (D.C. Cir. Oct. 20, 2026) (quoting *Vilsack*, 808 F.3d at 913). To establish standing, a plaintiff must show that it has suffered 1) an "injury in fact" that is concrete, particularized, and actual or imminent; 2) that the "injury was likely caused by the defendant"; and 3) that the "injury would likely be redressed by judicial relief." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111–12 (2025) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). Where, as here, the plaintiff seeks "prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *FDA v.*

*All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)).

AAU's members face a substantial likelihood of injury to their right to associate with donors and other sources of funding. The Supreme Court has long recognized that "a demand for private donor information 'inevitably' deters the exercise of First Amendment rights," *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 189 (2026) (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976)), in part because it "encourage[s] groups and individuals to cease or modify protected First Amendment" activity that "the government disfavors," *id.* (first citing *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460–63 (1958); and then citing *Shelton v. Tucker*, 364 U.S. 479, 485–87 (1960)). That rationale applies equally here. Many AAU members are "among the institutions whose donors' names" the Department is planning to publish. Compl. ¶ 21. Publishing the names will burden the institutions' rights to associate with those donors, who will be deterred from making future contributions for fear of retaliation, reprisals, or embarrassment in their home countries, among other reasons. *See* Snyder Decl. ¶¶ 28–30.

To be sure, unlike in *First Choice*, the Department does not seek to collect the names of covered sources, but merely to publish names it already has in its possession. But that distinction cuts in AAU's favor, because it amplifies the harm AAU's members are likely to suffer. As the Supreme Court has recognized, a "government that chooses to make private donor information public may make the damage worse." *First Choice*, 608 U.S. at 199. Indeed, *First Choice* expressly recognized the "risk of harassment and reprisals" that publication "could invite" above and beyond the "pressure to avoid ties" that disclosure to the Government produces. *Id.* at 198 (internal quotation mark omitted) (quoting *Shelton*, 364 U.S. at 486).

Nor is this risk uncertain. AAU has submitted a declaration from its president, who avers that in the past, covered donors "gave gifts in reliance" on "assurances that the donor's identity would not be publicly disclosed," and that publication of their names would "weaken institutions' ability to recruit new donors or secure repeat donations, as prospective donors would be hesitant to risk the revelation of their personal information." Snyder Decl. ¶¶ 11–12. Those representations are materially similar to the ones the Supreme Court found sufficient for imminent harm in *First Choice*. *See id.* at 189. Indeed, it is a "commonsense inference[]" that publication of donors' identities will "inevitably" deter some from donating to the institutions. *Id.* at 190 (first quoting *Diamond Alt. Energy*, 606 U.S. at 116; and then citing *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 617 (2021)).

Because AAU's members have shown a substantial likelihood of injury to their associational interests, and that injury is "fairly traceable" to the Department's Publication Decision, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)), and will likely be "redress[ed]" by an order enjoining and/or staying the Decision, *id.* at 562, AAU has made the necessary showing at this stage.

**ii. APA Claims**

Turning to the merits of its claims, AAU argues, *inter alia*, that the Publication Decision exceeds the Department's statutory authority and is arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A), (C); *see also* Pls.' Mem. Supp. Mot. for TRO, Prelim. Inj. & Stay at 13–26, ECF No. 2 ("Mot."). In response, the Department contends that the Publication Decision is not final agency action, and that in any event, it survives AAU's challenges either because publication is required by Section 117 or because the publication is a permissible exercise of policy discretion. *See* Defs.' Opp'n to Pls.' Mot. at 5–14, ECF No. 21 ("Opp'n").

On the preliminary record before the court, AAU is likely to succeed on its claims. The Publication Decision is likely final agency action as it appears to "mark the 'consummation' of the agency's decisionmaking process" and "determine 'rights or obligations,' or produce 'legal consequences.'" *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). Moreover, the agency's proffered rationales for the Publication Decision are unlikely to pass muster. Contrary to the Department's lead argument, Section 117 does not require publication of all information disclosed to it in relation to financial reporting requirements. And, in the alternative, even if the statute did invest the Department with the discretion it now invokes—which is unlikely—the agency has not "give[n] adequate reasons" to justify its decision to publish covered sources' names. *Advanced Energy United v. FERC*, 185 F.4th 186, 212 (D.C. Cir. 2026) (quoting *Montrois v. United States*, 916 F.3d 1056, 1067 (D.C. Cir. 2019)). In particular, the Department has failed to "provide a reasoned explanation" for its policy about-turn and to consider the "serious reliance interests" its repeated assurances of confidentiality have engendered over the past six years. *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 568 (2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–222 (2016)). Accordingly, AAU is likely to succeed on the merits.

**a. Final Agency Action**

The APA restricts judicial review to "final agency action[s]." 5 U.S.C. § 704. Under the APA, agency action is final when it marks 1) "the consummation of the agency's decisionmaking process" and 2) "is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Hill v. U.S. Dep't of Interior*, 151 F.4th 420, 428 (D.C. Cir. 2025) (internal quotation mark omitted) (quoting *Bennett*, 520 U.S. at 178). Both requirements are likely met here.

First, the Publication Decision appears to be the culmination of the Department's decisionmaking process. It was definitively set out in a "final, written document in the administrative record." *Ctr. for Taxpayer Rts.*, 190 F.4th at 1002; *see* 2026 Comment Response, at 4. Moreover, it was repeatedly announced on a website consulted by regulated entities. *See* FSA Publication Reminder, *supra*. As a result, the Decision is far from "tentative or interlocutory." *Bennett*, 520 U.S. at 178. Rather, it is a final determination to publish the identities of foreign sources. Indeed, the Department even scheduled a date for the publication. *See* 2026 Comment Response, at 4. And it has never reconsidered its decision to publish the information, despite delaying the actual publication several times. *See* FSA Publication Reminder, *supra*.

Second, the Publication Decision is also likely to determine legal rights and have legal consequences. The Decision retroactively applies a new legal regime to information collected under express assurances of confidentiality. *See Ctr. for Taxpayer Rts.*, 190 F.4th at 1007 (concluding that a procedure which "reduce[d] . . . privacy rights" determined legal consequences and was final agency action). By declaring that it intends to publish that information, the Decision burdens the rights of AAU's member institutions to associate with foreign donors. *See First Choice*, 608 U.S. at 189.

The Department claims that the Publication Decision is an "unreviewable policy statement" because it was "not the product of notice-and-comment rulemaking" and has never been characterized as a "rule," i.e. "a formal rule published in the Federal Register with a clear effective date." Opp'n at 6 (quoting *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1236 (D.C. Cir. 2026)). But characterization as a rule or notice-and-comment rulemaking has never been the yardstick by which final agency action is measured. In fact, the Supreme Court and D.C. Circuit have found such agency actions as memoranda, *Biden v. Texas*, 597 U.S. 785, 807–09 (2022),

compliance orders, *Sackett v. EPA*, 566 U.S. 120, 124–27 (2012), and even letters, *Rhea Lana, Inc. v. DOL*, 824 F.3d 1023, 1025 (D.C. Cir. 2016), as final agency action subject to APA review. The D.C. Circuit has "rejected the proposition that if an agency labels its action an 'informal' guideline it may thereby escape judicial review under the APA." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000). That forecloses the Department's argument.

The Department nonetheless insists that the Publication Decision "is a Department policy statement which merely expresses the Department's view of what the law requires," and that such a policy statement is "not final, and not reviewable." *Id.* (quoting *Bessent*, 167 F.4th at 1236). Its position appears to be that the Publication Decision "merely clarifies [the agency's] existing duties" under the statute, and that "[a]ny significant consequences or determination of rights" that may result is a function of "Section 1011f(e) itself," not the Publication Decision. *Id.* But that argument falls apart on closer inspection. The Publication Decision is not simply a "policy statement." *Id.* Rather, it consists of a concrete action—publication of the identities of foreign sources—that will take place on a specified date on a specified website. *See* 2026 Comment Response, at 4; FSA Publication Reminder, *supra*. That distinguishes this case from *Bessent*, where the Memorandum of Understanding between the Internal Revenue Service ("IRS") and Department of Homeland Security ("DHS") merely explained how the IRS planned to administer a statutory provision in the abstract, divorced from the context of any specific agency action. *See* 167 F.4th at 1226–27, 1236.

Accordingly, AAU is likely to establish that the Publication Decision is final agency action.

**b. Agency Action in Excess of Statutory Authority**

The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

5 U.S.C. §§ 706(2), (2)(C). Federal agencies typically have no power to act unless authorized by statute. *See FEC v. Cruz*, 596 U.S. 289, 301 (2022). In determining whether an agency has acted beyond its delegated authority, courts "'decide all relevant questions of law' and 'interpret . . . statutory provisions'" without deference to the agency's position. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398 (2024) (emphasis omitted) (quoting 5 U.S.C. § 706). That means interpreting "the relevant statutory provisions *de novo*." *Michigan v. U.S. Dep't of Energy*, 191 F.4th 677, 691 (D.C. Cir. 2026) (citing *Loper Bright*, 603 U.S. at 400–01).

AAU is likely to demonstrate that Section 117 of the Act does not authorize the Department to publish the identities of foreign sources. Section 117(a) provides that institutions that "receive[] a gift from or enter[] into a contract with a foreign source, the value of which is $250,000 or more . . . shall file a disclosure report with the Secretary [of Education] on January 31 or July 31, whichever is sooner." 20 U.S.C. § 1011f(a). Section 117(b) then describes the "contents of [that] report," which vary depending on whether the source is a foreign government and whether the institution is owned or controlled by a foreign source. *Id.* § 1011f(b). "For gifts received from or contracts entered into with a foreign source other than a foreign government," as relevant here, "[e]ach report to the Secretary required by this section shall contain" the "aggregate dollar amount of such gifts and contracts attributable to a particular country," defined as the country of citizenship or principal residence for natural persons, or country of incorporation or principal place of business for legal entities. *Id.* §§ 1011f(b), (b)(1). Section 117(e) then provides that "[a]ll disclosure reports required by this section shall be public records open to inspection." *Id.* § 1011f(e).

As the text makes clear, the statute does not require AAU's member institutions to report the identities of foreign sources, just the aggregate dollar amounts attributable to their respective countries. In turn, Section 117(e) does not require public disclosure of the identities, just the

aggregate amounts. That conclusion is also apparent from the fact that Section 117(b) *does* require institutions to report "the identity of the foreign source" in a particular circumstance: when the institution "is owned or controlled by" that source. *Id.* § 1011f(b)(3). In that case, Section 117(e) requires the Department to publish the foreign source's identity. In short, Congress knew how to mandate the reporting and publication of the identities of foreign sources, but chose not to apply that requirement to institutions like AAU's members. "Congress's deliberate decision . . . is telling." *Seven-Sky v. Holder*, 661 F.3d 1, 12 (D.C. Cir. 2011), *abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).

The structure of Section 117 further reinforces the conclusion that the Publication Decision likely exceeds the Department's authority. *See Snyder v. United States*, 603 U.S. 1, 12 (2024). Section 117(b) establishes a baseline for the required contents of the disclosure report. Section 117(c) then imposes "additional disclosures for restricted and conditional gifts," requiring institutions to also report, *inter alia*, "the amount, the date, and a description of such conditions or restrictions." *Id.* §§ 1011f(c), (c)(1), (c)(2). Again, Section 117(c)'s more detailed reporting requirements show that Congress knew how to mandate more detailed disclosures, but chose not to do so here. Accordingly, the Department's decision to publish the identity of foreign sources—information that AAU's members were not even required to disclose—likely exceeds the agency's authority.

Indeed, no provision of Section 117 appears to grant the Department license to collect more information than is required by Sections 117(b) and (c), nor does any provision authorize it to publish that information. Section 117(g), for example, permits the Department to promulgate regulations to enforce the statute. *Id.* § 1011f(g). But, to take the Department's own word, it has never characterized the Publication Decision as a "rule." *See* Opp'n at 6. In any event, publicly

disclosing donors' identities likely exceeds, not enforces the Department's statutory duties.[3] Likewise, Section 117(f), which permits the Department of Justice to bring a civil action against entities that fail to comply with the statutory disclosure requirements, lends no support to the Department's actions. 20 U.S.C. § 1011(f)(1). To the contrary, that provision fixes a means of enforcing compliance: civil suit. Congress did not authorize the Department to disseminate information that universities were not even required to disclose in order to somehow enforce the statute.

The Department concedes that Section 117(b) does not require AAU's members to report the identities of their foreign sources, but nonetheless insists that because the names form part of the "disclosure report" submitted to the agency, and Section 117(e) requires the entire report to be published without any "carve out[s]," the names must be publicly disclosed. Opp'n at 7. At base, the Department contends that a "disclosure report" required by Section 117 may contain more than the information that "shall" be contained in those reports under Sections 117(b) and (c). *See id.* at 7, 9; 20 U.S.C. §§ 1011f(a), (c).

But the Department's interpretation of the statute is foreclosed by text, structure, and common sense. Sections 117(b) and (c) make clear that a disclosure report consists only of the information it must contain pursuant to those sections. 20 U.S.C. §§ 1011f(b)–(c). Sections 117(b) and (c) reference the same "disclosure report" required by Section 117(a). *Id.* They are the only provisions of the statute that prescribe the contents of disclosure reports. And those provisions are

[3] The Department argues that AAU's members "should have sued prior to providing" the names and addresses to the Department if they "had qualms about the legality of the Department's" collection. Opp'n at 10. But "conforming to the dictates of invalid administrative action does not estop a party from subsequently contesting that very action." *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 n.9 (D.C. Cir. 1958) (citations omitted). And here, AAU seeks relief against the Department's present—and *distinct*—missteps.

specific, requiring disclosure reports to contain specific information. Read in context, Sections 117(b) and (c) exhaustively catalog the contents of the reports.

Resisting this conclusion, the Department contends that the word "shall" in Sections 117(b) and (c) does not "limit[ ] the scope of disclosure to only the contents" set out in those provisions. Opp'n at 7. It insists that AAU attempts to graft an atextual limitation on the public disclosures by rewriting Section 117(e) to say, for instance, that the "*required contents of disclosure reports* in this section shall be public records." *See id.* (emphasis added). But the Department fails to appreciate that Sections 117(b) and (c) do indeed use the words "contents" and "disclosures" interchangeably when prescribing what information a disclosure report shall contain. That Congress chose to equate the "contents" of a report with the "disclosures" required by Section 117 is instructive. It shows that it is the Department, not AAU, that seeks to rewrite Sections 117(b) and (c) to read, for instance, that "each report to the Secretary required by this section shall contain, *but is not limited to,*" the specified information.

The Department's interpretation would also eviscerate Congress's carefully crafted regime governing the content of disclosure reports. Section 117(b) requires the identity of a foreign source to be reported only in one instance: when the institution "is owned or controlled by a foreign source." *Id.* § 1011f(b)(3). By its plain terms, Section 117(b) requires other institutions not receiving funds from foreign governments only to report the "aggregate dollar amount" of such funds "attributable to a particular country." *Id.* § 1011f(b)(1). But by broadly interpreting "disclosure report" to mean *all* information reported in connection with foreign sources, and requiring institutions to report foreign source identities even when they are not owned or controlled by foreign sources, the Department threatens to "collapse the distinction" that Congress drew. *PayPal, Inc. v. CFPB*, 58 F.4th 1273, 1280 (D.C. Cir. 2023).

The Department's view also flouts common sense. It has identified no sensible principle limiting the kinds of information that must be publicly disclosed once it has chosen to compel that information from universities. Passport numbers? Part of the disclosure report. Social security numbers, for those foreign sources that have them? The same. Even sensitive information accidentally reported, like a donor's religious affiliation, could not escape the public eye. That would be so even if publication might violate federal privacy laws. *See* Mot. at 7, 13–14, 33–35. The Department's interpretation is so expansive that it appears to have given pause even to the Department itself: it has decided to withhold publication of the foreign sources' addresses for safety and privacy reasons even though it insists on revealing their names. *See* 2026 Comment Response, at 3 n.1.

The Department does not dispute the sweeping breadth of its interpretation, but offers two final defenses. In a last-ditch appeal to the statutory structure, it first insists that Sections 117(d)(1) and (d)(2) indicate that a disclosure report may contain more information than is required by Sections 117(b) and (c). *See* Opp'n at 7–8. Section 117(d)(1) permits institutions complying with state financial disclosure requirements to submit "a copy of the disclosure report filed with the State" so long as the requirements imposed by state law "are substantially similar to the requirements of" Section 117. 20 U.S.C. § 1011f(d)(1). Section 117(d)(2) permits institutions to fulfill their Section 117 disclosure requirements by submitting a report filed with another federal agency "containing requirements substantially similar" to those imposed by Section 117. *Id.* § 1011f(d)(2). But these provisions, which merely permit an institution to meet its Section 117 obligations by submitting a report governed by a different legal regime "in lieu of" a Section 117 report, have little to say about whether Section 117 reports may contain more information than required by Sections 117(b) and (c). *Id.* § 1011f(d)(1), (d)(2).

Finally, the Department contends that it may exercise its discretion to withhold certain information from publication. *See* Opp'n at 13. But the Department concedes—as it must—that "there is no explicit statutory support" for this "assertion of discretion." *Id.* Nor can the court identify any provision in Section 117 that "delegates" this type of "discretionary authority" to the Department. *Loper Bright*, 603 U.S. at 395. Accordingly, the Department retreats to the contention that it "likely possesses statutorily *implicit* authority" to withhold certain data from publication. *See* Opp'n at 13 (emphasis added) (citing *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016)); *see also* Tr. of Mot. Hr'g at 40–42, ECF No. 31. But the case on which the Department relies, *HTH Corp.*, recognizes such implicit statutory authority only in very narrow circumstances, such as to "correct clerical mistakes" in orders, 823 F.3d at 679 (citing *Howard Sober, Inc. v. Interstate Com. Comm'n*, 628 F.2d 36, 41 (D.C. Cir. 1980)), "police the behavior of" attorneys in agency proceedings, *id.* (citing *Polydoroff v. Interstate Com. Comm'n*, 773 F.2d 372, 374 (D.C. Cir. 1985)), or reconsider prior decisions when done in a timely manner, *id.* (citing *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014)). Indeed, the D.C. Circuit has held that where "Congress has spoken" to an issue, implicit statutory authority does not apply. *Ivy Sports*, 767 F.3d at 86 (Kavanaugh, J.).

Congress has clearly spoken to the Department's powers. Section 117 likely does not authorize the Department to pick and choose which information it wishes to keep secret and which to disseminate. Accordingly, AAU is likely to succeed on the merits of this claim.

**c. Agency Action that is Arbitrary and Capricious**

AAU also argues that the Publication Decision is arbitrary and capricious in violation of the APA. *See* Mot. at 17–26; *see also* 5 U.S.C. § 706(2)(A). To survive judicial review on such a claim, an agency action must be "reasonable and reasonably explained." *Int'l Dark-Sky Ass'n,*

*Inc. v. FCC*, 106 F.4th 1206, 1213 (D.C. Cir. 2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). The agency must have "considered the relevant issues," *Prometheus*, 592 U.S. at 423, and "give[n] adequate reasons" for its decisions, *Advanced Energy United v. FERC*, 185 F.4th 186, 212 (D.C. Cir. 2026) (quoting *Montrois v. United States*, 916 F.3d 1056, 1067 (D.C. Cir. 2019)). When, as here, an agency changes an existing policy, it must "provide a reasoned explanation for the change, display awareness that [it is] changing position, and consider serious reliance interests." *White Lion*, 604 U.S. at 568 (cleaned up) (quoting *Encino Motorcars*, 579 U.S. at 221–222).

As a threshold matter, the Department contends that an arbitrary and capricious claim against an agency's "changed . . . interpretation of a statute" is no longer available after *Loper Bright*, 603 U.S. at 369. Opp'n at 9. It insists that under that decision, "once a court interprets a challenged statute," the court's interpretation binds the agency. *Id.* So it would be fruitless to "seek . . . [further] explanation" from the agency for a changed interpretation that could never control. *Id.* (quoting *Bessent*, 167 F.4th at 1237).

The Department's view of the law is incorrect, however. *Loper Bright* did not disturb the understanding that even after an agency has found a prior policy illegal, as here, "how best to address [that] finding of illegality moving forward can involve important policy choices." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020). In *Regents*, for example, DHS sought to rescind the Deferred Action for Childhood Arrivals ("DACA") program because the Attorney General found that it "conferred benefits in violation of the INA [Immigration and Nationality Act]." *Id.* at 24. In the wake of that determination, DHS chose to terminate the entire DACA program, as opposed to just a portion of it. *See id.* at 27. When challengers argued that the decision was arbitrary and capricious in violation of the APA, the Supreme Court agreed. *See id.* at 35–36.

It reasoned that DHS had "plainly exercised . . . discretionary authority" in implementing the new policy, even if required by statute, and that exercise of discretion was subject to APA review. *Id.* at 26. To survive arbitrary and capricious review, the Court held, DHS should have considered the significant reliance interests that DACA had engendered over the years. *See id.* at 30–32.

Like DHS in *Regents*, the Department has "plainly exercised . . . discretionary authority" in the wake of its finding that Section 117 has always required the publication of covered foreign sources' identities: it has vowed to publish the names of all covered donors imminently. *See id.* at 26 (citation omitted); *see also* FSA Publication Reminder, *supra*. Thus, even if the Department is correct that the statute requires publication—and it is likely not, *see supra* Part III.A.1.ii.a—its decision about "how best to address [that] finding of illegality moving forward" is subject to review, *Regents*, 591 U.S. at 25.

Contrary to the Department's argument, *Bessent*, 167 F.4th at 1218, did not—and indeed, cannot—foreclose such APA review. *Contra* Opp'n at 9. In *Bessent*, several nonprofit organizations sued to prevent the IRS from sharing taxpayers' addresses with DHS for immigration enforcement purposes. *See Bessent*, 167 F.4th at 1223. They argued that the IRS's policy was contrary to law because 26 U.S.C. § 6103(i)(2) "prohibited the disclosure of addresses" in the relevant circumstances. *Id.* The organizations also "claimed that IRS had acted arbitrarily and capriciously by changing its interpretation of § 6103(i)(2) without adequate explanation or consideration of reliance interests." *Id.* The D.C. Circuit rejected both arguments. *Id.* at 1224. It first explained that Section 6103(i)(2) *required* IRS to disclose the noncitizens' addresses. *Id.* Then it held that remand to the agency to further explain the adoption of its new—and correct—interpretation would be a "useless formality." *Id.* (citation omitted). That made sense given the facts of *Bessent*. The plaintiffs there had challenged IRS's changed interpretation of Section

6103(i)(2), which was laid out in a Memorandum of Understanding signed with DHS, and unaccompanied by any discrete real-world action. *See id.* at 1226–27, 1236. Here, by contrast, the Department has not merely issued a document outlining its new interpretation of Section 117; it has also decided to publish the names of covered donors imminently. *See* FSA Publication Reminder, *supra*. This case is thus more like *Regents*.

The Department's decision to publish the names of covered donors is likely arbitrary and capricious. That is because the Department failed to consider the serious reliance interests that its prior policy of confidentiality had engendered. And it failed to reasonably explain why it decided to publish the identities of covered foreign sources while withholding other information it deemed sensitive, like their addresses.

**(1) Failure to Consider Reliance Interests**

In 2020, the Department identified at least two policy reasons for keeping covered sources' identities confidential. First, it recognized that publication could threaten the "safety of donors in religiously persecuted countries." 2020 Comment Response, at 4. It appreciated that "disclosure of a donor's identity in certain instances could put the donor in danger of being harmed by violence" and lead many "donors in religiously persecuted countries" to "not want to take the risk of making a donation." *Id.* Second, the Department was mindful of the "strong privacy [interests] implicated in" donors' "personally identifiable information" and the harm publication would cause to those interests. *Id.* In 2023, the Department again "assure[d ] institutions" that except in circumstances not relevant here, it would "withhold the foreign source party's name and address (excepting country) from the public disclosure report to the extent permitted by law." 2023 Comment Response, at 2.

Institutions and foreign sources relied upon these assurances of confidentiality for over five years. When the Department sought the names and addresses of foreign sources to more effectively enforce Section 117, AAU's members provided that information on the understanding that it would be kept private. *See* Compl. ¶¶ 15, 21, 40, 46–47; Snyder Decl. ¶ 16. AAU's member institutions also passed along the Department's assurances of confidentiality to foreign sources. *See* Compl. ¶¶ 79, 112; Snyder Decl. ¶¶ 11, 17. The promise that their name would not be "made publicly available" was "critical" to many donors, who would not otherwise have contributed. Snyder Decl. ¶¶ 26–27. As AAU explains, many foreign donors gave in reliance on those promises, funding "scholarships and fellowships, endowed professorships, capital campaigns and building projects, libraries and collections, and academic programs across disciplines." Compl. ¶¶ 47, 79; *see also* Snyder Decl. ¶ 11. Disclosing the identities of foreign donors would thus destroy the trust AAU's member institutions have built with them and "weaken institutions' ability to recruit new donors or secure repeat donations." Snyder Decl. ¶ 12. Publication would also expose the donors to the very risks that led them to seek privacy in the first instance, such as "political and other forms of retaliation." *Id.* ¶ 28. Indeed, the Department anticipated such risks in 2020. *See* 2020 Comment Response, at 4.

In reversing its prior policy of confidentiality, the Department was required to provide a "reasoned explanation" for "disregarding facts and circumstances that underlay or were engendered by" the policy. *Encino Motorcars*, 579 U.S. at 222 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)). Wholly missing from the Publication Decision, however, was any consideration of these reliance interests. What is more, the Department did not appropriately grapple with the safety and privacy justifications for its prior policy of confidentiality. Indeed, it gave them only glancing attention, remarking that it was "clear that the

previous policy to not publish names and addresses was a policy determination based in part on the representations by certain institutions that the information was protected by" FOIA and "other expressed concerns of institutions." 2026 Comment Response, at 3. It cursorily brushed aside those concerns, claiming that "[a]t this point[,] based on evidence from the Department and other reliable sources—including, without limitation, Congressional committees and national security assessments—the statutory inspection requirement outweighs countervailing confidentiality interests or FOIA-based objections." *Id.* at 3–4. The Department provided no details about the evidence it had received or how it had weighed it, or other interests in transparency, *see* 2026 Supporting Statement, at 5, against the safety and confidentiality interests. Its "conclusory" and "unsupported" statement thus fails to clear the arbitrary and capricious standard. *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562–63 (D.C. Cir. 2010) (quoting *McDonnell Douglas Corp. v. U.S. Dep't of Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

Moreover, if anything, the Department appeared to abdicate its obligation to consider the potential risks to donors. In response to a commenter's "recommendation to establish a provision for donors who seek confidentiality because of potential risks of reprisal or persecution," the Department insisted that it "cannot determine the credibility of risk to donors," and that if a covered institution had "genuine concerns about the risks," the "institution and foreign counterparty" should "act accordingly." 2026 Comment Response, at 3. But that gets it exactly backwards: it is the Department's responsibility to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," not the institutions' or donors' to adjust their behavior accordingly. *Fox*, 556 U.S. at 516.

To be sure, the Department informed institutions in 2020 that there were "no guarantees that a future administration would not change its Section 117 policy" regarding the confidentiality

of names and addresses. 2020 Comment Response, at 4. But that disclaimer hardly relieves the Department of its obligation to consider the reliance interests its policy engendered over the course of over half a decade. Indeed, *Regents* rejected a materially similar contention to the Department's. There, the agency memorandum establishing DACA stated that the "program 'conferred no substantive rights' and provided benefits only in two-year increments." *Regents*, 591 U.S. at 31 (citations omitted). The Court nonetheless held that the disclaimer did not "preclude reliance interests" altogether. *Id.* Rather, it was "pertinent in considering the *strength* of any reliance interests" engendered in their stead. *Id.* (emphasis added). But DHS had given "no such consideration" to the reliance interests in *Regents*. *Id.* So too here.

**(2) Lack of Reasoned Explanation**

The Publication Decision likely also fails arbitrary and capricious review because it displays a lack of "reasoned decisionmaking." *Vertex Pharms. Inc. v. U.S. Dep't Health & Hum. Servs.*, 189 F.4th 1195, 1209 (D.C. Cir. 2026) (citing 5 U.S.C. § 706). Although the standard is "deferential," *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012), and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)), there is little to no coherence in the Publication Decision.

Start with the Department's equivocation about whether publication is mandatory under Section 117 or merely discretionary. Time and again, it defends the Publication Decision as "required by the statute." 2026 Comment Response, at 2; *id.* ("The requirements of the statute take precedence over any potential disincentive to qualifying foreign gifts or contracts . . . ."); *id.* at 8 ("[P]ublication of . . . names and addresses has always been consistent with the statutory

transparency requirement. A prior policy choice not to publish that information—made under different circumstances and based on different consideration [*sic*]—cannot override the clear statutory requirements and intent of Section 117."); *see also* Tr. of Mot. Hr'g at 9–11 (similar). But in the same breath, the Department characterizes its decision not to publish the addresses of covered foreign sources "as a policy matter." 2026 Comment Response, at 4. It cannot be both.

That equivocation has real consequences, because it leaves the Department in a double bind. If Section 117 requires publication of all information collected in connection with an institution's financial reporting requirements, then the Department must publish *all* the information. But that cannot be squared with its decision to withhold "the addresses (or similar PII)" from publication "as a policy matter," in "deference to the community's concerns about risk to individuals." *Id.* at 4. Indeed, the Department's own announcement appears to contradict its logic in this regard. *See id.* at 3 n.1 ("Although the statutory disclosure requirement does not include any qualifications for disclosure, the Department will continue to withhold foreign counterparty addresses and similar data, other than counterparty identities.").

Conversely, if publication is a matter of policy, and the Department purported to truly "defer[] to the community's concerns about risk to individuals," then it did not explain why it only withheld the addresses of the foreign sources and not also their names. *Id.* at 4. After all, safety risks were instrumental in its decision to keep covered sources' identities confidential in 2020. *See* 2020 Comment Response, at 4. Publishing the names of covered foreign donors would appear to present at least as significant, if not more serious, "risk[s] to individuals" than disseminating their addresses. 2026 Comment Response, at 4. The Department thus "entirely failed to consider" this "important aspect of the problem." *State Farm*, 463 U.S. at 43. And its post-hoc rationalizations in its opposition brief—that the harms to donors are "merely speculative" and indeed "beggar[]

credulity," Opp'n at 11, and that "with respect to the vast majority of transactions, institutions were not concerned about the public disclosure of foreign source identities," *id.* at 14—are all just that: post-hoc rationalizations, *see SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1947) (agency action must be sustained on "the grounds upon which the agency acted").[4]

Strangely, the Department concedes that the Publication Decision is "internally inconsistent." Opp'n at 10. It even deems the criticism "well-founded." *Id.* Its only defense is that the inconsistency has "no impact on the current litigation regarding the disclosure of foreign source identities." *Id.* But, as explained, the inconsistencies reveal the Department's lack of reasoned decisionmaking in formulating the Publication Decision. As the D.C. Circuit has stated, "[o]f course, it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent.'" *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025) (quoting *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018)). For these reasons, AAU is likely to succeed on the merits of its APA claims. The court accordingly declines to reach AAU's remaining arguments.

**2. Likelihood of Irreparable Harm**

Turning to the second factor of the preliminary injunction and stay analysis, AAU must show that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted) (citations omitted). Harm is irreparable if it is "'beyond remediation' by compensatory or other relief at the conclusion of litigation." *Talbott v. United States*, 176 F.4th 720, 747 (D.C. Cir. 2026) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290,

---

[4] The Department also claims that AAU's members do not have "standing" to represent the "safety interest of donors." Opp'n at 11. But the court has already found that AAU is substantially likely to demonstrate standing for its claims. *See supra* Part III.A.1.i. And the APA requires agencies to consider "important aspect[s] of the problem," regardless of whether those aspects directly affect the litigants before it. *State Farm*, 463 U.S. at 43.

297 (D.C. Cir. 2006)). To prevail on this factor, AAU must show that the harm it faces is "actual and not theoretical." *Id.* (quoting *Gospel Churches*, 454 F.3d at 297). It has done so here.

To start, implementing the Publication Decision would inflict irreparable harm upon the relationships AAU's members have developed with foreign donors, damaging the institutions' reputations and causing loss of goodwill. *See Adya LLC v. U.S. Drug Enf't Admin.*, 826 F. Supp. 3d 115, 133 (D.D.C. 2026) ("Because 'injury to reputation or goodwill is not easily measurable in monetary terms,' it is often 'viewed as irreparable.'" (alteration omitted) (quoting 11A *Wright & Miller's Federal Practice & Procedure* § 2948.1 (3d ed. Apr. 2026 update))); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (collecting cases holding that loss of reputation and goodwill constitutes irreparable harm). For years, AAU's member institutions have relayed the Department's promises to their donors, assuring them that their identities would not be disclosed. *See* Snyder Decl. ¶¶ 11, 17. And for years, foreign donors materially relied upon the institutions' representations, donating because they could do so in confidence. *See id.* ¶¶ 11, 17, 26. Publication of their identities would frustrate that reliance and damage the yearslong relationships universities have built overnight, likely to the point where they can never be fully repaired. *See id.* ¶ 33; *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 77 (D.D.C. 2009) ("Disclosure of a non-profit corporation's confidential donor list, like disclosure of a for-profit corporation's customer list, 'might well lead to a loss of trust and goodwill' if donors 'begin to feel that their personal information is not safe with plaintiff.'" (quoting *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001))).

What is more, publication of the identities would "significantly and immediately impair[]" the institutions' "ability to solicit support from their foreign alumni and other international supporters." Snyder Decl. ¶ 33. The resulting loss would be felt widely, as such sources have

funded "scholarships and fellowships, endowed professorships, capital campaigns and building projects, libraries and collections, and academic programs across disciplines." Compl. ¶ 79. Although economic harm can typically be redressed, where, as here, it is difficult to estimate the extent of the financial injury and "no adequate compensatory or other corrective relief will be available at a later date," it may be irreparable. *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) (quoting *In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022)).

The financial injury is particularly difficult to estimate, and the damage to the institutions' reputation and loss of goodwill all the more severe, because of the nature of the injury donors will suffer. As courts in this District have recognized, "the disclosure of confidential information is, by its very nature, irreparable because such information, once disclosed, loses its confidential nature." *Sierra Club v. Palkowski*, No. 24-cv-741, 2026 WL 887019, at *8 (D.D.C. Mar. 31, 2026) (quoting *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 433 (D.D.C. 2018)). Disclosure of personally identifiable information, in particular, may inflict irreparable injury because dissemination "could expose individuals to the risk of 'identity theft and other misuse of personal information,' such as extortion." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, No. 25-cv-339, 2025 WL 1783899, at *11 (D.D.C. June 27, 2025) (alteration omitted) (quoting *Williams v. Harry's Nurses Registry, Inc.*, No. 24-34, 2025 WL 842041, at *5 (2d Cir. Mar. 18, 2025)). Indeed, in 2020, the Department itself acknowledged that publishing foreign sources' identities would present a risk to "the safety of donors in religiously persecuted countries" and impair "the strong privacy [interests] implicated in their personally identifiable information." 2020 Comment Response, at 4. Those concerns have not dissipated. *See* Compl. ¶¶ 12, 73–75; Snyder Decl. ¶¶ 28–31; Mot. at 36–38.

Accordingly, AAU is likely to suffer irreparable harm in the absence of judicial relief, and the second factor is also met.

### 3. The Balance of the Equities and Public Interest

In deciding a preliminary injunction or stay motion, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). Courts are also to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)). "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

Like the other factors, this one also favors AAU. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted). Publishing the identities of foreign donors—which the universities have promised would remain confidential—would irreparably harm the universities' reputations, damage the relationships they have cultivated with donors over years, and implicate the donors' privacy and safety. *See* Snyder Decl. ¶¶ 33–34; *supra* Part III.A.2. Contrary to the Department's argument, the strength of these interests does not depend on whether the university is a public or private institution, *see* Opp'n at 18, as these reputations and relationships will be affected regardless. On the other side of the ledger, requiring the identities to be kept private, at least until the merits of this case have been conclusively resolved, would not harm the Department. The identities have not been publicly disclosed for six years, so it is difficult to see—and the Department has not articulated—how a few more months would make a material difference.

To be sure, there are cognizable public interests in increased transparency of foreign funding sources to American universities. That is especially true when foreign sources have contributed substantial sums of money to fund particular research programs. *See, e.g., Section 117 Entity of Concern Data – February 23, 2026, supra* (revealing, for example, that MIT received $24 million in gifts from a Russian entity in 2015). But by the same token, the Department has already published a list of ninety-two foreign sources of particular concern, given their presence on security and other lists maintained by the Government. *See id.* The public interest in the identities of the remaining sources is relatively low.

Accordingly, AAU has carried its burden on this factor of the analysis as well.

**B. Remedy**

AAU seeks both a preliminary injunction prohibiting the Department from publishing the names of covered foreign sources and a Section 705 stay under the APA preventing the Publication Decision from going into effect. The standard for obtaining a Section 705 stay is the same as that for obtaining a preliminary injunction. *See Cuomo*, 772 F.2d at 974 (citing *Holiday Tours, Inc.*, 559 F.2d at 843). The two forms of relief, however, are materially distinct: while an injunction "directs the conduct of a party" before the court, a stay "operates on the legal status of the challenged agency action," suspending its force rather than ordering any party to act or abstain from acting. *Mullin*, 179 F.4th at 31 (quoting *Nken*, 556 U.S. at 428); *see also Coal. for Indep. Tech. Rsch.*, 836 F. Supp. 3d at 232. Effectively, a Section 705 stay is to vacatur what a preliminary injunction is to a permanent injunction. *Mullin*, 179 F.4th at 32 (footnote omitted). And contrary to the Department's arguments, *see* Opp'n at 18–20, Section 705 stays and vacatur of agency action are frequent remedies in this Circuit, *see Neguse v. U.S. Immigr. & Customs Enf't*, 813 F. Supp. 3d 45, 100 (D.D.C. 2025) (collecting cases).

Because AAU has demonstrated that it is likely to succeed on the merits, that it is likely to face irreparable harm in the absence of judicial intervention, and that the equities and public interest favor its position, it has satisfied the standard for issuance of a preliminary injunction. *See supra* Part III.A. Accordingly, it has also met the test for obtaining a Section 705 stay.

## IV. CONCLUSION

For the foregoing reasons, AAU's Motions for a Preliminary Injunction and Stay of Agency Action will be GRANTED. ECF No. 2. A separate Order accompanies this Memorandum Opinion.

Date: November 13, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge